Adam M. Apton
LEVI & KORSINSKY, LLP
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RONDOLPH HO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ROCKET PHARMACEUTICALS, INC. and GAURAV SHAH,<br><br>Defendants. | Case No. 3:25-cv-10049<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Rondolph Ho ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Rocket Pharmaceuticals, Inc. ("Rocket" or the

"Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Rocket's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Rocket securities between February 27, 2025, to May 26, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.     Defendants provided investors with material information concerning Rocket's Phase 2 pivotal trial of RP-A501 for the treatment of Danon disease. Defendants' statements included, among other things, confidence in the drug's safety and efficacy, as well as the clinical trial's detailed protocol and Rocket's purported ability to meet the trial's endpoints as per the Company's ascribed timeline.

3.    Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of RP-A501's safety and clinical trial protocol; notably, that Rocket knew Serious Adverse Events (SAEs), including death of participants enrolled in the study, were a risk. In particular, Rocket amended the trial's protocol to introduce a novel immunomodulatory agent to the pretreatment regimen without providing this critical update to shareholders. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Rocket's securities at artificially inflated prices.

4.    The truth emerged on May 27, 2025, when Rocket announced that the FDA placed a clinical hold on the RP-A501 Phase 2 pivotal study after at least one patient suffered a Serious Adverse Event (SAE), ultimately, death, while enrolled in the study following a substantive amendment to the protocol that the Company failed to disclose to investors at the time management made the revision. In fact, Rocket stated that, while the patient was dosed in May, the decision to amend the protocol was made "several months" earlier. Despite this, Rocket made no attempt to alert investors or the public to the change until after the SAE occurred.

5.    Investors and analysts reacted immediately to Rocket's revelation. The price of Rocket's common stock declined dramatically. From a closing market price

of $6.27 per share on May 23, 2025, Rocket's stock price fell to $2.33 per share on May 27, 2025, a decline of about 37% in the span of just a single trading day.

## JURISDICTION AND VENUE

6.     Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Rocket is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.    Plaintiff purchased Rocket common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Rocket is attached hereto.

12.    Rocket Pharmaceuticals, Inc. is a Delaware corporation with its principal executive offices located at 9 Cedarbrook Drive, Cranbury, NJ 08512. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "RCKT."

13.    Defendant Gaurav Shah ("Shah") was, at all relevant times, the Co-Founder, Board Member, and Chief Executive Officer of Rocket.

14.    Defendant Shah is sometimes referred to herein as the "Individual Defendant." Rocket together with the Individual Defendant are referred to herein as the "Defendants."

15.    The Individual Defendant, because of his position with the Company, possessed the power and authority to control the contents of Rocket's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and

opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendant knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendant is liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendant.

16.    Rocket is liable for the acts of the Individual Defendant, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

17.    The scienter of the Individual Defendant, and other employees and agents of the Company are similarly imputed to Rocket under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

18.    Rocket is a fully integrated, late-stage biotechnology company focused on the development of gene therapies, with direct on-target mechanism of action and clear clinical endpoints, for rare and devastating diseases.

6

***The Defendants Materially Misled Investors Concerning***

***The Safety of Rocket's RP-A501 Investigational Gene Therapy***

<u>*February 27, 2025*</u>

19.    On February 27, 2025, Rocket published fourth quarter and full year 2024 financial results and highlights regarding RP-A501, in relevant part:

> Dosing in the Phase 2 pivotal study of RP-A501 for Danon disease is ongoing.
> - Details of the Phase 2 pivotal study can be found at www.ClinicalTrials.gov under NCT identifier NCT06092034.
> - Program update anticipated in the first half of 2025.

20.    Also as part of the press release, CEO Shah stated, in pertinent part:

> In 2024, we made strong progress in advancing our gene therapy pipeline, underscored by the *New England Journal of Medicine* publication of the Phase 1 study of RP-A501 for Danon disease and long-term data presented at AHA showing its safety and meaningful efficacy up to five years. Our momentum continues as we progress with the Phase 2 pivotal trial of RP-A501 and the Phase 1 trial of RP-A601 for PKP2-ACM, and we remain on track to submit the IND for BAG3-DCM in the first half of 2025. Looking ahead to 2025, we will maintain our focus and resources on advancing our AAV cardiovascular programs while seeking to realize value in our full pipeline in a thoughtful manner, so we deliver the greatest value to our patients and shareholders.

<u>*May 8, 2025*</u>

21.    On May 8, 2025, Rocket published first quarter 2025 financial results and highlights regarding RP-A501, in relevant part:

> Phase 2 pivotal study of RP-A501 for Danon disease is ongoing.

- Program update anticipated in mid-year 2025 and a clinical data readout expected in mid-year 2026. Details of the Phase 2 pivotal study can be found at www.ClinicalTrials.gov under NCT identifier NCT06092034.
- In March, the largest longitudinal natural history study of Danon disease to date was published in the Journal of the American Heart Association (JAHA), revealing key insights into the distinct cardiac patterns of Danon disease patients, showing earlier, more Serious heart issues in male patients, while also noting that many females develop progressive cardiomyopathy and heart failure in adolescence or early adulthood.

22.    The above statements in Paragraphs 19 to 21 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to Rocket's projected timeline for the Company's RP-A501 Phase 2 pivotal trial to meet its required endpoints, as well as the safety of the drug and the trial as amended. In truth, Rocket's optimistic reports pertaining to the trial's ascribed timeline and safety profile fell short of the reality; ultimately, at least one patient enrolled in the study suffered from a Serious Adverse Event (SAE) and died, following Rocket's veiled amendment to the trial's protocol which introduced a novel immunomodulatory agent, a C3 inhibitor, to the pretreatment regimen, which halted enrollment and caused the trial to be place on hold by the FDA.

***The Truth Emerges***

<u>*May 27, 2025*</u>

23.    On May 27, 2025, Rocket published a press release providing an update on the Company's Phase 2 Clinical Trial of RP-A501 for Danon Disease, including that a patient enrolled in the trial experienced an unexpected Serious Adverse Event (SAE). The press release stated, in relevant part:

> ***A patient participating in the Phase 2 pivotal trial of RP-A501 experienced an unexpected Serious Adverse Event (SAE).*** The SAE involved clinical complications related to a capillary leak syndrome. ***Rocket is conducting a comprehensive root cause analysis and remains in active dialogue with the U.S. Food and Drug Administration (FDA) and other key stakeholders, with the current focus being on the recent introduction of a novel immune suppression agent to the pre-treatment regimen that had been implemented to mitigate complement activation observed in some patients.*** This novel agent was specific to the AAV9-Danon program. ***Upon learning of the initial event, Rocket voluntarily paused further dosing in the study. On May 23, 2025, the FDA placed a clinical hold on the trial to allow for further evaluation. Rocket is deeply saddened to report that this patient has since passed away after an acute systemic infection.***
>
> Rocket is working with the FDA, the Independent Data Safety Monitoring Committee, clinical investigators, and scientific experts, and is committed to ensuring the safety of all study patients while resuming the trial as expeditiously as possible. ***While the clinical hold remains in place, the company is unable to provide guidance on the anticipated timing for completion of the Phase 2 trial.***

(Emphasis added).

24.    Also as part of the press release, CEO Shah issued a statement, in pertinent part:

> We are heartbroken by this loss and are fully committed to our mission to develop gene therapies that address the underlying cause of devastating diseases like Danon. We are immensely grateful for the patients and families who participate in this important research.

25. The same day, Rocket hosted a special call to detail the RP-A501 updates, including the Serious Adverse Event (SAE) that occurred during the Phase 2 trial. CEO Shah stated, in pertinent part:

> A patient enrolled in our Phase II pivotal trial experienced an unexpected serious adverse event and clinical complications related to capillary leak syndrome. Rocket is conducting a comprehensive root cause analysis and remains in active dialogue with the FDA and other key stakeholders with the current focus being on the recent introduction of a novel immune suppression agent to the pretreatment regimen that has been implemented to mitigate complement activation.

> Now this novel agent was specific to the Danon program and not for PKP2, BAG3 or other programs. Following this initial SAE, Rocket proactively and voluntarily paused further dosing in the study out of an abundance of caution. We immediately notified the U.S. FDA, and the FDA on May 23 placed the trial on clinical hold to allow for additional evaluation. *Subsequently, the patient experienced additional medical and procedural complications during his hospital course and unfortunately passed away after a systemic infection.*

> First and foremost, our thoughts are with the patient's family, caregivers and the treating clinical team. This is a deeply tragic loss, and we are committed to fully understanding their circumstances surrounding it objectively and neutrally. We are also immensely grateful to the family for their contribution to this important clinical research and their commitment to helping advance science for the broader Danon community.

> *Now as was shared in our press release and just now, there is an ongoing and objective review to assess the root cause of the initial SAE. And as I mentioned, an area of focus is a recent protocol amendment that introduced a novel immunomodulatory agent to the pretreatment regimen. This change was implemented proactively to further*

10

*enhance patient safety and was informed by the occurrence of com-plement activation earlier.*

*Rocket is carefully evaluating whether a mechanism related to the new agent may have influenced immune responses in an unexpected or paradoxical way. Again, this agent is specific to the Danon pro-gram and has not been used in PKP2, BAG3 or other programs. Also, these programs are not impacted by this clinical hold. We're working now with sites, external scientific experts and the FDA. And while the clinical hold remains in place, we're unable to provide guidance on the exact timing of completion of the Phase II trial.*

[Emphasis added].

26.    As part of the special call, Rocket hosted a question-and-answer

segment, wherein the Company's management responded to questions from analysts,

in relevant part:

<Q: Joshua Elliott Schimmer - Cantor Fitzgerald & Co – Analyst> Condolences to the family of the patient. I guess are you able to provide any additional details around this event in terms of when it occurred, number one, what the specific immune or novel agent was that -- was added? I guess this is incremental to the steroid, sirolimus and rituximab.

And then are you able to provide any comments in terms of the number of patients treated in the program to date? And if the answer to any of those is no, when might we expect to hear?

<A: CEO Shah> *Yes. So the patient was treated in early May. And the agent that was used was the C3 inhibitor, and it was introduced into this trial because there was ongoing evidence of complement activation in Danon disease. And we aim to try to completely eliminate any TMA risk altogether.* So at that time, this particular agent was coming into the market and also we had some experience in pediatric patients. So the timing was right to try to eradicate the risk of TMA

altogether, not just for Danon, but potentially as a read-through to other AAV programs across our portfolio and others. So it was with that in mind that we introduced this novel agent.

Now I will say that we are considering that as one option, one thought, one idea for root cause. We're doing a comprehensive root cause analysis pretty neutral and objectively, and this is one idea. It's the current focus, just one idea. And in terms of the number of patients, we're not quite ready to comment on that, but as the protocol, it goes through the FDA, and we have discussions with them to resolve the hold, we'll be able to provide further guidance.

*    *    *

<Q: Mani Foroohar - Leerink Partners LLC – Analyst> I would add my condolences to the family of this patient. I want to follow up a little bit on Josh's question, which seem to be the most important. Can you give us a sense of when the decision was made to add this C3 inhibitor potentially to the protocol? Was this the only patient to receive this agent? And then I have a quick follow-up.

<A: CEO Shah> Yes. ***So the decision was made earlier several months ago to add this. And the -- there was one more additional patient who did receive this agent as well after this patient that we're talking about. And the second patient has had a much reduced course, has had evidence of capillary but has had a reduced course. What we were able to do here is learn from the first case and intervene so that we didn't see the same events happening in the second patient. So there are 2 cases like this now. And I will say that both of these cases are cases where this -- the only difference really was the introduction of this agent. So that's why that's one hypothesis that we're working with.***

<Q: Mani Foroohar> Okay. And when you talk -- so is the right interpretation of that, that you had some number of patients, at least these 2, who have had capillary leak syndrome after dosing with the AAV, after receiving the other 3 agents and the immunomodulatory regimen that Josh [ helpfully listed ]. And then after that, at some point, they had capillary leak syndrome and then this novel agent was given, and then they had an acute infection? Or did the acute infection come

12

prior to the CPS and the novel agent was given after? Could you clarify the order of events there?

<A: CEO Shah> Sure. So yes, let's walk through the time line here in some granularity. ***So these are the only 2 patients that have seen what we're calling a capillary leak syndrome, the ones that we're talking about here. Now this agent is given before the infusion. It's given a few doses after infusion as well. And it's given in conjunction with the other standard immunomodulatory regimen, including rituximab, sirolimus and steroids with hopefully rapid taper. So all of that is given together. And it was a full package that was intended to eradicate complement activation as well as any later T cell responses to really focus on the safety profile of these patients in the days and weeks after therapy.*** Safety is, of course, our first priority here while we develop a full benefit-risk profile.

So in terms of the occurrence of the medical events, about -- so we did not see TMA. We did not see other gene therapy effects like myocarditis. ***About a week after the infusion, that's when we started seeing some evidence of capillary leak.*** There were other medical complications and procedural complications in the week or so afterwards. And actually the patient was, at that time, stable and doing potentially well enough that we were cautiously optimistic of recovery. And the capillary leak was improving. Unfortunately, over the weekend, over this past weekend, he developed an acute systemic infection that accelerated his demise. That's the full sequence of events. And the clinical hold was placed on Friday -- the clinical hold was placed Friday just before this demise. So all of these -- the most severe events unfolded literally in the last 3 or 4 days.

*        *        *

<Q: Avraham Leib Novick - Morgan Stanley – Research Associate> It's Avi Novick on the line for Mike. I guess are there any patients that have been enrolled in the study that have still not been infused with RP-A501? And I guess just as a quick follow-up, were there any previously dosed patients who have had complement-mediated adverse events?

13

<A: CEO Shah> Yes. So there are patients who are still waiting to be treated. Our plan and the time line was such that we would have finished the treatment of these patients by midyear, which is when we were going to have the program update as we've guided to previously. So there were more patients left to be treated, all ready to go and were lined up to be treated shortly. Unfortunately, we had the setback that we're talking about today. So that's going to be paused.

***Earlier in the trial, we did see complement activation and TMA. It was a gene therapy-associated effect that's part of trial safety benefit that we usually read out at the end of the trial. And those patients are actually now doing well from a safety and potentially even an efficacy viewpoint. But because it was part of routine explained side effects of gene therapy, we continue with the program. There was no clinical hold, and we modified the protocol in the way that I described earlier, to continue to further mitigate the risk.***

\*     \*     \*

<Q: Tyler Martin Van Buren - TD Cowen – Analyst> Since you discussed that this agent was introduced to reduce the incidence of TMAs, can you give more color on the incidence of TMAs that have been observed to date? Or any additional color on what you've seen so far in the trial?

<A: CEO Shah> Yes. So there was an initial episode of TMA that was linked to a gene mutation, an additional gene mutation that confers complement sensitivity in some patients. We modified the protocol with the 14 panel test to reduce the -- or to eliminate those patients from enrolling who would have those sorts of gene mutations that exacerbate complement.

***There was another one that persisted. There was another TMA that we saw also. And TMA is a known risk of this therapy. We don't think that the risk is ever going to be zero. But in order to try to make it as close to zero as possible, we introduced this new inhibitor, and we're going to evaluate what finally happened here.***

14

And I should also say that those patients who did have those early complement activations have completely recovered from the sequelae and are doing well right now.

*    *    *

<Q: Thibaut R. Pardo-García - LifeSci Capital, LLC, – Research Associate> This is Thibaut Pardo for Cory Jubinville. My condolences to the family of the patient. So we have -- we had up to 5 years of AEs data that were going pretty well. So this Phase I program, we had everything pretty controlled with -- once the update to include rituximab, sirolimus and prednisone combo. Why take that risk of introducing a novel agent?

<A: CEO Shah> We always aim to provide the optimal experience for patients and really lean in on the benefit risk. And although at the time, we didn't know how rapidly these complement issues would and could resolve. So we worked with an abundance of caution putting patient safety first to make sure that other patients didn't necessarily have those experiences. Now since then, those patients, as I mentioned, have recovered fully from the complement activation issues. And I think that -- so we were trying to be extra careful with safety and trying to eliminate all risk altogether.

*    *    *

<Q: Gil Joseph Blum - Needham & Company, LLC, Research –Analyst> And allow me to add my condolences. So just to be perfectly, perfectly clear, the only event of capillary leak syndrome that we're seeing were only when this agent was used? There was no evidence in any of the other patients?

<A: CEO Shah> That's correct.

[Emphasis added].

15

27.    The aforementioned press releases and statements made by Defendants contradicted their earlier statements, wherein the Company portrayed an understanding of the safety issues surrounding its investigational gene therapy, RP-A501, including Serious Adverse Events (SAEs). Furthermore, Rocket provided investors with positive statements relating to the safety and efficacy of the drug as well as the timeline pertaining to the RP-A501 Phase 2 pivotal trial, which is in direct contrast to the statements made during the alleged corrective event. Defendants knew or should have known that RP-A501's success would be impacted by SAEs when the Company amended the trial's protocol to introduce a C3 inhibitor for two patients enrolled in the trial. In fact, rather than properly amending the clinical trial protocol, Rocket quietly introduced a novel immune suppression agent to mitigate complement activation putting the patients receiving this additional agent at risk of suffering from a Serious Adverse Event (SAE).

28.    Investors and analysts reacted immediately to Rocket's revelation. The price of Rocket's common stock declined dramatically. From a closing market price of $6.27 per share on May 23, 2025, Rocket's stock price fell to $2.33 per share on May 27, 2025, a decline of about 37% in the span of just a single trading day.

29.    A number of well-known analysts who had been following Rocket quickly reacted to Rocket's news. For example, J.P. Morgan published a report titled

"Clinical Hold a Major Setback for Danon Pivotal and Shares" and concluded, in

relevant part:

> ***In our view, this morning's announcement of a patient death in the pivotal phase 2 study of RP-A501 for Danon Disease and subsequent FDA placed clinical hold represents a major, perhaps insurmountable, setback for the program.*** With the Danon program being the primary focus for the Street, and little value being ascribed to the company's remaining pipeline, the pre-market reaction (shares down ~66% vs XBI up 1%) strikes us as appropriate. For reference, cash at the end of 1Q25 was ~$3/share while our model forecasts a year end pro-forma ~$2/share. While the company will seek to work with the FDA to understand what drove the patient's capillary leak syndrome (initially thought to be due to the novel immune pre-conditioning agent), we see a real possibility that the event changes the risk/ benefit dynamic for A501 such that the bar for registration is more conservative than the current pivotal design presently supports. While we expect better visibility on the path forward on the upcoming call at 8:30, we wouldn't be surprised by shares continuing to be under pressure at least through resolution of the clinical hold.

[Emphasis added].

30.    Similarly, Cantor decreased its price target for Rocket following the

SAE news from $30 to $10, citing the Company's major setback. Cantor's report

stated, in pertinent part:

> This morning, RCKT announced a clinical hold on RP-A501, AAV9 gene therapy for Danon's Syndrome after a patient died from capillary leak syndrome + complications.
>
> ● RCKT had just introduced an FDA approved C3 inhibitor (so likely Empaveli) as part of the complement activation prophylactic regimen.
>
> ● The first 2 patients treated with this added prophylactic therapy developed capillary leak syndrome - manifesting as extreme

hypotension, peripheral and pulmonary edema without cardiac dysfunction.

● One of the two subsequently died from a super-infection, leading to a pause in enrollment and the trial being placed on hold.

● As such, it seems fairly clear that capillary leak syndrome in this context is a result of the interaction of the C3 inhibition + the underlying disease + the AAV vector and is unlikely to be an issue without the same C3 inhibitor exposure.

TMA had already been described with this program, leading to a prophylactic regimen (rituximab, sirolimus and steroids, with eculizumab as needed) to reduce complement activation.

● RCKT continued to see TMA events. One appears attributed to a rare complement mutation that is now being screened to exclude patients. Another appeared to have an alternate complement pathway component that led to the addition of C3 inhibition.

31.     The fact that these analysts, and others, discussed Rocket's shortfall and the severe impact of the clinical hold placed by the FDA on the RP-A501 Phase 2 trial suggests the public placed significant weight on Rocket's statements of prior confidence in the RP-A501 investigational gene therapy and Phase 2 pivotal trial. The frequent, in-depth discussion of Rocket's RP-A501 investigational gene therapy and Phase 2 pivotal trial for Danon disease confirms that Defendants' statements during the Class Period were material.

### *Loss Causation and Economic Loss*

32.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Rocket's common stock and operated as a fraud or deceit on Class Period purchasers of Rocket's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Rocket's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Rocket's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

33.     Rocket's stock price fell in response to the corrective event on May 27, 2025, as alleged supra. On May 27, 2025, Defendants disclosed additional information that was directly related to their prior misrepresentations and material omissions concerning Rocket's RP-A501 investigational gene therapy and Phase 2 trial.

34.     In particular, on May 27, 2025, Rocket announced that the FDA placed a clinical hold on the RP-A501 Phase 2 pivotal trial to allow for further evaluation following the Company's announcement of a Severe Adverse Event (SAE), noting that a patient died following an acute systemic infection.

### *Presumption of Reliance; Fraud-On-The-Market*

35.    At all relevant times, the market for Rocket's common stock was an efficient market for the following reasons, among others:

(a)    Rocket's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)    Rocket communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Rocket was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Rocket was reflected in and incorporated into the Company's stock price during the Class Period.

36.    As a result of the foregoing, the market for Rocket's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Rocket's stock price. Under these

circumstances, all purchasers of Rocket's common stock during the Class Period suffered similar injury through their purchase of Rocket's common stock at artificially inflated prices, and a presumption of reliance applies.

37. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

38. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with positive expectations and timeline projections for RP-A501 while at the same time failing to properly account for Serious Adverse Events (SAE) and the impact that they would have on safety and ascribed timelines. Defendants provided the public with safety information and timelines that failed to account for potential SAEs that they knew or should have known about during the Phase 2 trial.

39.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

40.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Rocket who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

41.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who

purchased or otherwise acquired Rocket's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

42.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Rocket's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Rocket or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of May 2, 2025, there were approximately 107.7 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

43.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

44.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

45.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Rocket;

(c)    whether the Individual Defendant caused Rocket to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)      whether the prices of Rocket's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

46.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

47.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

49.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Rocket common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Rocket's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

50.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Rocket's securities. Such reports, filings, releases and statements were materially false and

misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

51.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

52.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendant had knowledge of the details of Rocket's internal affairs.

53.    The Individual Defendant is liable both directly and indirectly for the wrongs complained of herein. Because of his position of control and authority, the Individual Defendant was able to and did, directly or indirectly, control the content of the statements of the Company. As an officer and/or director of a publicly-held

company, the Individual Defendant had a duty to disseminate timely, accurate, and truthful information with respect to Rocket's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Rocket's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Rocket's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

54.    During the Class Period, Rocket's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Rocket's common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases

and/or acquisitions by Plaintiff and the Class, the true value of Rocket's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Rocket's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

55.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

56.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendant*

### *for Violations of Section 20(a) of the Exchange Act*

57.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

58.    During the Class Period, the Individual Defendant participated in the operation and management of the Company, and conducted and participated, directly

and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Rocket's misstatements.

59.    As officers and/or directors of a publicly owned company, the Individual Defendant had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Rocket which had become materially false or misleading.

60.    Because of their positions of control and authority as senior officers, the Individual Defendant was able to, and did, control the contents of the various reports, press releases and public filings which Rocket disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendant exercised his power and authority to cause Rocket to engage in the wrongful acts complained of herein. The Individual Defendant, therefore, was a "controlling person" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Rocket's common stock.

61.    The Individual Defendant, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendant had the power to direct the actions

30

of, and exercised the same to cause Rocket to engage in the unlawful acts and conduct complained of herein. The Individual Defendant exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

62.    By reason of the above conduct, the Individual Defendant and/or Rocket are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated: June 11, 2025

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*
Adam M. Apton
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*