Brian Calandra
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, NY  10016
Telephone:  (212) 661-1100
Fax:  (917) 463-1044
bcalandra@pomlaw.com

*Co-Lead Counsel for Co-Lead Plaintiff
Dimitar Yankov, and the Proposed
Class*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE ROCKET PHARMACEUTICALS, INC. SECURITIES LITIGATION | Case No. 3:25-cv-10049-ZNQ-TJB |
| THIS DOCUMENT RELATES TO: | CLASS ACTION |
| ALL ACTIONS | CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |

TABLE OF CONTENTS

I.  NATURE OF ACTION .................................................................. 4

II.  JURISDICTION AND VENUE ..................................................... 13

III.  PARTIES .................................................................................... 14

IV.  CONFIDENTIAL WITNESSES .................................................. 15

V.  SUBSTANTIVE ALLEGATIONS ............................................... 16

    A.  Rocket's Business And Operations ..................................... 16

        1.  *Rocket Is A Pre-Revenue, Clinical Stage Company* ................. 16

        2.  *Rocket's RP-A501 Danon Disease Phase 1 Clinical Trial* ....... 18

        3.  *Rocket's A501 Danon Disease Phase 2 Clinical Trial* ............ 20

    B.  Material Undisclosed Negative Facts Concealed From Investors .......... 21

        1.  *Material Undisclosed Facts Later Admitted By Defendants* .... 22

        2.  *Material Undisclosed Facts Described By The CWs* .............. 26

    C.  Materially False Or Misleading Statements And Omissions ................. 29

    D.  The Truth Begins To Emerge ................................................. 52

    E.  Additional Facts Probative Of Scienter ................................. 59

        1.  *The Individual Defendants Were Financially Motivated To Commit Fraud* .......................................................... 60

        2.  *Rocket Raised Funds During The Class Period* ...................... 61

        3.  *Defendants' Knowledge Or Reckless Disregard Of Red Flags Demonstrates Scienter* .......................................... 62

        4.  *The Fraud Implicated Core Operations* ................................. 65

        5.  *The Individual Defendants Signed, Were Quoted In, Or SOX-Certified The Alleged Misstatements* ......................................... 66

2

      6.    *Insider Resignations And Suspicious Employment Status Changes Support Scienter* ........................................................ 67

      7.    *The Fraud Violated Rocket's Corporate Code Of Conduct And Insider Trading Policy* ............................................. 68

VI.    NO SAFE HARBOR ........................................................ 70

VII.   LOSS CAUSATION / ECONOMIC LOSS ................................. 71

VIII.  PRESUMPTION OF RELIANCE ........................................ 73

IX.    LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS ......................... 74

X.     CLAIMS FOR RELIEF .................................................... 77

FIRST CLAIM ........................................................................ 77

SECOND CLAIM .................................................................... 81

XI.    PRAYER FOR RELIEF .................................................. 83

XII.   DEMAND FOR JURY TRIAL .......................................... 84

1.     Lead Plaintiffs Dimitar Yankov and Corey Sipmann ("Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by Lead Plaintiffs' undersigned attorneys, for Lead Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiffs' attorneys, which included, *inter alia*, interviews with certain witnesses as discussed herein and review of Defendants' public statements and publicly available documents, presentations, and announcements; U.S. Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding Rocket Pharmaceuticals, Inc. ("Rocket"); analysts' reports and advisories and other press coverage about Rocket; Rocket's stock chart, Rocket's corporate website; U.S. government websites; data from news services such as Bloomberg and Yahoo! Finance; and information obtainable on the Internet.  Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF ACTION

2.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants and other excluded parties (identified below) who purchased or otherwise acquired the securities of Rocket (NASDAQ: RCKT)

during the Class Period of February 28, 2024 through August 25, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the U.S. federal securities laws and to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against Defendants Rocket, Dr. Gaurav Shah (its CEO), and Aaron Ondrey (its CFO).

3.    This lawsuit arises from Defendants' public statements and omissions concerning Rocket's 12-patient Phase 2 clinical trial ("Phase 2 Trial") of its gene therapy drug candidate for the treatment of Danon Disease, called "RP-A501" (a/k/a "A501"), which was one of Rocket's top two leading drug candidates, and the one with the highest economic upside if approved.  The fraud allegedly inflated Rocket's stock price during the Class Period, until it was incrementally revealed, removing the inflation and causing Lead Plaintiffs and the Class members damages.

4.    Before the Class Period, Rocket had conducted a seven-patient Phase 1 trial of A501, during which one dosed patient experienced a serious adverse event ("SAE") involving a serious health risk called thrombotic microangiopathy ("TMA") and was unable to complete the trial, reducing its patient count to six when the trial was finally completed following a clinical hold imposed by the U.S. Food and Drug Administration ("FDA").  Thus, entering the Class Period, investors looked to Defendants for accurate, fulsome disclosures regarding the safety

5

protocols implemented to prevent SAEs in the Phase 2 Trial, whether those protocols had been effective, and the Phase 2 Trial's progress in dosing patients without incidence of SAEs or SAE-related delays.

5.      However, unbeknownst to investors, the Phase 2 Trial was beset with SAEs, impacting four out of first six patients, one of whom died.  Dosed before the Class Period began in early 2024, the very Phase 2 Trial participant, a pediatric patient from Chicago, suffered a TMA-related SAE, which caused a multi-month hospitalization in Philadelphia for an acute kidney injury.  Rocket immediately halted further dosing, flew senior personnel to meet with his doctors, and initiated a root cause analysis.  After Defendants convinced the FDA that the first patient had a genetic mutation predisposing him to an SAE, the Phase 2 Trial resumed, but shortly thereafter, the fourth dosed patient had an SAE in August 2024, again requiring an extensive hospitalization due to kidney injury, this time related to the trial's complement activation suppression regimen, which Defendants deployed in an attempt to manage A501's TMA risk.  While that patient eventually received the A501 dose after recovering, no further patients were dosed from that point until May 2025.  In the interim, Defendants had decided by January 2025 to introduce a C3 inhibitor as an alternative way to suppress complement activation, at which point they engaged with FDA to gain approval for a trial redesign.  In May 2025, Defendants dosed two patients, both of whom promptly suffered SAEs related to

capillary leak syndrome ("CLS") causing them to remain hospitalized while doctor tried to stabilize them.  The FDA imposed a clinical hold on May 23, 2025, days before one of the two patients died.

6.     Each of these SAEs was required by governing regulations to be disclosed immediately to Rocket.  Yet, Defendants concealed from investors all these material, adverse facts, which were established by Defendants' later admissions and by the confidential witnesses statements of several former Rocket employees pled herein – until a dosed Phase 2 Trial patient died.  They further concealed from investors, all the way into August 2025, that Rocket lacked any viable trial design during the Class Period that could safely and effectively dose patients with A501 while managing the trial's SAE risks, arising from A501 complement activation and/or from the very suppression regimens Defendants attempted.  Despite their non-admission, this fact was betrayed by the steady stream of senior personnel resignations, including Defendant  Ondrey.

7.     Instead, throughout the Class Period, Defendants made a steady stream of materially false and misleading statements and omissions, misleading the market about the existence and severity of the Phase 2 Trial's SAE risks, including the risk of TMA for RP-A501, and Rocket's ability to safely control the SAE risk and timely complete the Phase 2 Trial.

8.     The Class Period starts on February 27, 2024, when Rocket's 10-K for the year ending December 31, 2023, described purported safety measures taken in Rocket's Phase 2 Trial, stating:

> Based on the initial efficacy observed in the low dose cohort and ***to mitigate complement-mediated safety concerns observed in the high dose cohort (thrombotic microangiopathy ("TMA"))*** and in agreement with the FDA, ***we are focusing on the low dose (6.7e13 gc/kg) and we will no longer administer doses of 1.1e14 gc/kg or higher in this trial***. ***Additional safety measures have been implemented and are reflected in the updated trial protocol***.  These measures include exclusion of patients with end-stage heart failure, and a refined immunomodulatory regimen involving transient B- and T-cell mediated inhibition, ***with emphasis on preventing complement activation***, while also enabling lower steroid doses and earlier steroid taper, with all immunosuppressive therapy discontinued 2-3 months following administration of RP-A501.

Defendants repeated the above language, virtually unchanged, in ***every*** quarterly filing until the end of the Class Period, making no material changes to it as all of the adverse undisclosed facts arose one after another.

9.     Defendants also specifically discussed the first two Phase 2 Trial dosed patients, referred to as their two patient safety run-in, without speaking the full truth and disclosing that the ***first one*** had experienced an SAE related to TMA, leaving him hospitalized out of state for months, forcing Rocket to pause dosing for months to permit a root cause analysis and consultation with FDA before dosing could resume.  Such statements included, *inter alia*, "And then ***we had a two-patient run-in, right, and the patients had to be staggered too.  And then after the second***

*patient, there's another follow-up period,*" "***The pediatric run-in enrolled two patients in a sequential manner with a minimum three-month follow-up prior to subsequent enrollment***," and "***Before the post-pediatric follow-ups, so two patients were treated earlier, followed for a certain time, discussed with FDA and IDMC, and then we started the broader trial really from July to September***." These misstatements even miscast the nature of Defendants' discussions with FDA, creating the false and misleading impression that they were routine and not the result of a TMA-related SAE, dosing halt, root cause analysis, and discussions over whether the trial would be permitted to resume.

10.    Defendants also repeatedly chose to tout Rocket's progress in dosing Phase 2 Trial patients, without disclosing that one of the first two dosed patients and two of the first four dosed patients experienced TMA-related SAEs. Defendants also concealed that the TMA risk was both higher and more severe than previously observed for RP-A501, that Rocket had no safe plan to address the risk, and that the first two SAEs prompted a total dosing halt while Defendants decide upon the institution of a C3 inhibitor and sought FDA approval to redesign the trial to use it. Defendants touted progress, but repeatedly left out necessary context, *e.g.*, stating over time "***we're really more focused on*** enrollment, ***treatment and execution***" on May 16, 2024, "***dosing [is] ongoing in the Phase 2 pivotal study of RP-A501 for Danon disease***" on November 7, 2024, "***we're in the process of dosing, and we are***

*dosing patients*" on November 12, 2024, "*We're finishing dosing as fast as possible*" on January 13, 2025, "*dosing and follow-up are ongoing*" on February 27, 2025, and "*the trial and follow-up are ongoing*" on May 8, 2025.

11.     Defendants also attributed delays in the Phase 2 Trial to other, more benign causes, omitting the true, adverse reasons. For instance, they said "So *it just takes time to get there*. And then there is – *after the two patient run and the trial is designed so that everyone else can be treated without staggering,*" on September 5, 2024. They said, "*Before the post-pediatric follow-ups, so two patients were treated earlier, followed for a certain time, discussed with FDA and IDMC, and then we started the broader trial really from July to September.* So enrollment would have been done then. And so *there's getting everyone dosed just takes some time*," on November 12, 2024. On November 18, 2024, they said, "In terms of what's gating for the dosing, it's -- there's -- *these patients need to come in, get three months of troponin at baseline*, they need to get cardiac biopsies and other things to be fully eligible. *So all of that is going on, and we're dosing patients as rapidly as possible now*." They claimed, "I do want to just answer the why is there a difference question. *After enrollment, patients still have to undergo screening of other labs like troponin mandated by the FDA because it is a key secondary endpoint. And also, this is a -- in some ways, a heavy protocol. We're looking at a lot of different measures. So, it just takes time to get all of those up and running*.

*So, that's why the enrollment is different from the actual dosing*," on December 3, 2024.  On April 8, 2025, well after the decision to redesign the trial protocol to implement the C3 inhibitor and on the cusp of doing so, they said, "*the enrollment to treatment time is, unfortunately, a little bit cumbersome. . . . Number one, these patients require immunomodulation.  So, that takes time to set up and source appropriately.  Number two, there's some vaccines involved in immunomodulation, which also takes time. . . . So, all this, along with the holidays, has added the time up, which I understand is not ideal, but it is getting done*."

12.    Rocket was forced to disclose the prior SAEs and many of the concealed negative Phase 2 Trial facts outlined above on May 27, 2025, after the two patients dosed in May 2025 both of experienced CLS-related SAEs after receiving the C3 inhibitor and A501, the FDA imposed a clinical hold on the Phase 2 Trial on May 23, 2025, and one of the two patients died after suffering sepsis. Defendants disclosed these facts and that Rocket had decided to add the C3 inhibitor "several months ago," after two previously undisclosed incidents of TMA.  These disclosures prompted negative analyst reactions, and Rocket's stock price fell $3.94 per share or -62.84% in a single day.

13.    However, after the May 27, 2025 disclosure, Defendants maintained that the Phase 2 Trial had a path forward, with multiple options available to finally safely balance the need to inject a clinically sufficient A501 dose with the need to

manage the risks of SAEs, including those arising from TMA, related to A501 itself and/or the complement activation suppression regimen.  Yet, even after the FDA lifted the clinical hold and authorized Rocket to resume the Phase 2 Trial by dosing the remaining six participants, the uncontrollable SAE risk remained and the fraud was further revealed when, months later, the trial had still not resumed dosing and, instead, senior company personnel hit the exits.  The high-level resignations included, Rocket's longtime President and Chief Operating Officer, Dr. Kinnari Patel, who was instrumental in developing and advancing RP-A501, and Rocket's Chief Financial Officer, Defendant Aaron Ondrey.  Rocket's stock price fell $0.23 per share, or -7.44%, on news of Dr. Patel's resignation and $0.15 per share, or -4.24%, on news of Defendant Ondrey's resignation.

14.    While the fraud was ongoing, Defendants reaped ill-gotten gains from sales of Rocket stock at fraud-inflated prices.  Rocket raised $182.5 million by selling 15.2 million shares and closing a private placement of pre-funded warrants to purchase 400,000 shares on December 12, 2024, during the lengthy halt in Phase 2 Trial dosing following two TMA-related SAEs earlier in 2024 and just before Defendants reached their decision to implement the novel C3 inhibitor.  In addition, Defendant Shah netted $769,402.18 and Defendant Ondrey netted $43,903.48 from stock sales that were suspicious in amount, compared to their salaries, and in timing, compared against the alleged misstatements, corrective disclosures, and other key

events.   In the context of Defendants' knowledge or reckless disregard of the undisclosed, adverse negative facts outlined above, these motive allegations and other facts add to the strong inference of Defendants' scienter.

15.    Lead Plaintiffs and the other Class members suffered losses as a result of the fraud alleged herein, which this lawsuit seeks to recover.

16.    Relevant facts continue to develop regarding the long-paused A501 Phase 2 Trial, and more would be revealed through discovery.

## II.    JURISDICTION AND VENUE

17.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§78j(b) and 78t(a)) ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

19.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).   Rocket is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions, and the subsequent damages, took place within this Judicial District.

20.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

21.     Lead Plaintiff Dimitar Yankov, as set forth in his accompanying certification, incorporated by reference herein, purchased Rocket securities during the Class Period at prices artificially inflated by Defendants' fraud and was damaged upon the revelation of Defendants' fraud, as alleged herein.

22.     Lead Plaintiff Corey Sipmann, as set forth in his prior-filed certification (ECF 15-5), incorporated by reference herein, purchased Rocket securities during the Class Period at prices artificially inflated by Defendants' fraud and was damaged upon the revelation of Defendants' fraud, as alleged herein.

23.     Defendant Rocket Pharmaceuticals, Inc. is incorporated under Delaware law with its principal executive offices located at 9 Cedarbrook Drive, Cranbury, New Jersey 08512.  Its common stock traded during the Class Period on the NASDAQ exchange under the symbol "RCKT."

24.     Defendant Dr. Gaurav Shah ("Shah") co-founded Rocket in 2015 and he served as Rocket's Chief Executive Officer ("CEO") and as a member of the Board of Directors at all relevant times.

25.    Defendant Aaron Ondrey ("Ondrey") was appointed Rocket's Chief Financial Officer ("CFO") on March 25, 2024 until his resignation from Rocket on August 20, 2025.

26.    Defendants Shah and Ondrey (together, the "Individual Defendants"), because of their positions with Rocket, possessed the power and authority to control the contents of Rocket's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were given copies of Rocket's reports and press releases alleged herein to be false or misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, they knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

## IV.    CONFIDENTIAL WITNESSES

27.    Multiple potential confidential witnesses ("CWs") expressed concerns about giving statements or about being identified in this complaint for fear of retaliation by Defendants.  For instance, CW1 expressed concerns over Rocket's

"litigious" conduct toward former employees, several of whom it has sued over purported trade secret issues. CW1 also noted that Rocket's COO was known to behave vindictively toward employees and give them "does not meet expectation" reviews if they suggested other approaches or pressed to do things the right way. As such, the specific titles, tenures, responsibilities, and chain of reporting for CW1, CW2, and CW3 are not set forth herein. Lead Plaintiffs can provide them for *in camera* review, if the Court so orders.

28.    CW1 worked at Rocket during the Class Period in 2024.

29.    CW2 worked at Rocket during the Class Period until January 2025.

30.    CW3 worked for Rocket during the Class Period until July 2025.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Rocket's Business And Operations

#### 1.    *Rocket Is A Pre-Revenue, Clinical Stage Company*

31.    Rocket is a pre-revenue, clinical-stage, multi-platform biotechnology company focused on the development of gene therapies for rare diseases, purportedly with direct on-target mechanism of action and clear clinical endpoints – its core operation. During the Class Period Rocket had three clinical-stage *ex vivo* lentiviral vector ("LVV") programs, two of which were deprioritized in July 2025. At issue in this lawsuit is the clinical stage *in vivo* adeno-associated virus ("AAV") program for Danon Disease, a multi-organ lysosomal-associated disorder leading to early death due to heart failure. Rocket has global commercialization and

development rights to all of its product candidates under royalty-bearing license agreements.

32.    Broadly speaking, gene therapy is a therapeutic approach in which an isolated gene sequence or segment of DNA is administered to a patient, most commonly for the purpose of treating a genetic disease caused by genetic mutations. Gene therapy aims to address the disease-causing effects of absent or dysfunctional genes by delivering functional copies of the gene sequence directly into the patient's cells, offering the potential for curing the genetic disease, rather than simply addressing symptoms.

33.    Danon Disease is an autosomal dominant, rare, inherited disorder characterized by progressive cardiomyopathy, which is almost universally fatal in males, even in settings where cardiac transplantation is available.  Cardiomyopathy is a disease of the heart muscle that makes it difficult for the heart to pump blood to the rest of the body.  According to Rocket, Danon Disease is fundamentally a disease of enlarged hearts, and a mutation of the LAMP2 gene, with associated protein deficit, is the root cause of Danon Disease.

34.    Danon Disease predominantly affects males early in life and is characterized by the absence of LAMP2B in the heart and other tissues.  LAMP2B is a protein and a major component of heart cells.  Variants in the LAMP2B can lead to Danon Disease.  According to Rocket, Danon Disease is estimated to affect 15,000

17

to 30,000 people in the United States and in the European Union.  Life expectancy for males with Danon Disease, exclusive of the gene therapy, is approximately 20 years.

### 2.    *Rocket's RP-A501 Danon Disease Phase 1 Clinical Trial*

35.    Before the Class Period, Rocket conducted an open-label, Phase 1 clinical trial of its AAV-based gene therapy candidate for the treatment of Danon Disease, RP-A501 (a/k/a A501), which enrolled 7 male patients.

36.    On June 18, 2019, Rocket issued a press release informing the market that patient dosing for Phase 1 had begun.  The gene therapy itself consisted of a recombinant adeno-associated serotype 9 (AAV9) containing a functional form of the human LAMP2B transgene.

37.    Some Phase 1 patients received a low dose of the LAMP2 transgene $(6.7 \times 10^{13}$ gc/kg), and some received a higher dose $(1.1 \times 10^{14}$ gc/kg).

38.    To ensure the gene therapy reaches its desired target, which in the case of Danon Disease is the heart, Rocket administered an immunomodulatory regime before administering the actual gene therapy, so the body's immune system would not attack the LAMP2B transgene before it reached the heart.  The immunomodulatory pretreatment regimen consisted of prednisone (a steroid that suppresses the immune system), tacrolimus or sirolimus (both immunosuppressants), and rituximab (an antibody medication that targets and

destroys B-cells, a type of white blood cell that produces antibodies to fight infections).

39.    "Complement activation" was a known risk to the efficacy of the A501 gene therapy.  The body's complement system is a part of the immune system that "complements" other defense mechanisms to fight infections.    Complement activation is a chain reaction of proteins that triggers an immune response to eliminate pathogens.  Complement activation in the context of gene therapies can lead to negative health developments.

40.    Sometime in 2020, before December 9, 2020, and only days after receiving the gene therapy, a patient in the A501 Phase 1 clinical trial developed TMA (thrombotic microangiopathy), a serious disorder where blood clots form in small blood vessels, blocking blood flow and potentially damaging organs, including the heart.  The TMA event in this patient caused acute kidney injury requiring renal replacement therapy, as well as thrombocytopenia, a condition where the blood has an abnormally low number of platelets, creating the risk of excessive bleeding. Rocket categorized the TMA as a grade 4 serious adverse event ("SAE").   Adverse events in clinical trials are characterized on a scale of grades 1-4, with grade 4 being the most serious of the adverse events, and thus an SAE.   At the time, Rocket disclosed the fact of an SAE, but did not call it TMA.  The patient later required a heart transplant.

19

41.    The TMA event caused FDA to put a clinical hold on the A501 Phase 1 clinical trial on May 10, 2021, delaying the trial and stopping all dosing.  The hold was not lifted until August 16, 2021.  Rocket publicly disclosed both the TMA and the negative symptoms from the TMA in August 2021.  Rocket said the TMA was "due to immune-mediated complement activation," elsewhere described as a "complement-mediated grade 4 [TMA]."

### 3.    Rocket's A501 Danon Disease Phase 2 Clinical Trial

42.    In a press release issued on September 12, 2023 ("9/12/2023 Press Release"), Rocket announced that it had reached agreement with FDA on the trial design for the A501 Phase 2 Trial.

43.    Rocket enrolled 12 male patients in the Phase 2 Trial.  Enrollment began in September 2023.  Its protocols were published on clinicaltrials.gov on October 3, 2023.  The co-primary endpoints were LAMP2 protein greater than grade 1, and a decline in left ventricular mass size greater than 10%.

44.    According to Defendants in a November 6, 2023, press release ("11/6/2023 Press Release"), Rocket had already "Initiated Phase 2 pivotal trial of A501 for Danon Disease following FDA alignment," and "Rocket is working towards initiation of Phase 2 pivotal trial activities in Europe and the UK."

45.    Dosing of the first Phase 2 Trial patients began before the Class Period, in late 2023 or early 2024.  The agreed upon dosage with the FDA was the low dose

from the Phase 1 clinical trial.  According to Defendant Shah, speaking at a January 8, 2024 J.P. Morgan Healthcare Conference, "[t]his trial is enrolling, and we've chosen low dose to move forward, like I said, 6.7e13 vector genomes per kilogram."

46.    Rocket purportedly implemented additional safety measures for the Phase 2 Trial, not included in phase 1, primarily to prevent complement activation. On September 17, 2024, Rocket issued a press release ("9/17/2024 Press Release") announcing that "all patients have been enrolled in the global, pivotal Phase 2 clinical trial evaluating A501 to treat male patients with Danon disease."  Rocket stated that following a "two-patient safety run-in… the remaining ten patients were enrolled across the United States (U.S.) and European Union within three months." A safety run-in is an initial phase of a clinical trial to assess the short-term safety and tolerability of a treatment combination.

**B.    Material Undisclosed Negative Facts Concealed From Investors**

47.    Throughout the Class Period, Defendants, through material misrepresentations and omissions, concealed negative, undisclosed facts from investors, failing into roughly two thematic categories.  First, Defendants concealed the existence and severity of multiple SAEs, as well as the resulting company actions and impacts on the Phase 2 Trial's progress and timeline.  Before the Class Period, the first participant in the trial, a pediatric patient from Chicago dosed in Philadelphia, experienced an SAE involving TMA so severe that he suffered an

acute kidney injury that prevented his safe return home during a multi-month hospitalization. Defendants concealed those facts, along with an ensuing root cause analysis and dosing halt, a second SAE involving TMA, a change to the trial protocol to introduce a C3 inhibitor, which led to two more SAEs involving CLS (capillary leak syndrome), resulting in one patient death. Second, even when the patient death forced Defendants to reveal many of these facts, they continued to conceal that Rocket had no viable approach to safely control the SAE risk that arose in the Phase 1 trial and exacerbated in the Phase 2 Trial, a goal the C3 inhibitor introduction disastrously failed to meet. Months after the FDA permitted Rocket to resume dosing, it has not done so, as key personnel have resigned.

### 1.    *Material Undisclosed Facts Later Admitted By Defendants*

48.     Per the Study Overview page for the Phase 2 Trial on clinicaltrials.gov, the study began on September 5, 2023. Rocket announced alignment with the FDA on the trial on September 12, 2023. Enrollment for the two-patient safety run-in began shortly after. Enrollment for the rest of the trial took place in summer 2024, and was complete by September 17, 2024, as disclosed in the 9/17/2024 Press Release.

49.     Deep into the Class Period on May 27, 2025, after the FDA imposed a clinical hold on the A501 Phase 2 Trial and a dosed patient died, Defendants admitted certain material undisclosed facts about the Phase 2 Trial in public

statements.  These admissions, as more fully detailed in the "The Truth Begins To Emerge" section *infra*, substantially evidence the extent of undisclosed SAE risks and incidents plaguing the Phase 2 Trial, as well as the true reasons the Phase 2 Trial was delayed, and cross-corroborate CW statements about when the adverse facts arose and became known to Defendants.

50.    In a webinar held on May 27, 2025 ("5/27/2025 Webinar") to discuss the patient death and the trial hold with investors and analysts, Defendant Shah disclosed for the first time that earlier Phase 2 Trial patients had showed complement activation and experienced TMA-related SAEs, stating:

> **So there was an initial episode of TMA** that was linked to a gene mutation, an additional gene mutation that confers complement sensitivity in some patients.  We modified the protocol with the 14 panel test to reduce the – or to eliminate those patients from enrolling who would have those sorts of gene mutations that exacerbate complement.

> **There was another one that persisted.  There was another TMA that we saw also**.  And TMA is a known risk of this therapy.  We don't think that the risk is ever going to be zero.  But in order to try to make it as close to zero as possible, we introduced this new inhibitor, and we're going to evaluate what finally happened here.

> And I should say that those patients who did have those early complement activations have completely recovered from the sequelae and are doing well right now.

51.    These disclosures could be read with Rocket's 9/17/2024 Press Release, which had said that the two run-in patients, which Shah was discussing in May 2025,

had already been dosed by at least September 2024. Those disclosures, read together, partially fix the timing of the first two patients' dosing.

52.    Defendant Shah also admitted on the 5/27/2025 Webinar that, as a result of these TMA incidents, Defendants decided to add the C3 inhibitor to the Phase 2 Trial regimen "several months ago." A complement inhibitor is a substance or drug that blocks the activity of the complement system, hoping to prevent excessive immune responses, inflammation, and cell damage. A C3 complement inhibitor is designed to block the C3 protein, a central component of the immune system's complement cascade. However, the specific C3 inhibitor Rocket chose to use in its revised Phase 2 clinical trial was novel. During the 5/27/2025 Webinar, Defendant Shah admitted that the C3 inhibitor used was "new" and just "coming into the market…," and was intended to "eradicate the risk of TMA altogether." Defendants had not previously disclosed that Rocket was considering a change to the Phase 2 Trial protocol, that they had approached FDA to seek approval for a change, or that they had stopped dosing in the interim, delaying the trial for months.

53.    On the 5/27/2025 Webinar, Defendant Shah also admitted that the first two patients dosed after the trial resumed – the fifth and sixth to be dosed overall – both received the C3 inhibitor and A501 and both developed CLS-related SAEs. CLS is a rare, life-threatening condition where fluids and proteins leak from small blood vessels, or capillaries, causing low blood pressure, edema, and blood

24

thickening.  It can lead to shock and multiple organ failure if not promptly treated.

Rocket's May 27, 2025 press release ("5/27/2025 Press Release") disclosed that, as

a result of these SAEs, on May 23, 2025, FDA placed a clinical hold on the trial and

required Rocket to conduct a root cause analysis into the cause.  The 5/27/2025

Webinar and the 5/27/2025 Press Release disclosed that one of these two patients

died, with the press release stating that the cause of death was an acute systemic

infection.[1]  The 5/27/2025 Webinar said that the patient who died had been dosed in

early May 2025 and died some time over the May 24-26, 2025 weekend.

54.    On August 20, 2025, Rocket published a press release to its corporate

website ("8/20/2025 Press Release"), which was filed with the SEC the same day as

Exhibit 99.1 to a Form 8-K ("8/20/2025 8-K").  The press release confirmed that

only six patients had been treated in the Phase 2 Trial with A501.  It disclosed that,

though the FDA authorized the Phase 2 Trial to resume, further dosing would be at

a recalibrated dose, less than 60% of the previous level (3.8 x $10^{13}$ GC/kg).

55.    After the Class Period, on September 9, 2025, Defendant Shah spoke at

the Morgan Stanley 23rd Annual Global Healthcare Conference ("9/9/2025 MS

Conference"), where he discussed the status of the Phase 2 Trial.  At the conference,

Shah admitted that Rocket discovered early into the Phase 2 Trial that it was seeing

---

[1]    A C3 complement inhibitor has been shown to be "involved in the development of septic shock."  Charchaflieh, *et al.*, "The Role of Complement System in Septic Shock," Journal of Immunology Research, September 23, 2012.

increased risk of TMA versus Phase 1. He also revealed that Rocket did not anticipate treating new patients in the Phase 2 Trial until early 2026, because of a long safety and logistical preparation period before Rocket could even resume the trial, and that the next three patients will be staggered, with one month in between each patient. He also admitted that the Phase 2 Trial's SAE risk caused delay:

> [W]e would have treated all the patients who were lined up for infusion within over the course of 2 or 3 months. The only issue is that because of this TMA risk, we had to pause the trial, came up with a C3 inhibitor plan. That took another 6 months to get the trial started.

56.    While Defendants had not previously confirmed the C3 inhibitor was the cause of the CLS events, at the 9/9/2025 MS Conference, Shah did so, saying:

> What we then did to mitigate the risk of TMA was to add a C3 inhibitor. ***And the C3 inhibitor did address the TMA risk, but seems to have led to a paradoxical increase in capillary leak syndrome risk***, which we saw in recent patients treated with the Danon disease in Phase II. One of those patients unfortunately passed away.

57.    The Phase 2 Trial's webpage on clinicaltrials.gov at the National Institutes of Health shows that, as of October 1, 2025, Rocket has now enrolled 14 patients, rather than the 12 initially planned. However, dosing still has not begun.

### 2.    *Material Undisclosed Facts Described By The CWs*

58.    CW1 confirmed that two patients had serious SAEs in the first small group of patients dosed with A501 in the Phase 2 Danon Disease trial. In early 2024, CW1 was told by co-workers with direct knowledge that the first patient dosed in the Phase 2 Trial was an adolescent boy from Chicago, who received A501 dosing

at Children's Hospital of Philadelphia ("CHOP") in late 2023 or more likely early 2024, and experienced a serious SAE, which was identified as a TMA by his medical doctors. CW1 believes the TMA led to an acute kidney injury, with a long recovery that prevented the boy's return to Chicago for several months while he remained hospitalized in Philadelphia. CW1 recalled that senior Rocket clinical and medical personnel flew to Chicago to discuss with the boy's doctor how to get him home safely. CW1 said Rocket conducted a root cause analysis to determine the cause of the SAE, pausing dosing of other patients while the analysis was undertaken. CW1 said Rocket concluded the analysis by deciding that the boy had a genetic mutation that predisposed him to a strong immune response. CW1 said that FDA permitted continued trial dosing after Rocket provided FDA with the root cause analysis results and its conclusion. CW1 said that two patients were dosed thereafter. In August 2024, CW1 received direct information that the fourth patient, a German boy dosed at a clinical site in Germany, quickly suffered a SAE identified as a TMA. CW1 vaguely recalled that the boy had experienced an overdose of a preconditioning drug that is infused by IV over a period of time prior to A501 infusion. CW1 said the boy was in the intensive care unit ("ICU") for several weeks recovering from the event, which CW1 thinks included acute kidney damage, and that he received the A501 infusion only after fully recovering. CW1 said the German boy was the last patient dosed before Rocket introduced the C3 inhibitor to the pretreatment regimen.

27

59.    CW2 said that the C-suite at Rocket was heavily involved in the A501 program and discussions with FDA, which CW2 contrasted with the large pharmaceutical companies at which CW2 had worked previously.  CW2 said that at such companies, typically the team involved in a particular drug product's program are the employees communicating directly with the FDA regarding regulatory issues, but "at Rocket, it was the C-suite," which was "heavily involved."  CW2 said that patients in the first group dosed with A501 in the Phase 2 Trial experienced complement activation, including TMA.  CW2 learned of these adverse events through informal conversations with co-workers, with word spreading internally that the issue was TMA.  CW2 said that the patients dosed with A501 were at the hospital for dosing, but the TMA reactions "extended their hospital stays a lot longer than anticipated."  CW2 said that Rocket was a small company, and information about the Phase 2 Trial was discussed by the clinical team with other employees.  CW2 said that the process for obtaining FDA approval for adding the C3 inhibitor took some time.  By the time CW2 left Rocket in January 2025, Rocket had determined its approach to move forward with adding the C3 inhibitor to the pretreatment with immunosuppressants, which was "either approved or about to be approved" by the FDA.

60.    CW3 also corroborated.  CW3 said that patients in the first group dosed with A501 in the Phase 2 Trial experienced TMA.  CW3 learned this information

from co-workers in early 2025, when the commercial team began to become concerned about the slow pacing of the trial.  As CW3 explained, the commercial team focuses on timelines that lead up to a drug product launch, and their reason to be involved is removed if a drug program is delayed significantly.  CW3 said that co-workers shared information about what they were hearing about the TMAs in the trial, which "came up as the reason for why the dosing and enrollment was going slower than expected in the trial." CW3 explained that Rocket is a small company, and that the employees at the New Jersey HQ tended to eat lunch together, talk amongst themselves, and be more aware of other departments' activities in comparison to the more siloed culture of large companies.

### C.    Materially False Or Misleading Statements And Omissions

61.    The Class Period begins on February 28, 2024.

62.    Throughout the Class Period, Defendants made materially false or misleading statements, as events unfolded as alleged herein, regarding the Phase 2 Trial's purported measures to "mitigate complement-mediated safety concerns," purported "safety measures," and purported "emphasis on preventing complement activation."  Defendants used two close variants of these statements, as follows.

(a)    After market-close on February 27, 2024, Rocket filed with the SEC its Form 10-K for the fiscal year ended December 31, 2023 ("2023 10-K"), which

Defendant Shah signed and certified under the Sarbanes-Oxley Act of 2002 ("SOX"). It stated, *inter alia*, as follows:

> Based on the initial efficacy observed in the low dose cohort and ***to mitigate complement-mediated safety concerns observed in the high dose cohort (thrombotic microangiopathy ("TMA"))*** and in agreement with the FDA, ***we are focusing on the low dose (6.7e13 gc/kg) and we will no longer administer doses of 1.1e14 gc/kg or higher in this trial***. ***Additional safety measures have been implemented and are reflected in the updated trial protocol***. These measures include exclusion of patients with end-stage heart failure, and a refined immunomodulatory regimen involving transient B- and T-cell mediated inhibition, ***with emphasis on preventing complement activation***, while also enabling lower steroid doses and earlier steroid taper, with all immunosuppressive therapy discontinued 2-3 months following administration of RP-A501.

Defendants repeated verbatim these statements from the 2023 10-K in additional Rocket SEC filings, including: (i) Rocket's Form 10-Q filed May 7, 2024, signed and SOX certified by Defendants Shah and Ondrey ("Q1 2024 10-Q"); and (ii) Rocket's Form 10-Q filed August 6, 2024, signed and SOX certified by Defendants Shah and Ondrey ("Q2 2024 10-Q").

(b)    Rocket's Form 10-Q filed November 7, 2024, signed and SOX certified by Defendants Shah and Ondrey ("Q3 2024 10-Q"), slightly altered this language, by stating:

> Based on the initial efficacy observed in the low dose cohort and ***to mitigate complement-mediated safety concerns observed in the high dose cohort (thrombotic microangiopathy) and in agreement with the FDA, we have moved forward with the low dose (6.7e13 gc/kg).*** Additional safety measures were implemented and are reflected in the updated trial protocol for Phase I and the protocol for our ongoing

pivotal Phase II study. These measures include exclusion of patients with end-stage heart failure, and a refined immunomodulatory regimen involving transient B- and T-cell mediated inhibition, ***with emphasis on preventing complement activation***, while also enabling lower steroid doses and earlier steroid taper, with all immunosuppressive therapy discontinued 2-3 months following administration of RP-A501.

Thereafter, Defendants repeated verbatim these statements from the Q3 2024 10-Q in additional Rocket SEC filings, including: (i) Rocket's Form 10-K 2024 for the fiscal year ended December 31, 2024, filed February 27, 2025, signed and SOX certified by Defendants Shah and Ondrey ("2024 10-K"); (ii) Rocket's Form 10-Q filed May 8, 2025, signed and SOX certified by Defendants Shah and Ondrey ("Q1 2025 10-Q"); and (iii) Rocket's Form 10-Q filed August 7, 2025, signed and SOX certified by Defendants Shah and Ondrey ("Q2 2025 10-Q").

63.    On April 29, 2024, Rocket filed its Form ARS filing with the SEC ("2023 Annual Report"), which was a refiling of the 2023 10-K, which had been signed and SOX certified by Defendant Shah and which contained the misstatements therein as noted above.

64.    On May 16, 2024, Rocket's Chief Medical & Gene Therapy Officer, Jonathan Schwartz ("Schwartz") spoke at the Bank of America ("BoA") Health Care Conference 2024 ("5/16/2024 BoA Conference"), which included a question and answer ("Q&A") session.  In an exchange with a BoA Securities Research Analyst regarding the Phase 2 Trial, Schwartz stated as follows:

31

Q:    Are we still on track to see interim data in 2024?  And then ultimately, what should investors be looking for an update – and yes, what would you constitute, I guess, a good readout here?

A:    Yes.  *So – the study is active and* enrolling as anticipated, *very much on track.  We have avoided precise guidance as we're really more focused on* enrollment, *treatment and execution* with the goal of also preserving data integrity, not providing a whole bunch of interim looks at efficacy as we did in Phase I.  That was really important for Phase I, but the goal for Phase II is to make sure that we're doing our utmost to treat the patients and follow them properly, enabling health authority approval and other good launch outcomes.  I think you can anticipate some updates regarding the study status this year, and we'll provide more granularity on that later in the year.

Schwartz's statements were not identified as forward-looking statements, were not accompanied by warnings or risk disclosures, and did not direct the audience to such warnings or disclosures found elsewhere.   On information and belief, given Defendant Shah's close oversight of Rocket's clinical trials and public statements thereon, Defendant Shah authorized Schwartz's statements.

65.    On September 5, 2024, Defendant Shah spoke at the Morgan Stanley 22nd Annual Global Healthcare Conference ("9/5/2024 MS Conference"), including a Q&A session.  Regarding the Phase 2 Trial's progress, he stated as follows:

Q:    And remind us when you started enrolling patients.  And then the pivotal study and just maybe how that's been going?

A:    So the agreement with FDA was like I said last September.  And of course, once you have the agreement, you have to amend the protocol, get it to sites, start the sites, that takes a few months.  *And then we had a two-patient run-in, right, and the patients had to be staggered too.  And then after the second patient, there's another follow-up period.*  And then you talk to the FDA again.  So it just takes time to get there.  And then there is – *after the two patient run and the*

*trial is designed so that everyone else can be treated without staggering.*  But the enrollment is going on pretty well at this point.

Shah's statements were not identified as forward-looking statements, were not accompanied by warnings or risk disclosures, and did not direct the audience to such warnings or disclosures found elsewhere.

66.    On September 17, 2024, Rocket published the 9/17/2024 Press Release on its corporate website announcing completion of enrollment for the Phase 2 Trial. It said, "*The pediatric run-in enrolled two patients in a sequential manner with a minimum three-month follow-up prior to subsequent enrollment.*  In addition, all patients enrolled in the trial are required to have a three-months observational pre-treatment run-in to enable an assessment of troponin (and other biomarker) trajectories to optimally assess this key secondary endpoint."  On information and belief, given Defendant Shah's close oversight of Rocket's clinical trials and public statements thereon, Defendant Shah authorized the 9/17/2024 Press Release's issuance.

67.    On November 7, 2024, Rocket published an earnings press release to its corporate website ("11/7/2024 Earnings Release"), which was filed with the SEC that day as Exhibit 99.1 to a Form 8-K ("11/7/2024 8-K") signed by Rocket's General Counsel and Chief Corporate Officer, Martin Wilson ("Wilson").  It said:

*Continued advancement of Phase 2 pivotal study of RP-A501 for Danon Disease:*

33

- In September, Rocket announced completion of enrollment in the Phase 2 pivotal study of RP-A501 to treat Danon Disease.

- ***Dosing in the Phase 2 pivotal study is ongoing.*** …

It repeated, "***dosing [is] ongoing in the Phase 2 pivotal study of RP-A501 for Danon disease.***"  On information and belief, given his close oversight of Rocket's clinical trials and public statements thereon, Defendant Shah authorized the 11/7/2024 Earnings Release's issuance and the 11/7/2024 8-K's filing with the SEC.

68.    On November 12, 2024, Defendant Shah spoke at the UBS Global Healthcare Conference ("11/12/2024 UBS Conference"), including a Q&A session. Shah's statements, including the following, were not identified as forward-looking statements, were not accompanied by warnings or risk disclosures, and did not direct the audience to such warnings or disclosures found elsewhere.

(a)    Regarding the Phase 2 Trial's progress, Shah stated as follows:

Q:    So yes, let's focus on Danon. I mean, for this RP-A501, …if you can like remind us like this Phase 2 potentially pivotal trial, like what's the design? Why are you focusing on these co-primary endpoints, LAMP-2 and LV mass reduction, just to sort of give the rationale for that?

A:    It's a 12-month endpoint in 12 patients total.  And that trial is now fully enrolled, ***we're in the process of dosing, and we are dosing patients.***  We haven't given exact guidance on when the readout is. ***But we'll start seeing some incremental data internally, certainly in 2025.*** I think we wait for the final disclosure until the whole data set is done because it is a pivotal trial design, and just to respect the confidentiality of the FDA dialogues there.

(b)    In another exchange with a UBS Analyst, Shah stated as follows:

Q:     So going back to the status of the study.  So you mentioned that you have completed the enrollment of these 12 patients by September. And then -- So you have dosed some of them, not all of them, just like what's the cadence of like how long does it take to get to that dosing?

A:     ***So there's a three-month run in for troponin that the FDA mandated so we can have sort of a more longitudinal comparison of pre versus post.***  So not all those patients would have gone through that. There's other pre-treatment work up like cardiac biopsy. ***So we haven't given exact guidance, but it's ongoing, and we're going to get it done as rapidly as possible.***

Q:     Got it.  Okay.  But when did you -- when did you initiate -- when did you sorry, enrolling the first patient or when do you dose the first patient? Have you talked about that?

A:     We haven't, but ***the enrollment basically happened between July and September.***

Q:     I see.

A:     ***Before the post-pediatric follow-ups, so two patients were treated earlier, followed for a certain time, discussed with FDA and IDMC, and then we started the broader trial really from July to September.***  So enrollment would have been done then.  And so there's getting everyone dosed just takes some time.

69.     On November 18, 2024, Rocket held an Investor Webinar ("11/18/2024 Webinar") to discuss Rocket's presenting long term results from its A501 Phase 1 trial at the American Heart Association 2024 and publishing its Phase 1 trial data in the New England Journal of Medicine.  Defendant Shah participated, along with Schwartz and Rocket's then-President, Chief Operating Officer, and Head of Research and Development, Dr. Kinnari Patel.

(a)     In prepared remarks, Defendant Shah said:

I want to thank our scientific advisers, our investigators and most importantly, the patients that we work with for their commitment to this program to advance the potentially life-changing treatment option for Danon patients. ***Importantly, with*** the rapid enrollment of the Phase II study and ***the ongoing dosing of patients in that study***, we look forward to presenting a broader program update on epidemiology and prevalence in 2025 after dosing is complete for this trial.

(b)     During Q&A, Defendant Shah made these statements:

Q:     I know it's a bit early to speculating about what the label might look like. But do you think that the label could potentially exclude patients with reduced EF? And what percentage of patients do you think have reduced ejection fraction? And then given that you announced a couple of months ago, the completion of enrollment in the pivotal trial. I guess, what are the current bottlenecks in terms of treating those patients?

A:     So I think the EF question in the label, we can't anticipate. I can say, though, that we always try to go for as broad label as possible. But ***patient safety is first and paramount***. So we'll have those discussions at the right time with FDA and EMA.
In terms of what's gating for the dosing, it's -- there's -- ***these patients need to come in, get three months of troponin at baseline***, they need to get cardiac biopsies and other things to be fully eligible. ***So all of that is going on, and we're dosing patients as rapidly as possible now.***

70.     On December 3, 2024, Defendant Shah spoke at the 7th Annual Evercore ISI HealthCONx Conference ("12/3/2024 Evercore Conference"), which included a Q&A session.  Shah's statements were not identified as forward-looking statements, were not accompanied by warnings or risk disclosures, and did not direct the audience to such warnings or disclosures found elsewhere.

(a)    In prepared remarks, he said "[T]he Danon program is fully enrolled as of September. ***We're continuing to dose patients.*** We'll have a broader program update in the first half of 2025 that we look forward to."

(b)    During Q&A, he stated as follows:

Q:    So, let's dive into the Danon program. And I'll start with a few more operational questions and we'll go a little bigger picture. Just operationally, you guys announced that enrollment is completed. We've gotten some questions on when dosing itself will be completed. And typically, companies don't quite announce that granular level of detail. But just given where you're at, would it make sense to consider providing that update?

A:    ***Potentially, we could provide that update***. I do want to just answer the why is there a difference question. ***After enrollment, patients still have to undergo screening of other labs like troponin mandated by the FDA because it is a key secondary endpoint. And also, this is a -- in some ways, a heavy protocol. We're looking at a lot of different measures. So, it just takes time to get all of those up and running. So, that's why the enrollment is different from the actual dosing***. And I think that's something that we could consider. Point taken.

71.    On December 10-12, 2024, Rocket filed with the SEC a Preliminary Prospectus Supplement ("12/10/2024 Preliminary Prospectus Supplement"), and a follow-up Prospectus Supplement ("12/12/2024 Prospectus Supplement"), in connection with a proposed public offering of $150 million in Rocket stock. Both said about the Phase 2 Trial: "***dosing and follow-up is ongoing***." On information and belief, given Defendant Shah's close oversight of Rocket's clinical trials and

public statements thereon, Defendant Shah authorized the filing of the 12/10/2024 Preliminary Prospectus Supplement and 12/12/2024 Prospectus Supplement.

72.     On January 13, 2025, Defendant Shah spoke at the 43rd Annual J.P. Morgan Healthcare Conference ("1/13/2025 JPM Conference").    In prepared remarks, he said, "***Low dose is the one that we are moving forward into the Phase 2 pivotal study***, which we've done enrolling*.*   But ***you can see, again, a profound decrease over time versus what would happen untreated and even versus other agents that are out there on the market***."   He continued:

> The Phase 2 trial is ongoing.   We've completed enrollment as of a few months ago.   ***We're finishing dosing as fast as possible.***   Again, the key endpoints here are going to be a combination of protein expression and LV Mass Index.   ***Again, drawing from Phase 1, if we see even a partial response of Phase 1, this could be a positive trial.***   More on that in the first half program update.

Shah's statements were not identified as forward-looking statements, were not accompanied by warnings or risk disclosures, and did not direct the audience to such warnings or disclosures found elsewhere.

73.     Rocket announced its 2024 year-end and Q4 2024 financial results and updates in a pair of public statements made on February 27, 2025, as follows:

(a)     Rocket published an earnings press release to its corporate website ("2/27/2025 Earnings Release"), which was filed with the SEC the same day as Exhibit 99.1 to a Form 8-K signed by Defendant Shah ("2/27/2025 8-K").   It said, "***Dosing ongoing in the Phase 2 pivotal study of RP-A501 for Danon disease***

*Program update expected in the first half of 2025*," and "Dosing in the Phase 2 pivotal study of RP-A501 for Danon disease is ongoing.  Details of the Phase 2 pivotal study can be found at www.clinicaltrials.gov under NCT identifier NCT06092034.  *Program update anticipated in the first half of 2025*."

(b)    Rocket's 2024 10-K, signed and SOX-certified by Defendants Shah and Ondrey, repeatedly said "***dosing and follow-up are ongoing***" for the Phase 2 Trial.

74.    On April 8, 2025, Defendant Shah spoke at the 24th Annual Needham Virtual Healthcare Conference ("4/8/2025 Needham Conference"), which included a Q&A session.  During Q&A, Defendant Shah made statements regarding the reasons for the Phase 2 Trial's rate of progress, as follows:

> Q:    And as you mentioned, you are in that ongoing pivotal study. And one of the most common investor questions we always get is, when should dosing be wrapped up, the timing of potential pivotal readout? But can you just maybe take the time to remind investors why there is a live time between enrollment and dosing and any updates you could give there?
>
> A:    Yes, absolutely.  So, we did announce at the end of last year that patients were enrolled.  ***And the enrollment to treatment time is, unfortunately, a little bit cumbersome.  And it's very specific to the trial.***  It's not going to happen in the commercial world.  ***But that's because, number one – and there's several reasons, right? Number one, these patients require immunomodulation.  So, that takes time to set up and source appropriately.***
>
> ***Number two, there's some vaccines involved in immunomodulation, which also takes time.  There's a troponin run-in, number three, of three months that the FDA mandates.***
>
> We have six sites going on.  We want to treat patients at the different sites.  So, ***instead of putting everyone at one site, we try to stagger***

39

*them*.  *So, that takes a little bit of time.  But those patients who are treated at a single site, who's treating more than one patient, they want to stagger a little bit as well.*

*So, all this, along with the holidays, has added the time up, which I understand is not ideal, but it is getting done.  It is moving forward.  And we continue to anticipate an efficacy readout in the first half of 2026.*  I just want to make sure we're in 2025 now.  So, 2026 is next year, correct.

Shah's statements were not identified as forward-looking statements, were not accompanied by warnings or risk disclosures, and did not direct the audience to such warnings or disclosures found elsewhere.

75.    On April 30, 2025, Rocket filed its Form ARS filing with the SEC ("2024 Annual Report"), which was a refiling of the 2024 10-K, which had been signed and SOX certified by Defendants Shah and Ondrey and which contained the misstatements therein as noted above.

76.    On April 30, 2025, Rocket filed with the SEC a Proxy Statement Pursuant to Exchange Act §14(a) ("4/30/2025 Proxy Statement") for its 2025 Annual Meeting of Stockholders, signed by Defendant Shah.  It said about the Phase 2 Trial, "*dosing and follow-up is ongoing*."

77.    On May 8, 2025, Rocket filed the Q1 2025 10-Q, signed and SOX certified by Defendants Shah and Ondrey.  It repeatedly said that "*the trial and follow-up are ongoing*," for the Phase 2 Trial.

78.    On May 27, 2025, Rocket held the 5/27/2025 Webinar pre-market to discuss the patient death and the trial hold with investors and analysts, on which Defendant Shah spoke.  On it, Defendants acknowledged that two Phase 2 Trial patients had experienced TMA before implementing the C3 inhibitor, but Defendants overstated their ability to deal with the underlying SAE risk as follows:

(a)    In prepared remarks, Defendant Shah said:

We believe that transparency responsibility are absolutely critical during times like this, so we are working together with the FDA to define the next steps.  ***But we are confident that there is a path forward, and we remain committed to advancing RP-A501 with the highest standards of safety, science, and care***.

(b)    Defendant Shah also had the following exchange with an analyst about earlier Phase 2 Trial patients:

Q:    I guess are there any patients that have been enrolled in the study that have still not been infused with RP-A501?  And I guess just as a quick follow-up, were there any previously dosed patients who have had complement-mediated adverse events?

A:    Yes.  So there are patients who are still waiting to be treated.  Our plan and the timeline was such that we would have finished the treatment of these patients by midyear, which is when we were going to have the program update as we've guided to previously.  So there were more patients left to be treated, all ready to go and were lined up to be treated shortly.  Unfortunately, we had the setback that we're talking about today.  So that's going to be paused.

***Earlier in the trial, we did see complement activation and TMA.  It was a gene therapy-associated effect that's part of trial safety benefit that we usually read out at the end of the trial.***  And those patients are actually now doing well from a safety and potentially even an efficacy viewpoint.  ***But because it was part of routine explained side effects of gene therapy, we continue with the program.  There was no clinical***

*hold, and we modified the protocol in the way that I described earlier, to continue to further mitigate the risk.*

(c)     Defendant Shah also had the following exchange with an analyst about

a path forward for the Phase 2 Trial:

Q:     Just wanted to see if one possible path forward is to remove the use of the C3 inhibitor in the remaining patients given that the patients who were dosed without the inhibitor do not have the same serious adverse events as the 2 patients who did receive it?

A:     So I don't want to comment on exactly what the path forward would be. *But there are various ways to move forward, including revising the immunomodulatory regimen perhaps to a simpler one.* We, of course, will continue to screen out patients who have predisposition for complement activation based on genetic testing.

*And there may be other changes that we come up with* together with the FDA, *for example, leaning in a little bit more to the existing complement inhibitors that have been demonstrated to be safe already*. *So there are ways to do this, and we do feel confident that we will find a path forward expeditiously as possible.*

(d)     He had this exchange about the choice of complement inhibitor:

Q:     And this is a follow-up question to your previous comments on existing complement inhibitor with safety – probably a better safety profile. What was the reason that you chose the new agent over those existing agents that could potentially be safer, please?

A:     It was – it's been shown in other trials, in other programs to potentially be more efficacious at complement inhibition, so we – and safe in other programs. So we felt that in order to mitigate the risk of complement activation in Danon patients, it was a better choice and sort of moving the field in the right direction to mitigate safety. So that was the reason for it.

Also, there was a pediatric data that was available that we could potentially apply to Danon, and we leverage some of that information to move it into the Danon program. And sometimes drug development

is never linear. **And we are, of course, going back to drawing board, but we're confident that there is a path forward with the simplified regimen here.**

(e)    Finally, he had this exchange with an analyst about next steps:

Q:    I appreciate the timing forward is somewhat opaque here. But could you just maybe articulate in some granularity what next steps would entail just to give us a sense here of what needs to transpire before we get any clarity here?

A:    So we are – good question. **We're already in deep dialogue with FDA back and forth and doing a neutral, objective root cause analysis. We're discussing with them a potential revising immunomodulatory regimen and potentially other changes.** We'll get a formal list of questions from them shortly and be able to respond to them. I can't give you a time line on exactly when we'll come out of that process, but as expeditiously as possible is the goal, is the target. Meanwhile, the patients continue to be on the docket to be enrolled and treated as soon as possible.

And the program overall has demonstrated great benefit risk in the Phase I with the NEJM publication last year with 6 of 6 patients performing well. This is a drug. **This is an active program. We're committed to it. It is going to move forward. We've had this very sad and unfortunate roadblock at the moment, but it does not stop the Danon program from moving forward.** And we'll – I just don't want to give time lines right now, but **we will get back on track as soon as possible.**

79.    Rocket announced its Q2 2025 financial results and updates in public statements made on August 7, 2025, as follows:

(a)    Rocket published an August 7, 2025 earnings release ("8/7/2025 Earnings Release"), which was filed with the SEC that day as Exhibit 99.1 to a Form 8-K signed by Wilson ("8/7/2025 8-K"). On information and belief, given Defendant Shah's close oversight of Rocket's clinical trials and public statements

43

thereon, as well as his being quoted within the release, Defendant Shah authorized its dissemination.  The release quoted Defendant Shah claiming that there was "regulatory *alignment to resolve the clinical hold for RP-A501 in Danon disease in progress*…."  The release also said:

> *Investigation into the Serious Adverse Event (SAE) from the Phase 2 pivotal study of RP-A501 for Danon disease is ongoing*.
>
> - *Rocket previously disclosed an SAE*, related to clinical complications from capillary leak syndrome and unfortunately leading to the patient's death.  In response, Rocket paused dosing and initiated a root cause analysis, focusing on the recent addition of a C3 inhibitor to the pre-treatment regimen.  On May 23, 2025, FDA placed the trial on clinical hold for further evaluation.
>
> - *Rocket is actively working with FDA, independent safety monitors, and clinical experts to ensure patient safety and resume the trial*.
>
> - While the clinical hold remains in place, the company cannot provide guidance on trial completion timing.

(b)    Rocket also filed its Q2 2025 10-Q, signed and SOX certified by Defendants Shah and Ondrey.  It said:

> In September 2024, we announced completion of enrollment of 12 patients in the Phase 2 study across sites in the U.S. and EU.  As previously disclosed, *two patients participating in the Phase 2 pivotal study of RP-A501 each experienced an unexpected Serious Adverse Event (SAE)*.  The SAEs involved clinical complications related to a capillary leak syndrome and were followed by a systemic infection and multi-organ damage, ultimately leading to one of the patient's death. Rocket voluntarily paused further Phase 2 study dosing in the U.S. and EU, and the FDA subsequently placed the trial on clinical hold on May 23, 2025 to allow for further evaluation.  *Rocket is conducting a comprehensive root cause analysis* and remains in active dialogue with

the FDA and other key stakeholders, **with the current focus being on the recent introduction of a novel immune suppression agent, a C3 inhibitor, to the pre-treatment regimen that had been implemented to mitigate complement activation observed in some Phase 2 patients.**

**Rocket** is working with the FDA, the Independent Data Safety Monitoring Committee, clinical investigators, and scientific experts, and **is committed to ensuring the safety of all study patients** while resuming the trial as expeditiously as possible. **Rocket is committed to transparency** and will provide updates as our analysis progresses. However, while the clinical hold remains in place, the company is unable to provide guidance on the anticipated timing for completion of the Phase 2 trial.

80.    On August 20, 2025, Rocket published the 8/20/2025 Press Release,

stating as follows:

**The hold was lifted in under three months, underscoring** the efficiency of the FDA's review process and **Rocket's commitment to expeditiously optimize safety and resume the trial.**

In its correspondence, the FDA confirmed that Rocket satisfactorily addressed issues outlined in the clinical hold. **The FDA authorized the pivotal study to resume first with a recalibrated dose of $3.8 \times 10^{13}$ GC/kg of RP-A501 in three patients, treated sequentially with a minimum four-week interval between each treatment.** This adjusted dose aligns with the lower range of administered doses that were associated with efficacy across multiple biomarkers, echocardiographic and clinical endpoints in the Phase 1 study, and has been determined as most likely to confer the safety and efficacy identified in the low-dose Phase 1 cohorts. In addition, Rocket will collaborate with investigators to implement an immunomodulatory regimen more closely reflecting that administered in the Phase 1 pediatric cohort. **The revised regimen discontinues prophylactic use of a C3 complement inhibitor, while maintaining sirolimus, rituximab, and steroids. Additionally, the protocol will specify a lower threshold for administering a C5 inhibitor (eculizumab) in response to impending complement activation.**

> To date, six patients with Danon disease have been treated in the Phase 2 study with RP-A501. ***Further updates about the Phase 2 study can be expected following review of data from the next three patients.***

On information and belief, given Defendant Shah's close oversight of Rocket's clinical trials and public statements thereon, Defendant Shah authorized the 8/20/2025 Press Release's issuance.

81.    Defendants foregoing public statements alleged herein all were materially false or misleading when made, and thus actionable, given the concealed, negative, contemporaneous facts known to Defendants as detailed in the "Material Undisclosed Negative Facts Concealed From Investors" section *supra* and "Defendants' Knowledge Or Reckless Disregard Of Red Flags Demonstrates Scienter" and "The Truth Begins To Emerge" sections *infra*.  Specifically:

(a)    Before the Class Period began, the first participant in the 12-patient Phase 2 Trial, a pediatric patient from Chicago, was dosed with A501 at the Children's Hospital of Philadelphia and experienced a severe SAE concerning TMA, demonstrating that the TMA issues that had arisen during the Phase 1 trial had both worsened with Phase 2 doses and had not been addressed by the Phase 2 Trial structure, including its pretreatment regimen, immunosuppressive therapy and complement activation prevention approach, and dosing level.  Defendants concealed this severe TMA event, the patient's multi-month hospitalization due to acute kidney injury, and Rocket's ensuing dosing halt and root cause analysis efforts

from investors while otherwise choosing to discuss the Phase 2 Trial's purported safety attributes and Rocket's progress in dosing patients.  Thus, the 2023 10-K, 2023 Annual Report, Q1 2024 10-Q, 5/16/2024 BoA Conference, Q2 2024 10-Q, 9/5/2024 MS Conference, 9/17/2024 Press Release, 11/7/2024 Earnings Release, 11/7/2024 8-K, Q3 2024 10-Q, 11/12/2024 UBS Conference, 11/18/2024 Webinar, 12/3/2024 Evercore Conference, 12/10/2024 Preliminary Prospectus Supplement, 12/12/2024 Prospectus Supplement, 1/13/2025 JPM Conference, 2/27/2025 Earnings Release, 2/27/2025 8-K, 2024 10-K, 4/8/2025 Needham Conference, 2024 Annual Report, 4/30/2025 Proxy Statement, and Q1 2025 10-Q statements were materially false or misleading.  The 9/5/2024 MS Conference, 9/17/2024 Press Release, and 11/12/2024 UBS Conference misstatements are particularly false or misleading as they expressly referenced the first two patients, their "run-in" pretreatment, their "follow-up period," and in the case of the 11/12/2024 UBS Conference, that Rocket "discussed [them] with FDA and IDMC."

(b)    By August 2024, Defendants knew that the fourth participant in the 12-patient Phase 2 Trial, a pediatric patient dosed in Germany, had experienced an SAE, yet again concerning TMA.  Whereas Rocket had claimed that the first SAE in Philadelphia was due to a purported genetic predisposition in the patient toward complement activation with A501, this SAE was caused by the pretreatment regimen used in the Phase 2 Trial.  The SAE once again involved an extended hospitalization

due to acute kidney damage.  It further demonstrated that the TMA issues that had arisen during the Phase 1 trial and that had worsened in the Phase 2 Trial were not addressable by the Phase 2 Trial structure, including its pretreatment regimen, immunosuppressive therapy and complement activation prevention approach, and dosing level.  Defendants concealed this severe TMA event, the patient's extended hospitalization due to acute kidney injury, and Rocket's ensuing cessation of dosing under the original pretreatment regimen after only 1/3 of the patients had been dosed and Rocket's work to redesign the trial protocol.  Thus, the 9/5/2024 MS Conference, 9/17/2024 Press Release, 11/7/2024 Earnings Release, 11/7/2024 8-K, Q3 2024 10-Q, 11/12/2024 UBS Conference, 11/18/2024 Webinar, 12/3/2024 Evercore Conference, 12/10/2024 Preliminary Prospectus Supplement, 12/12/2024 Prospectus Supplement, 1/13/2025 JPM Conference, 2/27/2025 Earnings Release, 2/27/2025 8-K, 2024 10-K, 4/8/2025 Needham Conference, 2024 Annual Report, 4/30/2025 Proxy Statement, and Q1 2025 10-Q statements were materially false or misleading for these additional reasons.  Here, too, the 9/5/2024 MS Conference, 9/17/2024 Press Release, and 11/12/2024 UBS Conference misstatements are particularly false or misleading as they expressly referenced the first two patients, their "run-in" pretreatment, and their "follow-up period," and in the case of the 11/12/2024 UBS Conference, that Rocket "discussed [them] with FDA and IDMC."

(c)     By January 2025, Rocket had determined to alter the Phase 2 Trial pretreatment regimen and add the C3 inhibitor.  That was a major alteration to the Phase 2 trial protocol, prompted by two SAEs within the first four dosed patients of the 12-patient trial, which required not only the close supervision and authorization of Rocket's top leadership but also FDA approval to implement.  That decision further and conclusively demonstrated that the TMA issues that had arisen during the Phase 1 trials and that had worsened in the Phase 2 Trial were not addressable by the original Phase 2 Trial structure, including its pretreatment regimen, immunosuppressive therapy and complement activation prevention approach, and dosing level.  Defendants concealed that decision, Rocket's ongoing work to seek and obtain FDA approval of the protocol redesign, and the forthcoming introduction of the C3 inhibitor which carried its own serious SAE risks and increased the overall risk profile of the Phase 2 Trial.  Thus, the 1/13/2025 JPM Conference, 2/27/2025 Earnings Release, 2/27/2025 8-K, 2024 10-K, 4/8/2025 Needham Conference, 2024 Annual Report, 4/30/2025 Proxy Statement, and Q1 2025 10-Q statements were materially false or misleading.

(d)     By early May 2025, dosing resumed, with the next two trial participants to be dosed – patients five and six – receiving the C3 inhibitor as part of the redesigned trial protocol.  Both of these patients experienced SAEs related to CLS, causing both to be hospitalized with hard-to-treat symptoms, ultimately causing one

of the patients to die, thereby once again halting the Phase 2 Trial.  Defendants concealed these facts until the patient's death forced them to finally disclose the SAEs that had been plaguing the Phase 2 trial throughout its conduct.  Thus, the Q1 2025 10-Q statements were materially false or misleading for these additional reasons.

(e)    Until a dosed patient's death forced Rocket to finally disclose many details regarding the Phase 2 Trial SAEs and related impacts, investors had been misled regarding the true reasons for the Phase 2 Trial's extended timeline and progress pacing.  Unbeknownst to them, the Phase 2 Trial had experienced significant delays, dosing halts, and timeline extensions due to the extended hospitalizations of four out of the first six trial participants to be dosed, related dosing halts, ensuing root cause analysis work, and additional necessary communications, presentations, and discussions with FDA to explain the SAEs, to seek approval for trial redesigns, and to seek authorization to resume dosing.  Thus, the 9/5/2024 MS Conference, 9/17/2024 Press Release, 11/12/2024 UBS Conference, 11/18/2024 Webinar, 12/3/2024 Evercore Conference, 1/13/2025 JPM Conference, and 4/8/2025 Needham Conference statements, which posited purported explanations for the trial timeline, were materially false or misleading. The 9/5/2024 MS Conference, 9/17/2024 Press Release, and 11/12/2024 UBS Conference misstatements are particularly false or misleading as they expressly

referenced the first two patients, their "run-in" pretreatment, the time required for their "follow-up," and in the case of the 11/12/2024 UBS Conference, that Rocket "discussed [them] with FDA and IDMC."    Likewise, the 5/16/2024 BoA Conference, 11/7/2024 Earnings Release, 11/7/2024 8-K, 11/12/2024 UBS Conference, 11/18/2024 Webinar, 12/3/2024 Evercore Conference, 12/10/2024 Preliminary Prospectus Supplement, 12/12/2024 Prospectus Supplement, 1/13/2025 JPM Conference, 2/27/2025 Earnings Release, 2/27/2025 8-K, 2024 10-K, 2024 Annual Report, 4/30/2025 Proxy Statement, and Q1 2025 10-Q statements, which said that the trial was "on track" with dosing "ongoing" and similar language, without disclosing the halts, disruptions, and delays in dosing patients, were materially false or misleading.

(f)    Unbeknownst to investors, throughout the Class Period, Defendants lacked a viable approach that could simultaneously address the SAE issues that arose during the Phase 1 trial, dose A501 at levels sufficient to conduct adequate Phase 2 clinical testing, and ensure the safety of Phase 2 Trial participants.  The original trial design could not avoid TMA-related SAEs from both the A501 and the pretreatment regimen, which manifested in two of the first four dosed patients.  The revised trial design, which introduced the C3 inhibitor, traded one grave risk for another, causing CLS-related SAEs that manifested in both of the next two patients dosed, killing one of them.  Aside from these two deficient approaches, with regards to which

51

Defendants had publicly misrepresented the true risks, Rocket lacked any viable Option C.  Consequently, despite the FDA's permitting Rocket to resume its Phase 2 Trial, months have elapsed with no additional patients dosed, while key high-ranking personnel, including Defendant Ondrey, have resigned.  Thus, the 2023 10-K, 2023 Annual Report, Q1 2024 10-Q, 5/16/2024 BoA Conference, Q2 2024 10-Q, 9/5/2024 MS Conference, 9/17/2024 Press Release, 11/7/2024 Earnings Release, 11/7/2024 8-K, Q3 2024 10-Q, 11/12/2024 UBS Conference, 11/18/2024 Webinar, 12/3/2024 Evercore Conference, 12/10/2024 Preliminary Prospectus Supplement, 12/12/2024 Prospectus Supplement, 1/13/2025 JPM Conference, 2/27/2025 Earnings Release, 2/27/2025 8-K, 2024 10-K, 4/8/2025 Needham Conference, 2024 Annual Report, 4/30/2025 Proxy Statement, Q1 2025 10-Q, 5/27/2025 Webinar, 8/7/2025 Earnings Release, 8/7/2025 8-K, Q2 2025 10-Q, and 8/20/2025 Press Release statements, which all touted aspects of the Phase 2 Trial's design, were materially false or misleading for these additional reasons.

### D.    The Truth Begins To Emerge

82.    Three partial corrective disclosures incrementally revealed aspects of Defendants' fraud, causing artificial inflation to be removed from the price of Rocket's securities.

83.    On May 27, 2025, before the markets opened, Rocket published the 5/27/2025 Press Release to its corporate website, which was filed with the SEC as

Exhibit 99.1 to a Form 8-K ("5/27/2025 8-K"), signed by Defendant Shah. It announced that a patient participating in the Phase 2 Trial died after an acute systemic infection brought on by an SAE involving clinical complications related to CLS. The 5/27/2025 Press Release said Rocket was "conducting a comprehensive root cause analysis" with a focus on "the recent introduction of a novel immune suppression agent to the pre-treatment regimen that had been implemented to mitigate complement activation observed in some [Phase 2 Trial] patients." It also disclosed that before the patient death Rocket had voluntarily paused further dosing and "the FDA placed a clinical hold on the [Phase 2 Trial] to allow further evaluation."

84. Rocket also held the 5/27/2025 Webinar pre-market to discuss the patient death and trial hold with investors and analysts. On the webinar, Defendant Shah provided additional information about the event and the Phase 2 Trial in response to analyst questions.

(a)     Defendant Shah said, in response to a question:

So the patient was treated in early May. And the agent that was used was the C3 inhibitor, *and it was introduced into this trial because there was ongoing evidence of complement activation in Danon disease. And we aim to try to completely eliminate any TMA risk altogether.* So at this time, this particular agent was coming into the market also we had some experience in pediatric patients. *So the timing was right to try to eradicate the risk of TMA altogether, not just for Danon, but potentially as a read-through to other AAV programs across our portfolio and others. So it was with that in mind that we introduced this novel agent.*

53

(b)     He also revealed that the decision to add the C3 inhibitor was made "several months ago," that another patient also received the C3 inhibitor and also had evidence of CLS which was indicated about a week after infusion in both patients.  Shah also said the that the inhibitor was given in conjunction with the other standard immunomodulatory regimen and though both patients experienced CLS, they did not show TMA symptoms.  Shah also said about the patient that died, "the patient was, at that time, stable and doing potentially well enough that we were cautiously optimistic of recovery.   And the capillary leak was improving. Unfortunately, over the weekend, over this past weekend, he developed an acute systemic infection that accelerated his demise. That's the full sequence of events. And the clinical hold was placed on Friday -- the clinical hold was placed Friday just before this demise.  So all of these -- the most severe events unfolded literally in the last 3 or 4 days."

(c)     In response to a question about previous patients experiencing complement-mediated adverse events, Defendant Shah revealed:

> ***Earlier in the trial, we did see complement activation and TMA.***  It was a gene therapy-associated effect that's part of trial safety benefit that we usually read out at the end of the trial.  And those patients are actually now doing well from a safety and potentially even an efficacy viewpoint.  ***But because it was part of routine explained side effects of gene therapy, we continued with the program.   There was no clinical hold, and we modified the protocol in the way that I described earlier, to continue to further mitigate the risk.***

(d)    In response to a question about incidence of TMA, Defendant Shah explained it had been a serious problem:

> *[T]here was an initial episode of TMA that was linked to a gene mutation, an additional gene mutation that confers complement sensitivity in some patients.* We modified the protocol with the 14 panel test to reduce the – or to eliminate those patients from enrolling who would have those sorts of gene mutations that exacerbate complement. *There was another one that persisted. There was another TMA that we saw also.* And TMA is a known risk of this therapy. *We don't think that the risk is ever going to be zero.* But in order to try to make it as close to zero as possible, we introduced this new inhibitor, and we're going to evaluate what finally happened here.

(e)    Shah also acknowledged the risk of introducing the C3 inhibitor, and admitted "we didn't know how rapidly these complement issues would and could resolve." Shah also confirmed that the two impacted patients received the same A501 dose as others, and that the patients' weight was similar to others dosed in the trial. Shah also admitted that, with the adverse events resulting from the C3 inhibitor Rocket was "*going back to drawing board,*" but Rocket is "confident there is a path forward with the simplified regimen here."

85.    The same day, analysts, both before and after the 5/27/2025 Webinar, emphasized the importance of the news for Rocket.

(a)    A Scotiabank report ("5/27/2025 Scotiabank Report") said "the SAE and patient death *creates a blanket of uncertainty for the Danon program moving forward and further, pushes back key clinical timelines* . . . We recognize that *this is a major setback for Rocket*, but still see a chance for this safety issue to be

55

resolved.  ***That said, we think investors will remain on the sidelines until RP-A501's safety profile is de-risked***."  The report also said "***we think the ongoing clinical hold and patient death will likely call into question the therapy's risk-benefit profile among investors.***"

(b)    A J.P. Morgan report ("5/27/2025 JPM Report") said:

***In our view, this morning's announcement of a patient death in the pivotal phase 2 study of RP-A501 for Danon Disease and subsequent FDA placed clinical hold represents a major, perhaps insurmountable, setback for the program.***  With the Danon program being the primary focus for the Street, and little value being ascribed to the company's remaining pipeline, the pre-market reaction (shares down ~66% vs XBI up 1%) strikes us as appropriate. . . . While the company will seek to work with the FDA to understand what drove the patient's capillary leak syndrome (initially thought to be due to the novel immune pre-conditioning agent), ***we see a real possibility that the event changes the risk/benefit dynamic for A501 such that the bar for registration is more conservative than the current pivotal design presently supports.***

(c)    A Jefferies LLC report ("5/27/2025 Jefferies Report") said:

***We expect significant stock weakness as a Danon patient died due to an acute systemic infection (following an SAE)***, leading the FDA to place a clinical hold on the pivotal Phase II (our core thesis).

\*       \*       \*

***SAE hurts the benefit/risk profile of the Danon program***, and it supports the notion that serious (i) safety events are unpredictable with gene therapies.

(d)    And a Needham & Company, LLC report ("5/27/2025 Needham Report") downgraded Rocket's stock on the news and said:

Earlier this morning, Rocket reported a patient death in its registrational study for RP-A501 in DD. ***The event may have stemmed from a protocol amendment adding a new complement inhibitor to the pre-treatment immunosuppression regimen, implemented to lower the risk of TMA-related AEs.*** The FDA has placed the study on clinical hold, and it remains unclear when/if dosing will resume. ***With increased uncertainty around the company's main value driver, we are downgrading our Buy Rating to a Hold.***

86.    On this news, Rocket's stock price substantially declined, on high trading volume, from a close of $6.27 per share on May 26, 2025, to close at $2.33 per share on May 27, 2025—a drop of $3.94, or -62.84%, per share.

87.    On May 27-28, 2025, analysts linked the stock drop to the disclosure and expressed concern about the continued SAE risk.

(a)    On May 27, 2025, a Cantor Fitzgerald report ("5/27/2025 Cantor Report") said "Should we be concerned about TMA going forward? ***Yes – in our mind this is the bigger issue for this program versus [capillary leak syndrome]. TMA might reflect the underlying disease pathophysiology of Danon combined with complement activation from AAV gene therapy.***" It also said "Can RCKT meaningfully lower the TMA risk from here? There are still short-term and long-term strategies that the company can explore – but will take time." It also said "How long will it take to address these concerns? Another important unknown – perhaps the most significant at this point. How many patients need to be treated to better quantify the TMA risk under various prophylactic regimens? Will regulatory requirements change to better quantify this risk? When will there be enough data?"

57

It concluded "*We do not believe capillary leak syndrome is the major risk to the Danon program; TMA, however, is*."

(b)     On May 28, 2025, a J.P. Morgan report ("5/28/2025 JPM Report") which expressed concern that despite safety precautions imposed, "[management] *does not expect TMA risk to go down to zero.*"

(c)     On May 28, 2025, a Chardan Capital Markets report ("5/28/2025 Chardan Report") expressed concern about continuing TMA.  It said, "While the disclosure does not negate the benefit reported for the program, *the patient death and commentary regarding instances of TMA impact the benefit/risk profile of RP-A501.*"  It also said, "*It is unclear to what extent other immunomodulatory regimens could mitigate TMA risk.*"

88.    Rocket announced its Q2 2025 financial results and business updates in a series of public statements made after the market closed on August 7, 2025, including the 8/7/2025 Earnings Release, which was filed with the SEC as Exhibit 99.1 to the 8/7/2025 8-K signed by Wilson, and the Q2 2025 10-Q, signed and SOX-certified by Defendants Shah and Ondrey.  The 8/7/2025 8-K revealed that Dr. Kinnari Patel, Rocket's President and Head of Research and Development (and its former Chief Operating Officer) would be leaving Rocket effective December 31, 2025, and would no longer serve in her role as Head of Research and Development as of August 8, 2025.

89.    In addition to serving as Rocket's President, Dr. Patel was instrumental to Rocket's development of its AAV programs including advancement of the Phase 2 Trial.

90.    On this news, Rocket's stock price substantially declined, on high trading volume, from a close of $3.09 per share on August 7, 2025, to close at $2.86 per share on August 8, 2025—a drop of $0.23, or -7.44%, per share.

91.    After the market closed on August 25, 2025, Rocket filed a Form 8-K with the SEC, signed by Wilson ("8/25/2025 8-K"), which disclosed that Defendant Ondrey resigned from Rocket on August 20, 2025, effective September 5, 2025.

92.    On this news, Rocket's stock price substantially declined, on high trading volume, from a close of $3.54 per share on August 25, 2025, to close at $3.39 per share on August 26, 2025—a drop of $0.15, or -4.24%, per share.

93.    As a result of Defendants' materially false and misleading statements and omissions, and the precipitous decline in market value of Rocket's stock, Lead Plaintiffs and other Class Members have suffered significant losses and damages.

**E.    Additional Facts Probative Of Scienter**

94.    A strong inference of scienter is evidenced through a holistic examination of the facts and circumstances.

### 1. The Individual Defendants Were Financially Motivated To Commit Fraud

95. The Individual Defendants were financially motivated to commit the fraud alleged herein. During the Class Period, they engaged in the following Rocket securities transactions.

(a) Defendant Shah repeatedly sold Rocket shares, as follows:

| Date | Number of Shares | Price / Share | Net Sale Proceeds |
|------|------------------|---------------|-------------------|
| May 16, 2024 | 9,790 | $23.35 | $228,596.50 |
| August 16, 2024 | 9,650 | $18.504 | $178,563.60 |
| November 21, 2024 | 11,091 | $13.054 | $144,781.914 |
| February 21, 2025 | 16,303 | $10.58 | $172,485.74 |
| May 16, 2025 | 3,621 | $6.528 | $23,637.888 |
| May 20, 2025 | 2,253 | $6.446 | $14,522.838 |
| August 18, 2025 | 2,234 | $3.05 | $6,813.70 |
| **Totals** | **54,942** | | **$769,402.18** |

The dates of these sales compare suspiciously against the dates of the misstatements and/or the corrective disclosures alleged herein. The total sales proceeds also compare suspiciously against Defendant Shah's 2024 salary of $635,880. Defendant Shah's sales were not in a Rule 10b5-1 plan and they were only marginally offset by his purchase of 20,000 Rocket shares at $5.08 / share, for a total cost of $101,600.00 on April 10, 2025. Defendant Shah also transacted in Rocket stock options (243,345 options granted on February 11, 2025) and Restricted Stock Units ("RSUs") (17,662 RSUs converted to common stock on May 14, 2024 and 81,655 RSUs awarded on February 11, 2025). While these transactions added

to Defendant Shah's Rocket positions, they cost him nothing and are thus not exonerating facts.

(b)     Defendant Ondrey likewise sold Rocket shares, pocketing $43,903.48 total from sales on April 4, 2025 (7,489 shares sold at $5.294 / share for proceeds of $39,646.766) and on July 3, 2025 (1,477 shares sold at $2.882 / share for proceeds of $4,256.714).  These sales were also outside of a Rule 10b5-1 plan, with no offsetting purchases of Rocket shares.  They compare suspiciously against both certain alleged misstatements and corrective disclosures and against his 2024 salary of $362,662.  His transactions in Rocket RSUs (46,781 RSUs awarded on April 1, 2024 and 90,358 RSUs awarded on February 11, 2025) and stock options (69,337 options granted on April 1, 2024 and 134,642 options granted on February 11, 2025) were likewise at no cost and thus not exonerating.

## 2.    *Rocket Raised Funds During The Class Period*

96.     During the Class Period, Rocket raised funds while the price of its securities was inflated by the alleged fraud.  Specifically, on December 12, 2024, Rocket completed a public offering of approximately 15.2 million shares of common stock at $12.50 per share and a private placement of pre-funded warrants to purchase 0.4 million shares of common stock at $12.49 per warrant; the net proceeds from the public offering and private placement were approximately $182.5 million.

97.     These transactions closed during the extended Phase 2 Trial dosing freeze, right as Defendants were reaching their decision to implement the C3 inhibitor as part of a revised protocol, when Rocket's stock price was artificially inflated by the ongoing fraud.  They evidence Rocket's corporate scienter because Defendants were highly motivated to complete these transactions to capitalize on the fraud inflation before having to disclose the adverse concealed facts.

### 3.     *Defendants' Knowledge Or Reckless Disregard Of Red Flags Demonstrates Scienter*

98.     Pursuant to 21 CFR §312.64, the FDA-required investigator was obligated to immediately report to Rocket—as the sponsor of the RP-A501 Phase 2 Trial—any serious adverse event.  Per 21 CFR §312.3, an investigator for a clinical trial is "an individual who actually conducts a clinical investigation (*i.e.*, under whose immediate direction the drug is administered or dispensed to a subject)."  The principal investigators for the Phase 2 Trial, as disclosed on clinicaltrials.gov, are Joseph Rossano, MD at CHOP and Barry Greenberg, MD at the University of California, San Diego, though under both U.S. and European regulations, an investigator is required at each trial site.

99.     Given the investigator reporting obligation, and no indication by Rocket that it was not met, Defendants learned of each of the four Phase 2 Trial SAEs promptly after the SAE was observed by the treating facility and medical team.  Rocket's later disclosures admitted much of the timeline regarding when the SAEs

arose, which by extension, essentially set the timing of Defendants' knowledge as to each SAE. As regards the few gaps that existed, the CW statements pled herein clarify and confirm aspects of that timeline.

100.    The 9/17/2024 Press Release established that the first two Phase 2 Trial patients were dosed by at least September 2024. The CW statements herein more precisely set the timing as occurring earlier, with the first patient having been dosed just before the Class Period, with CW1 learning in early 2024 that the first patient, who experienced the TMA-related SAE at Children's Hospital of Philadelphia, had been dosed in late 2023 or more likely early 2024. CW1 confirmed that the fourth patient dosed experienced the second TMA incident in Germany in August 2024. CW2 and CW3 confirmed that the first group of patients dosed with A501 in the Phase 2 trial experienced TMA. Moreover, CW1 and CW2 established the severity and duration of these extended TMA events and associated hospitalizations. CW1 also established that senior Rocket personnel flew to Chicago during the first TMA patient's multi-month hospitalization to discuss with his doctor how to get him home safely. The 5/27/2025 Webinar belatedly admitted the two TMA incidents.

101.    Cementing the timeline and Defendants' contemporaneous knowledge, CW1 established that the fourth patient, dosed in August 2024, was the last one dosed before the C3 inhibitor was added to the trial protocol. CW2 established that the decision to add the C3 inhibitor to the Phase 2 Trial protocol had been reached

by January 2025.  His statement is corroborated by Defendant Shah's admissions in the 5/27/2025 Webinar that the decision to add the C3 inhibitor was made "several months ago," even though the two patients who actually received the C3 inhibitor were not dosed until "early May."  Taken together, these facts establish a total cessation of dosing in the Phase 2 Trial from August 2024 to May 2025, which Defendants knew.

102.  The CWs also establish the SAE-prompted actions that required Defendants' close oversight.  For instance, CW1 established that the first patient's SAE prompted both a dosing halt and a root cause analysis, with results presented to and discussed with FDA.  CW2  established that the process for obtaining FDA approval for the C3 inhibitor addition took some time.  CW2 also established that Rocket's C-suite, which included Defendants Shah (CEO) and Ondrey (CFO), was "heavily involved" in the A501 program and related discussions with FDA, to an unusual extent compared to large pharmaceutical companies where that work was primarily handled by the drug product program team.  CW3 confirmed that Rocket is a small company with a non-siloed culture compared to large companies.  The 5/27/2025 Press Release admitted that the FDA imposed a clinical hold on the Phase 2 Trial on Friday, May 23, 2025, though they did not disclose it until Tuesday, May 27, 2025, after one of the C3 inhibitor SAE patients had died.  As they later admitted, after the clinical hold was instituted, Defendants engaged in further extended

discussions with the FDA over the SAEs and whether and how the Phase 2 Trial might be permitted to resume.

103.    As Defendants know, the Phase 2 Trial still has not resumed.

### 4.    *The Fraud Implicated Core Operations*

104.    The fraud alleged herein implicates Rocket's core operations.    As discussed *supra*, A501 for the treatment of Danon Disease was a key focus for Rocket and the Individual Defendants.    Rocket's Danon Disease program is its lead program on its AAV platform, which Rocket recently prioritized in its strategic corporate reorganization and pipeline prioritization.    Analysts were consistently focused on A501 progress, and its potential for success drove Rocket's stock price. According to the 5/27/2025 Jefferies Report, "Our core thesis centers on RP-A501's pivotal Phase II study," which it called a $1 billion opportunity.    Defendants provided regular updates on Rocket's Phase 2 Trial, and Rocket's CEO, Defendant Shah, regularly participated in events where he discussed the status of Rocket's Phase 2 Trial and its completed Phase 1 trial.

105.    Further, the Individual Defendants, by virtue of their positions and relationships to each other, and the core aspect of the Danon Disease program to Rocket's survival, were highly likely to be in receipt of information reflection the true facts regarding Rocket, their control over, and/or receipt and/or modification of Rocket's allegedly materially misleading misstatements and/or their associations

with the company which made them privy to confidential information concerning Rocket, participated in the fraudulent scheme alleged herein.

106.   In light of these facts, it is inconceivable that the Individual Defendants and executive management did not know the facts and circumstances of the frauds as alleged herein.  Moreover, such knowledge is imputable to Defendants, given the implication of core operations, the Individual Defendants' roles and status within Rocket, the facts alleged regarding Individual Defendants' receipt of information, and their personal involvement in the key events and circumstances at issue.

### 5.    The Individual Defendants Signed, Were Quoted In, Or SOX-Certified The Alleged Misstatements

107.   As the individuals who signed, were quoted in, authorized or orally made the alleged false and misleading statements described herein, Defendants Shah and Ondrey were under an obligation to familiarize themselves with the subject matter of those public statements and to speak truthfully.  As alleged herein, they violated such duties.

108.   As the individuals who SOX-certified SEC filings as described *supra*, Defendants Shah and Ondrey were obligated to inquire and investigate, familiarize themselves with the subject matter of their SOX certifications, and reassure themselves that the certifications were accurate and that they were speaking truthfully in making them.  As alleged herein, they violated such duties.

### 6. Insider Resignations And Suspicious Employment Status Changes Support Scienter

109. Defendants' scienter is further evidenced by the suspiciously timed departure of Rocket officers and directors during the Class Period.

110. On December 5, 2024, Rocket filed a Form 8-K with the SEC ("12/5/2024 8-K"), signed by Wilson, which announced that Mark White, Rocket's General Manager, Commercial Affairs, resigned effective January 1, 2025. Mr. White had worked at Rocket since April 2023, serving as Chief Medical Officer from April 2023 to March 2024, and General Manager, Commercial Affairs since March 2024. The 12/5/2024 8-K did not give a reason for Mr. White's resignation. Mr. White's resignation is suspicious and supports the inference of scienter.

111. On January 27, 2025, Rocket filed a Form 8-K with the SEC ("1/27/2025 8-K"), signed by Defendant Shah, which announced that Naveen Yalamanchi resigned from Rocket's board of directors on January 25, 2025. Mr. Yalamanchi served on the board of directors since January 2018. This resignation was suspicious and supports the inference of scienter.

112. On April 29, 2025, Rocket filed a Form 8-K with the SEC ("4/29/2025 8-K"), signed by Wilson, which announced that on August 26, 2025, R. Keith Woods told Rocket he would not stand for reelection to the Rocket board of directors. Mr. Woods served on the board of directors since December 2023. This resignation was suspicious and supports the inference of scienter.

113.   On August 7, 2025, Rocket filed the 8/7/2025 8-K which announced that effective December 31, 2024, Dr. Kinnari Patel will be leaving Rocket, and as of August 8, 2025, she will no longer serve in the role as President, Head of Research and Development.  Rocket had previously announced, by a July 11, 2025 Form 8-K ("7/11/2025 8-K") that, as of July 7, 2025, Dr. Patel was no longer serving as Rocket's Chief Operating Officer.  Dr. Patel had served as a corporate officer at Rocket since April 2016 in various roles and served as President since February 2021.  This resignation, so soon after the FDA placed a hold on the Phase 2 Trial, was suspicious and supports the inference of scienter.

114.   On August 25, 2025, Rocket filed the 8/20/2025 8-K which announced that, on August 20, 2025, Defendant Ondrey resigned as Rocket's Chief Financial Officer effective September 5, 2025.  This resignation, so soon after the FDA placed a hold on the Phase 2 Trial, was suspicious and supports the inference of scienter.

### 7.    *The Fraud Violated Rocket's Corporate Code Of Conduct And Insider Trading Policy*

115.   Rocket has a "Code of Business Conduct and Ethics" ("Code"), most recently revised October 7, 2024, which it publishes on the "Investor Relations" section of its corporate website.  Rocket references the Code and where it can be found in public filings, including proxy statements.

116.   The Code's "Introduction and Guiding Principles" states the following:

The Rocket Code of Business Conduct and Ethics (the "Code") applies to all employees, officers and directors of Rocket Pharmaceuticals, Inc. … The Company strives to uphold high legal and ethical principles and standards and has adopted this Code to promote:

- Compliance with applicable governmental laws, rules and regulations; …

- ***Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the United States Securities and Exchange Commission ("SEC")***, other regulatory agencies ***and in the Company's other public communications;***

117.   The Code further prohibits trading while in possession of nonpublic information, stating that:

All Rocket employees are prohibited from buying, selling or engaging in any other transaction with respect to securities of Rocket or any other company while in possession of material, nonpublic information. Material information is any information that a reasonable investor would consider important in making an investment decision.

118.   The Code, as detailed herein, barred Defendants' misconduct alleged herein, including their materially false or misleading statements and omissions about the Phase 2 Trial, as well as Defendants' transactions in Rocket securities at prices artificially inflated by the alleged fraud.  Defendants' violations of these express and binding corporate policies further buttress the influence of their scienter, whether based on their knowledge or recklessness.

69

## VI.    NO SAFE HARBOR

119.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein.  Most, if not all, of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent any were so labelled, they included statements of then-historical or then-present fact, and there were no accompanying, meaningful, cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Any purported cautionary language warned only of theoretical future risks at times when those risks had already ripened due to Rocket's then-ongoing misconduct.  Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstances.

120.    Alternatively, to the extent that the statutory safe harbor does apply to any false or misleading statements pleaded herein that the Court deems to have been forward-looking, Defendants are still liable for those statements because at the time each of them was made, the particular speaker knew that the forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of Rocket who knew that those statements were false or misleading when made.

121.   Moreover, the statements made by Defendants in the 1/8/2024 JPM Conference, 5/16/2024 BofA Conference, 9/5/2024 MS Conference, 11/12/2024 UBS Conference, 12/3/2024 Evercore Conference, 1/13/2025 JPM Conference, and 4/8/2025 Needham Conference were not accompanied by any language indicating they were forward-looking, nor did Defendants refer conference participants to any risk warnings in Rocket's Form 10-Ks or 10-Qs.

122.   For all these same reasons, the bespeaks caution doctrine likewise does not apply to shield Defendants from liability.

## VII.   LOSS CAUSATION / ECONOMIC LOSS

123.   The market for Rocket shares was open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive investors that artificially inflated Rocket securities and that operated as a fraud or deceit on Class Period purchasers or acquirors thereof by misrepresenting the material facts alleged herein. As detailed above, as Defendants' prior misrepresentations were incrementally revealed to the public, the price of Rocket securities fell, as artificial inflation came out.  Accordingly, as a result of their purchases or acquisitions of Rocket shares during the Class Period, Lead Plaintiffs and the Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

124.    During the Class Period, Defendants presented a misleading picture of Rocket's financial condition, performance, and business prospects, including as regards Rocket's then-ongoing clinical trials and its product development efforts. Defendants' false and misleading statements and omissions had the intended effect and caused Rocket's securities to trade at artificially inflated prices throughout the Class Period and until the truth was incrementally revealed to the market by the partial corrective disclosures pled herein.

125.    As detailed herein, the price of Rocket shares dropped, on high volume, in response to the issuance of each corrective disclosure alleged herein.  These stock drops removed inflation from the price of Rocket securities, causing real economic loss to investors who had purchased or acquired them during the Class Period.

126.    These declines were a direct and proximate result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the price declines in Rocket securities negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic factors or Rocket-specific facts unrelated to Defendants' fraudulent conduct.

127.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and other Class members was a direct and proximate result of Defendants' fraudulent scheme to artificially inflate the price of Rocket's securities and the subsequent declines in

the value thereof when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII. PRESUMPTION OF RELIANCE

128.  At all times, the market for Rocket shares was an efficient market, supporting a presumption of reliance under the fraud-on-the-market doctrine, for the following reasons, among others:

(a)  Rocket met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market, under the ticker symbol "RCKT;"

(b)  Rocket had approximately 90.8 million shares outstanding as of May 1, 2024, early in the Class Period, such that its stock was liquid.  During the Class Period, numerous shares of Rocket stock were traded on a daily basis, with moderate to heavy volume, demonstrating an active and broad market for Rocket stock and permitting a strong presumption of an efficient market;

(c)  As a regulated issuer, Rocket filed periodic public reports with the SEC;

(d)  Rocket regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)    Rocket was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period; and

(f)    Unexpected material news about Rocket was rapidly reflected and incorporated into its stock price during the Class Period.

129.    As a result of the foregoing, the market for Rocket stock promptly digested current information regarding Rocket from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Rocket securities during the Class Period suffered similar injury through their purchase thereof at artificially inflated prices, and a presumption of reliance applies.

130.    Alternatively, Lead Plaintiffs and the Class members are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX.    LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS

131.    Lead Plaintiffs bring this federal securities action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired the securities of Rocket

(NASDAQ: RCKT) during the Class Period of February 28, 2024 through August 25, 2025, both dates inclusive, seeking to recover damages caused by Defendants' violations of the U.S. federal securities laws and to pursue remedies under Exchange Act §§10(b) and 20(a) and Rule 10b-5 promulgated thereunder, against Defendants Rocket, Shah, and Ondrey.  Excluded from the Class are Defendants, the officers and directors of Rocket during the Class Period, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

132.   The Class members are so numerous that joinder of them all is impracticable.  Throughout the Class Period, Rocket securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other Class members may be identified from records maintained by Rocket or its transfer agent and may be notified of the pendency of this action by mail or email, using the forms of notice similar to those customarily used in securities class actions.

133.   Lead Plaintiffs' claims are typical of the claims of the Class members, as Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

134.   Lead Plaintiffs will fairly and adequately protect the Class members' interests, have no interests antagonistic to or in conflict with those of the Class, and retained counsel competent and experienced in class and securities litigation.

135.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period materially misrepresented material facts about the business, operations and management of Rocket;

- whether the Individual Defendants caused Rocket to issue materially false or misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing materially false or misleading financial statements;

- whether the prices of Rocket securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the Class members have sustained damages and, if so, what is the proper measure of damages.

136.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

137. As alleged herein, Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine inasmuch as Defendants made public misrepresentations or failed to disclose material facts during the Class Period; the misrepresentations and omissions were material and would tend to induce a reasonable investor to misjudge the value of Rocket's securities; and Lead Plaintiffs and the Class members purchased or otherwise acquired Rocket's securities between the time the Defendants failed to disclose or misrepresented material facts and the times true and corrective facts were disclosed, without knowledge of the omitted or misrepresented facts.

## X.    CLAIMS FOR RELIEF

### FIRST CLAIM

#### (Against All Defendants For Violation Of §10(b) and Rule 10b-5 Promulgated Thereunder)

138. Lead Plaintiffs repeat and re-allege each allegation contained above as if fully set forth herein.

139. This Count is asserted against Defendants and is based upon Exchange Act §10(b), 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

140. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly

engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiffs and the other Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Rocket securities; and (iii) cause Lead Plaintiff and other Class members to purchase or otherwise acquire Rocket securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions pled herein.

141. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Rocket securities. Such reports, filings, releases and statements, as alleged herein, were materially false and misleading in that they failed to disclose material adverse

78

information and misrepresented the truth about Rocket's finances, operations, and business prospects.

142. Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, including by virtue of their positions at Rocket, and intended thereby to deceive Lead Plaintiffs and the other Class members, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

143. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. Defendants' first-hand knowledge is alleged herein.  Moreover, as the senior managers and/or directors of Rocket, and in accordance with the Code of Conduct and the Governance Guidelines, the Individual Defendants had knowledge of the details of Rocket's operations, business, and internal affairs.

144. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority,

they were able to and did, directly or indirectly, control the content of the statements of Rocket.  As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Rocket's businesses, operations, financial condition, and prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Rocket securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Rocket's business and financial condition that were concealed by Defendants, Lead Plaintiffs and the other Class members purchased or otherwise acquired Rocket securities at artificially inflated prices and relied upon the price of those securities, the integrity of the market for those securities and/or upon statements disseminated by Defendants, and were damaged thereby.

145.   During the Class Period, Rocket securities were traded on an active and efficient market.  Lead Plaintiffs and the other Class members, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Rocket securities at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiffs and the other Class members known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated

prices that were paid.  At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class members, the true value of Rocket securities was substantially lower than the prices paid by Lead Plaintiff and the other Class members.  The market price of Rocket securities declined upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

146.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Exchange Act §10(b) and Rule 10b-5 promulgated thereunder.

147.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other Class members suffered damages in connection with their respective purchases, acquisitions, and/or sales of Rocket's securities during the Class Period, upon the disclosure that Defendants had been disseminating misrepresented financial and operational reports and information to the investing public.

## SECOND CLAIM

### (Violations of §20(a) of the Exchange Act
### Against the Individual Defendants)

148.   Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

149.   During the Class Period, the Individual Defendants oversaw and participated in the operation and management of Rocket, and conducted and

participated, directly and indirectly, in the conduct of Rocket's business affairs. Because of their senior positions, they knew the adverse non-public information about Rocket's business, operations, financial condition, results, and prospects, including its clinical trial data, product development efforts, and fundraising activities.

150. As officers and/or Directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Rocket's business, operations, financial condition, results, and prospects and to correct promptly any public statements issued by Rocket which had become materially false or misleading.

151. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Rocket disseminated in the marketplace during the Class Period concerning Rocket's business, operations, financial condition, results, and prospects. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Rocket to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Rocket within the meaning of Exchange Act §20(a). In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Rocket securities.

152.    Each of the Individual Defendants, therefore, acted as a controlling person of Rocket.  By reason of their senior management positions and/or being Directors of Rocket, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Rocket to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations and business of Rocket and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other Class members complain.

153.    By reason of the above conduct, the Individual Defendants are liable pursuant to Exchange Act §20(a) for the violations committed by Rocket.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## XII.  DEMAND FOR JURY TRIAL

Lead Plaintiffs hereby demand a trial by jury.

Dated:    November 18, 2025           Respectfully submitted,

**POMERANTZ LLP**

*/s/ Brian Calandra*
Brian Calandra
Matthew L. Tuccillo (*pro hac vice*)
Zachary Denver (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York   10016
Phone:      212-661-1100
Facsimile:   917-463-1044
bcalandra@pomlaw.com

*Co-Lead Counsel for Co-Lead Plaintiff
Dimitar Yankov, and the Proposed Class*

**THE ROSEN LAW FIRM, P.A.**

Gonen Haklay
101 Greenwood Ave., Ste. 440
Jenkintown, Pennsylvania   19046
Phone:      215-600-2817
Facsimile:   212-202-3827
ghaklay@rosenlegal.com

Laurence A. Rosen
One Gateway Center, Suite 2600
Newark, NJ 07102
Phone:      (973) 313-1887
Fascimile:   (973) 833-0399
lrosen@rosenlegal.com

*Co-Lead Counsel for Co-Lead Plaintiff*
*Corey Sipmann, and the Proposed Class*

## CERTIFICATE OF SERVICE

I, Brian Calandra, hereby certify that I have caused a copy of this Consolidated Class Action Complaint to be served on all counsel by the Court's CM/ECF System. Notice of this filing will be sent by e-mail to all parties by operation of the Court' s electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Brian Calandra*
Brian Calandra

## SUPPLEMENTAL CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, Dimitar Yankov, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I understand that, by court order, I was appointed as one of two Co-Lead Plaintiffs in the action *In re Rocket Pharmaceuticals, Inc. Securities Litigation*, 3:25-cv-10049 (D.N.J.) (the "Action") for all claims.  I remain willing to serve as a representative party for all claims on behalf of a class of investors who purchased or otherwise acquired the securities of Rocket Pharmaceuticals, Inc. ("Rocket") during the Class Period as specified in the First Amended Class Action Complaint For Violations Of The Federal Securities Laws (the "Amended Complaint"), including providing testimony at deposition and trial, if necessary.

3.      I have reviewed the initial Complaint filed against Rocket and the pertinent lead plaintiff filings in the Action, and do hereby authorize the filing of the Amended Complaint on my behalf.

4.      I did not purchase or otherwise acquire Rocket securities at the direction of plaintiffs' counsel or in order to participate in any private action under the Securities Act or Exchange Act.

1

5.    To the best of my current knowledge, the attached sheet lists all of my transactions in Rocket securities during the Class Period as specified in the Amended Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, apart from this Action, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Amended Complaint, beyond my *pro rata* share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge, information, and belief.


Executed _____
11/18/2025
                      (Date)

                                          DocuSigned by:

                                          *Dimitar Yankov*
                                          _____
                                          B79C6B8DDFB0429...
                                                    (Signature)
                                          Dimitar Yankov

# SCHEDULE A

Rocket Pharmaceuticals, Inc. (RCKT)                                                    Dimitar Yankov

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 5/23/2025 | 100 | $6.2800 |
| Purchase/Acquisition | 5/23/2025 | 30 | $6.2800 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.2800 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.2800 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.2750 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.2800 |
| Purchase/Acquisition | 5/23/2025 | 12 | $6.2800 |
| Purchase/Acquisition | 5/23/2025 | 81 | $6.2800 |
| Purchase/Acquisition | 5/23/2025 | 2,000 | $6.2800 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.2800 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 14 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 11 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 400 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 50 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 11 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 63 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 55 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 287 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 11 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 8 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 1 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 59 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 6 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 126 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 3,524 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 56 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 600 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 64 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3150 |
| Purchase/Acquisition | 5/23/2025 | 163 | $6.3150 |
| Purchase/Acquisition | 5/23/2025 | 14 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 16 | $6.3200 |

Rocket Pharmaceuticals, Inc. (RCKT)                                     Dimitar Yankov

## List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 5/23/2025 | 48 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 63 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 4 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 23 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 10 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 400 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 3 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 64 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 11 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 145 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3350 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3400 |
| Purchase/Acquisition | 5/23/2025 | 90 | $6.3400 |
| Purchase/Acquisition | 5/23/2025 | 49 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 300 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 17 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 39 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 6 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 22 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 63 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 53 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 173 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 52 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 104 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 101 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 6 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3150 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 8 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3400 |

Rocket Pharmaceuticals, Inc. (RCKT)                                    Dimitar Yankov

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 30 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3150 |
| Purchase/Acquisition | 5/23/2025 | 30 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3150 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3150 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 23 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 1 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 1 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 9 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 800 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 55 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 14 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 8 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 2,400 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 600 | $6.3150 |
| Purchase/Acquisition | 5/23/2025 | 37 | $6.3150 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3150 |
| Purchase/Acquisition | 5/23/2025 | 39 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 2 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 1,735 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 44 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 2 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 4 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 4 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 10 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |

Rocket Pharmaceuticals, Inc. (RCKT)                                          Dimitar Yankov

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 5/23/2025 | 1 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3400 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 81 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 63 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 11 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3150 |
| Purchase/Acquisition | 5/23/2025 | 59 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 400 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 744 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 132 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 800 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3150 |
| Purchase/Acquisition | 5/23/2025 | 11 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 36 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 39 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 78 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 92 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 300 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 15 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3150 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 28 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 247 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 11 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |

Rocket Pharmaceuticals, Inc. (RCKT)                                              Dimitar Yankov

## List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 80 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 1 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 78 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 64 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 61 | $6.3150 |
| Purchase/Acquisition | 5/23/2025 | 44 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 14 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 300 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 10 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 22 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3400 |
| Purchase/Acquisition | 5/23/2025 | 11 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 2 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 1 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 50 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 33 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 4 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 14 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 270 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 900 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 15 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 7 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 60 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 60 | $6.3150 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 800 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 8 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 61 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 7 | $6.3200 |

**Rocket Pharmaceuticals, Inc. (RCKT)**                                    **Dimitar Yankov**

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 5/23/2025 | 56 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 300 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 122 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 39 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 7 | $6.3400 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 64 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 12 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 53 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 14 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3400 |
| Purchase/Acquisition | 5/23/2025 | 800 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 10 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 60 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 96 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 14 | $6.3100 |
| Purchase/Acquisition | 5/23/2025 | 11 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 1 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 29 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 11 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 11 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 1 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3150 |
| Purchase/Acquisition | 5/23/2025 | 1 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 164 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |

**Rocket Pharmaceuticals, Inc. (RCKT)**                                    **Dimitar Yankov**

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 400 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3400 |
| Purchase/Acquisition | 5/23/2025 | 2 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 400 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 28 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 800 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 16 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 500 | $6.3150 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 2 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 4 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 63 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 28 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 7 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 2 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 10 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 17 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 56 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 11 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 14 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 72 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 1 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 39 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |

**Rocket Pharmaceuticals, Inc. (RCKT)**                                                      **Dimitar Yankov**

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 6 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 53 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 25 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 1,800 | $6.3150 |
| Purchase/Acquisition | 5/23/2025 | 263 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 11 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 14 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 25 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 11 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 26 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 27 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 1,100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 84 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 61 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 11 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 16 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 83 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |

**Rocket Pharmaceuticals, Inc. (RCKT)**                                                    **Dimitar Yankov**

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 5/23/2025 | 6,600 | $6.3150 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 11 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 104 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 44 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 16 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 200 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 600 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 4 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3250 |
| Purchase/Acquisition | 5/23/2025 | 16 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 8 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3200 |
| Purchase/Acquisition | 5/23/2025 | 100 | $6.3300 |
| Purchase/Acquisition | 5/23/2025 | 7 | $6.3300 |