Brian Calandra
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, NY  10016
Telephone:  (212) 661-1100
Fax:  (917) 463-1044
bcalandra@pomlaw.com

[*Additional counsel on signature page*]


*Co-Lead Counsel for Co-Lead Plaintiff
Dimitar Yankov, and the Proposed
Class*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE ROCKET PHARMACEUTICALS, INC. SECURITIES LITIGATION | Case No. 3:25-cv-10049-ZNQ-TJB |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (ECF 40) THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ........................................................................1

II.  SUMMARY OF ALLEGATIONS AND CLAIMS.......................................5

III. PROCEDURAL HISTORY / TEXT ORDER VIOLATION .......................12

IV.  ARGUMENT................................................................................................13

   A. APPLICABLE PLEADING STANDARDS ..........................................13

   B. THE CAC ADEQUATELY PLEADS FALSITY ..................................15

   C. THE MISSTATEMENTS AND OMISSIONS ARE NOT
      PROTECTED FROM LIABILITY ......................................................25

   D. THE CAC ADEQUATELY PLEADS SCIENTER..............................31

   E. THE CAC ADEQUATELY PLEADS LOSS CAUSATION ................38

   F. THE CAC'S §20(A) CLAIM SHOULD BE SUSTAINED ..................40

V.   CONCLUSION.............................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barbee v. Amira Nature Foods, Ltd.*,
  2025 WL 2505605 (D.N.J. Sep. 2, 2025) ..........................................................15

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...........................................................................................14

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
  2019 WL 3451523 (D.N.J. July 31, 2019) .........................................................27

*City of Livonia Emps.' Ret. Sys. v. Wyeth*,
  2010 WL 3910265 (S.D.N.Y. 2010)........................................................21, 23, 25

*City of Edinburgh Council v. Pfizer, Inc.*,
  754 F.3d 159 (3d Cir. 2014) .....................................................17, 18, 19, 20, 30

*City of Providence v. Aeropostale, Inc.*,
  2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013)....................................................36

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
  70 F.4th 668 (3d Cir. 2023) ..........................................................................16, 30

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
  477 F. Supp. 3d 123 (S.D.N.Y. 2020) (Rakoff, J.)............................................14

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012) ...............................................................32

*Cohen v. Kitov Pharms. Holdings, Ltd.*,
  2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018)....................................................15

*Cont'l Gen. Ins. Co. v. Olafsson*,
  2024 WL 4263211 (D.N.J. Sep. 23, 2024) (Quraishi, J.) ................17, 23, 25, 27

*Dudley v. Haub*,
  2013 WL 1845519 (D.N.J. Apr. 30, 2013)........................................................38

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)...........................................................................................38

ii

*Frater v. Hemispherx Biopharma, Inc.*,
   996 F. Supp. 2d 335 (E.D. Pa. 2014)........................................................20, 24

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017) ............................................................36

*FTC v. Wyndham Worldwide Corp.*,
   799 F.3d 236 (3d Cir. 2015) ...........................................................................14

*Gregory v. ProNAi Therapeutics, Inc.*,
   297 F. Supp. 3d 372 (S.D.N.Y. 2018) .............................................................18

*In re Advance Auto Parts, Inc. Sec. Litig.*,
   2020 WL 599543 (D. Del. Feb. 7, 2020).........................................................31

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) .........................................................................16

*In re Campbell Soup Co. Sec. Litig.*,
   145 F. Supp. 2d 574 (D.N.J. 2001)..................................................................15

*In re Celgene Corp. Sec. Litig.*,
   2019 WL 6909463 (D.N.J. Dec. 19, 2019)..........................................20, 24, 25

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
   2020 WL 3026564 (D.N.J. June 5, 2020).........................................................38

*In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*,
   2019 WL 1299673 (D.N.J. Mar. 20, 2019) ......................................................27

*In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II)*,
   751 F.3d 150 (3d Cir. 2014) ...........................................................................36

*In re Hertz Glob. Holdings, Inc.*,
   905 F.3d 106 (3d Cir. 2018) ...........................................................................38

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
   2017 WL 1536223 (D.N.J. Apr. 27, 2017),
   *aff'd*, 905 F.3d 106 (3d Cir. 2018)..................................................................29

*In re Innocoll Holdings Pub. Ltd. Sec. Litig.*,
   2020 WL 1479128 (E.D. Pa. March 25, 2020)..................................................29

*In re Lucent Techs., Inc. Sec. Litig.*,
217 F. Supp. 2d 529 (D.N.J. 2002) ........................................................................14

*In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*,
2011 WL 3444199 (D.N.J. Aug. 8, 2011) ..............................................................39

*In re NUI Sec. Litig.*,
314 F. Supp. 2d 388 (D.N.J. 2004) ........................................................................37

*In re Par Pharm. Sec. Litig.*,
2009 WL 3234273 (D.N.J. Sep. 30, 2009) ............................................................38

*In re Res. Am. Sec. Litig.*,
2000 WL 1053861 (E.D. Pa. July 26, 2000) .........................................................37

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015) ...............................................................18, 30

*In re Silvercorp Metals, Inc. Sec. Litig.*,
26 F. Supp. 3d 266 (S.D.N.Y. 2014) .....................................................................37

*In re SLM Corp. Sec. Litig.*,
740 F. Supp. 2d 542 (S.D.N.Y. 2010) ...................................................................37

*In re Toronto-Dominion Bank Sec. Litig.*,
2018 WL 6381882 (D.N.J. Dec. 6, 2018)...............................................................37

*In re Urban Outfitters, Inc. Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015)................................................................39, 40

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
2017 WL 1658822 (D.N.J. Apr. 28, 2017)............................................................38

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
620 F. Supp. 3d 167 (D.N.J. 2022)..........................................................20, 24, 25, 30

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ............................................... 14, 16, 23, 27, 28, 29

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*,
620 F.3d 137 (2d Cir. 2010) ..................................................................................27

iv

*Johnson v. Pozen, Inc.*,
    2009 U.S. Dist. LEXIS 12765 (M.D.N.C. Feb. 19, 2009) ..................................18

*Johnston v. HBO Film Mgmt., Inc.*,
    265 F.3d 178 (3d Cir. 2001) ......................................................................23

*Kendall v. Odonate Therapeutics, Inc.*,
    2021 WL 3406271 (S.D. Cal. Aug. 4, 2021).................................................37

*Langford v. Atlantic City*,
    235 F.3d 845 (3d Cir. 2000) ......................................................................14

*Levon v. CorMedix Inc.*,
    797 F. Supp. 3d 381 (D.N.J. 2025)................... 20, 22, 23, 25, 29, 30, 31, 37, 39

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011).......................................................17, 23, 25, 32, 34

*McCabe v. Ernst & Young, LLP*,
    494 F.3d 418 (3d Cir. 2007) ......................................................................39

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ......................................................................35

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)...................................................................................31

*Opengate Cap. Grp. LLC v. Thermo Fisher Sci. Inc.*,
    2014 WL 3367675 (D. Del. July 8, 2014) .................................................14

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000) ........................................................................7

*Rahman v. Kid Brands, Inc.*,
    736 F.3d 237 (3d Cir. 2013) ......................................................................32

*Roofer's Pension Fund v. Papa*,
    2018 WL 3601229 (D.N.J. July 27, 2018) ............................................36, 38

*Schmidt v. Skolas*,
    770 F.3d 241 (3d Cir. 2014) ........................................................................6

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
   351 F. Supp. 3d 874 (E.D. Pa. 2018)........................................................21

*Shulman v. Weston*,
   2025 WL 3754159 (D.N.J. Dec. 29, 2025).................................................28

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)....................................................31, 32, 33, 34

*Van Dongen v. CNinsure, Inc.*,
   951 F. Supp. 2d 457 (S.D.N.Y. 2013) .......................................................37

*Whiteley v. Zynerba Pharms., Inc.*,
   2020 WL 13879653 (E.D. Pa. Nov. 25, 2020) ...............................21, 22, 23, 25

*Williams v. Globus Med., Inc.*,
   869 F.3d 235 (3d Cir. 2017) .......................................................17

*Winer Fam. Tr. v. Queen*,
   503 F.3d 319 (3d Cir. 2007) .......................................................14

## Statutes

15 U.S.C. 78u-5(i)(1) .......................................................27

15 U.S.C. 78u-5(c) .......................................................25

15 U.S.C. 78u-5(c)(1)(A)(i) .......................................................28

15 U.S.C. §78u-5(c)(1)(A)(i) .......................................................28

Private Securities Litigation Reform Act of 1995 ............. 14, 15, 16, 25, 27, 29, 38

Securities Exchange Act of 1934 §10(b) ...............................5, 13, 16, 40

## Rules

Fed. R. Civ. P. 8(a).......................................................38

Fed. R. Civ. P. 9(b) ...............................................15, 16, 38

Fed. R. Civ. P. 12(b)(6).......................................................12, 14, 36

Securities and Exchange Commission Rule 10b-5......................................5, 13, 16

Securities and Exchange Commission Rule 10b5-1 ................................................36

## Regulations

21 C.F.R. §312.64 ............................................................................35

Lead Plaintiffs Dimitar Yankov and Corey Sipmann respectfully submit this opposition to Defendants' motion to dismiss (ECF 40) ("Motion") challenging the Consolidated Amended Class Action Complaint (ECF 34) ("CAC") for the reasons set forth in Defendants' memorandum of law (ECF 40-1) ("Memo").[1]

## I.    PRELIMINARY STATEMENT

During Rocket's Phase 1 trial of its drug candidate A501, one patient suffered an SAE (serious adverse event) involving TMA (thrombotic microangiopathy), causing an FDA clinical hold and a reduced patient headcount from seven to six. ¶¶4, 41.   Rocket said the TMA was caused by complement activation, a rapid immune response to either pathogens or to gene therapies like A501.  ¶¶39, 41.

Consequently, Rocket had to convince FDA and investors it could manage the TMA / complement activation risk in a Phase 2 trial.  So, "Rocket purportedly *implemented* additional safety measures for the Phase 2 Trial."  ¶46.  Principally, Rocket only attempted the Phase 1 "low dose" for Phase 2 (¶45), after the TMA-related SAE in Phase 1 occurred in a patient given the "high dose" (¶62(a)).  Rocket also excluded patients with end-stage heart failure and used a complement activation suppression regimen (a/k/a a "refined immunomodulatory regimen") administered before A501 in trial patients and continuing 2-3 months after dosing. ¶¶5, 8.  These

---

[1]    Unless specified, herein, "¶" cites are to CAC-numbered paragraphs, "Exh." Refers to Defendants' exhibits, all terms have CAC-assigned definitions, all emphasis is added and all internal citations and quotation marks are omitted.

steps were ***already taken*** as predicates for the Phase 2 Trial, and Rocket's quarterly filings throughout the Class Period said, "Additional safety measures ***have been implemented*** and are reflected in the updated trial protocol."  ¶¶8, 46, 62(a).

This case arises from Defendants' public statements and omissions regarding Rocket's ensuing 12-patient Phase 2 Trial of A501.  ¶¶3, 43.  It was enrolled in two stages: a "two-patient safety run-in" after which "the remaining ten patients were enrolled across the United States and European Union within three months."  ¶46.  "A safety run-in is an initial phase of a clinical trial to assess the short-term safety and tolerability of a treatment combination."  *Id*.  The run-in patients were not only part of the Phase 2 Trial patient population, they were specifically designated to assess A501's "safety and tolerability."  *Id.*  Rocket's SEC filings, *e.g.*, Exhibits 1-2 hereto as described below, expressly stated so.

Disastrously, ***the very first patient*** in the Phase 2 Trial, an adolescent boy from Chicago dosed in early 2024, experienced a TMA-related SAE, an acute kidney injury, that forced his hospitalization for months in Philadelphia.  ¶58.  During that time, Rocket flew out senior clinical and medical personnel, halted trial dosing, and conducted a root cause analysis.  *Id.*  Later, the fourth patient dosed, a boy in Germany, suffered a TMA-related kidney injury SAE in August 2024 requiring extended hospitalization, due to a preconditioning drug used in trying to prevent complement activation.  *Id.*  During the ensuing nine-month dosing halt, Defendants

2

decided in January 2025 to **modify** the Phase 2 Trial by introducing a new-to-market C3 inhibitor as an alternative to suppress complement activation to address Phase 2's persistent SAEs, then sought FDA approval. ¶¶5, 10, 52, 81(c). The inhibitor carried its own dangers and increased the Phase 2 Trial's overall risk profile. ¶53 & n.1; ¶81(c), (f). When dosing resumed in May 2025, the fifth and sixth dosed patients suffered SAEs related to CLS (capillary leak syndrome) due to the inhibitor and were hospitalized; one died shortly after FDA imposed a clinical hold on May 23, 2025. ¶¶5, 12. Throughout the Class Period, Defendants misrepresented and/or concealed all these facts and Rocket's inability to safely manage A501's SAE risks.

Defendants blatantly seek to rewrite both the CAC and the facts of the Phase 2 Trial itself to create an alternative narrative on which their entire brief rests.

First, they add the phrase "no more than" to the CAC's definition of the "two-patient safety run-in," falsely claiming it was "*no more than* an initial phase of a clinical trial to assess the short-term safety and tolerability of a treatment combination." *See, e.g.*, Memo at 5. Without citation, Defendants seek to excise the first two of the six dosed Phase 2 Trial patients, those specifically intended to flag safety issues. They claim, in effect, that the first patient dosed, who required months of hospitalization, does not count. The Memo proceeds as if he never existed, a root cause analysis into his SAE was never conducted, dosing was never halted, and no FDA engagement concerning him ever occurred. Defendants base all

3

ensuing argument on an alternative reality wherein no TMA-related SAE occurred until the fourth patient in the trial, leading to the C3 inhibitor.  Even then, Defendants argue (*e.g.*, Memo at 2, 6) the third and fourth SAEs, suffered in May 2025 after the novel C3 inhibitor was introduced, were the first giving rise to any disclosure duty. The Defendants cannot rewrite or ignore the CAC's allegations at the pleading stage.

Second, Defendants rewrite Rocket's ***past***-tense statements that "additional safety measures ***have been*** implemented" after the Phase 1 trial, for the Phase 2 Trial protocol, into ***future***-tense, open-ended statements that Rocket "***would implement*** additional safety measures not employed in Phase 1." *See, e.g.*, Memo at 6, 7.  They falsely claim investors were told Rocket intended to make safety-related adjustments to the Phase 2 Trial, not that safety measures were already employed during Phase 2 planning and FDA trial approval.  They use this alternate reality to justify concealing from investors, *e.g.*, that the Phase 2 Trial protocol was later redone, after two dosing halts and a root cause analysis prompted by two SAEs in the first four patients, to replace its complement activation suppression regimen with the C3 inhibitor.

Third, and relatedly, Defendants falsely claim that the novel C3 inhibitor was added to the pretreatment regimen "in light of the SAEs experienced in Phase 1." *See, e.g.*, Memo at 2.  That is not what the CAC (¶5) alleges.  All measures adopted "in light of the SAEs experienced in Phase 1" had already been adopted into the Phase 2 Trial protocol that was approved and implemented at its start.  It was only

4

after *two Phase 2 patients* experienced TMA-related SAEs, prompting two dosing halts, that Defendant decided, unbeknownst to investors, to add the novel C3 inhibitor, leading to two CLS-related SAEs and a patient death. ¶5.

This trickery should be rejected. The CAC's well-pled allegations must be accepted as true and construed in Lead Plaintiffs' favor. If they are, Defendants' dismissal arguments collapse. Their Motion should be entirely rejected.

## II.    SUMMARY OF ALLEGATIONS AND CLAIMS

The CAC raises claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder on behalf of a Class of investors who purchased or acquired Rocket's securities during the Class Period of February 28, 2024 - August 25, 2025. ¶2. Defendants allegedly committed fraud in their public statements and omissions about Rocket's 12-patient Phase 2 Trial of its key gene therapy drug candidate, RP-A501 (a/k/a A501), one of its two top prospects and the one having the highest economic upside. ¶3.

Pre-Class Period, during Rocket's seven-patient Phase 1 trial, one patient suffered a TMA-related SAE and failed to complete the trial, reducing its headcount and prompting an FDA to impose a trial hold. ¶¶4, 41. Rocket said the TMA was caused by complement activation, a rapid immune response to either pathogens or to intended gene therapies like A501. ¶¶39, 41.

Rocket then had to convince FDA and the market it could manage these risks

5

in a Phase 2 trial.  Thus, Rocket implemented new safety measures for the Phase 2 Trial, primarily to prevent complement activation.  ¶46.  It only used the lower of the two Phase 1 trial doses ($6.7×10^{13}$ gc/kg).  ¶¶37, 45.  It also excluded patients with end-stage heart failure and used a complement activation suppression regimen (its "refined immunomodulatory regimen") administered to patients before A501 and continuing 2-3 months after dosing.  ¶¶5, 8.[2]  These steps were **predicates** for the Phase 2 Trial, and Rocket's quarterly filings said, "Additional safety measures **have been implemented** and are reflected in the updated trial protocol."  ¶¶8, 62(a).

Thus, Defendants are wrong to suggest (*see, e.g.*, Memo at 2, 4-5, 16) that because the Phase 1 trial's TMA incident was discussed in the New England Journal of Medicine ("NEJM") in November 2024 – **nine months into the Class Period** – the Phase 2 Trial's SAE risks were "well publicized and well known."[3]  **After** Phase

---

[2]   The regimen: (a) added transient B- and T-cell mediated inhibition in pretreatment; (b) lowered steroid doses; (c) did an earlier steroid taper; and (d) discontinued all immunosuppressive therapy 2-3 months post-A501.  ¶¶8, 62(a)-(b).

[3]   Lead Plaintiffs oppose Defendants' request for judicial notice (Memo at 5 n.2) of the NEJM article (Exh. A), as well as purported slide decks (Exhs. BB, CC, EE) from the 1/8/2024 JPM Conference, 11/18/2024 Webinar, and 1/13/2025 JPM Conference.  The CAC alleges only that Defendant Shah discussed Rocket's publishing Phase 1 trial data in the NEJM (¶69); it does not reference or incorporate the article itself.  The CAC references oral remarks at those conferences / webinar, but not any purported slide decks.  *See* ¶¶45, 69, 72, 81(a)-(c), 81(e)-(f), 121. Defendants do not even request judicial notice for the articles cited in Memo at 6 n.3, and none should be taken.  All the foregoing documents should be disregarded. *See, e.g.*, *Schmidt v. Skolas*, 770 F.3d 241, 249-250 (3d Cir. 2014) (improper for district court to take judicial notice of materials "not integral to the complaint").

1, Rocket purportedly addressed its SAE, via the Phase 2 Trial's protocol design.[4] The Phase 2 Trial's risk profile, given these steps, was thus not publicly known.

In this context, investors and analysts entered the Class Period seeking timely, accurate, complete disclosures about Rocket's Phase 2 Trial, particularly its risks and incidences of SAEs, including TMA-related incidents. ¶4. Unbeknownst to investors, the Phase 2 Trial, starting with its very first patient, was beset with SAEs impacting four of the first six dosed patients, one of whom died. ¶5.

The first, a pediatric patient dosed in *early 2024*, suffered a TMA-related SAE and remained hospitalized for months with kidney injury. ¶¶5, 47, 58. Rocket halted dosing, flew senior personnel to his doctors, and initiated a root cause analysis. *Id.* This patient was in the two-patient pediatric safety run-in (¶¶9, 46), intended to identify "key AAV-associated toxicities" before other pediatric patients were dosed, and was clearly part of the 12-patient Phase 2 Trial study population – as Rocket's SEC filings made clear, *e.g.*, this chart filed with the SEC September 12, 2023:[5]

---

[4]    Defendants falsely claim (*e.g.*, Memo at 2) the C3 inhibitor was introduced "in light of the SAEs experienced in Phase 1." Not so. It only arose after the two Phase 2 TMA-related SAEs. ¶5; §II, *supra*.

[5]    This chart is from page 8 of Rocket's Investor Presentation ("9/12/2023 Presentation"), Exhibit 99.1 to its Form 8-K ("9/12/2023 8-K") filed with the SEC on September 12, 2023 to update investors on "the alignment it recently achieved with [FDA] on the design of the Phase 2 pivotal trial of RP-A501." The Court can take judicial notice of the Form 8-K and the presentation, as Lead Plaintiffs' Exhibits 1-2. *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (court may take "judicial notice of properly-authenticated public disclosure documents filed with the SEC").

7



After persuading FDA this patient had a genetic mutation predisposing him to an SAE, the Phase 2 Trial resumed. ¶¶5, 58. But, the fourth dosed patient suffered a TMA-related SAE in ***August 2024***, also with a long hospitalization, due to kidney injury arising from the complement activation suppression regimen meant to lower A501's TMA risk. *Id.* Rocket halted further patient dosing until May 2025. ¶¶5, 10. Notably, ***both*** these TMA-related SAEs occurred ***before*** Defendants claim (Memo at 2, 4-5, 16) the NEJM discussed the Phase 1 trial's SAE in November 2024.

By January 2025, Defendants decided to introduce the novel C3 inhibitor to suppress complement activation and engaged with FDA on a trial redesign. ¶¶5, 52, 59, 81(c). In May 2025, the fifth and sixth patients were dosed and given the C3 inhibitor, and both suffered CLS-related SAEs, causing hospitalizations. ¶¶5, 12, 47, 53, 56, 81(d). These were the third and fourth SAEs suffered within only six

8

patients dosed in the Phase 2 Trial.  FDA imposed a clinical hold on May 23, 2025, just before one of those patients died.  ¶¶5, 12, 49, 53.  The Phase 2 Trial was halted at that point and still has not resumed.  ¶¶13, 103.

Defendants' material misstatements and omissions throughout the Class Period misrepresented and/or concealed all these facts.  ¶¶7-11, 61-81.  For instance:

- •  Defendants touted the "low dose" and "[a]dditional safety measures" implemented in the Phase 2 Trial "to mitigate complement-mediated safety concerns observed in the high dose cohort (thrombotic microangiopathy (TMA))," with an "emphasis on preventing complement activation" – failing to adjust the language despite mounting contrary evidence, *e.g.*, SAEs, dosing holds, etc. ¶¶8, 62(a)-(b).

- •  Defendants discussed the first two patients, the safety run-in, while concealing the first one's SAE, *e.g.*, "The pediatric run-in enrolled two patients in a sequential manner with a minimum three-month follow-up prior to subsequent enrollment," "two patients were treated earlier, followed for a certain time, discussed with FDA and IDMC, and then we started the broader trial," and "we had a two-patient run-in, right, and the patients had to be staggered too.  And then you talk to the FDA again.  So it just takes time to get there."  ¶¶9, 11, 65-66, 68(b), 79(b).

- •  They touted Rocket's purported dosing progress, while concealing that four of six dosed patients experienced SAEs, causing multiple extended dosing delays, stating, *e.g.*, "we're finishing dosing as fast as possible," "dosing and follow-

9

up are ongoing," and "the trial and follow-up are ongoing." ¶¶10, 72, 73(b), 77.

• Defendants attributed Phase 2 Trial delays to benign, generic causes, not the actual, SAE-caused setbacks, stating, *e.g.*, "getting everyone dosed just takes some time," "this is a – in some ways, a heavy protocol. We're looking at a lot of different measures. So, it just takes time to get all of those up and running. So, that's why the enrollment is different from the actual dosing," and

> "Number one, these patients require immunomodulation. So, that takes time to set up and source appropriately. Number two, there's some vaccines involved in immunomodulation, which also takes time. There's a troponin run-in, number three, of three months that the FDA mandates. … [I]nstead of putting everyone at one site, we try to stagger them. So, that takes a little bit of time. … So, all this, along with the holidays, has added the time up, … but it is getting done."

¶¶11, 65, 68(b), 70(b), 74.

• Once a patient died, Defendants finally disclosed the four SAEs, but downplayed them, *e.g.*, the complement activation and TMA "was part of routine explained side effects of gene therapy" with "no clinical hold." ¶¶78(b), 79(b). They also concealed that Rocket lacked any way to safely dose patients while effectively managing SAE risks, *e.g.*, "we remain committed to advancing RP-A501 with the highest standards of safety, science, and care," "there are various ways to move forward, including revising the immunomodulatory regimen perhaps to a simpler one," "we're confident that there is a path forward with the simplified regimen here," "Rocket is actively working with FDA, independent safety monitors, and clinical

experts to ensure patient safety and resume the trial," "We're already in deep dialogue with FDA back and forth and doing a neutral, objective root cause analysis. We're discussing with them a potential revising immunomodulatory regimen," and "The hold was lifted in under three months, underscoring…Rocket's commitment to expeditiously optimize safety and resume the trial." ¶¶78(a), 78(c)-(e), 79(a), 80.

The CAC also adequately pleads Defendants' scienter. ¶¶94-118. It alleges Defendants knew of all SAEs immediately, as regulations require (¶¶6, 98-99), and of negative, undisclosed facts making their statements false or misleading (¶¶47-60). It sets the timeline of their knowledge (¶¶100-102) and alleges that A501 was in Rocket's core operations (¶¶104-106), the fraud violated its Code of Conduct (¶¶115-118), and Defendants Shah and Ondrey signed, were quoted in, and SOX-certified the alleged misstatements (¶¶107-108). Yet, Defendants concealed the Phase 2 Trial SAEs and related events until a May 2025 patient death and concealed into August 2025 that Rocket lacked a viable trial design to safely dose patients with A501 while effectively managing SAE risks. ¶6. Rocket raised $182.5 million via offerings at fraud-inflated prices, during an undisclosed Phase 2 dosing halt and just before it decided to employ the ill-fated C3 inhibitor. ¶¶14, 96-97. Defendants Shah ($769,000+) and Ondrey (~$44,000) made fraud-inflated sale proceeds during the fraud. ¶¶14, 95(a)-(b). The Phase 2 Trial remains halted (¶103), while Defendant Ondrey (CFO), Rocket's COO, and its Chief Medical Officer resigned (¶¶109-114).

11

A series of partial corrective disclosures allegedly revealed the fraud.  ¶¶12-13, 82-93.  On May 27, 2025, Rocket disclosed the four prior SAEs, patient death, FDA clinical hold, and related facts, prompting pre-market-close analyst reports, which are collectively pled as causing Rocket's stock to fall -$3.94 / share (-62.84%) that day.  *Id.*[6]  Defendants nonetheless said the Phase 2 Trial had paths forward.  *Id.* But even after FDA lifted the clinical hold, rather than resuming dosing, resignations in August 2025 by Rocket's President / COO, who was key in developing and advancing A501, and Defendant Ondrey prompted stock declines of -$0.23 / share (-7.44%) on August 8, 2025 and -$0.15 / share (-4.24%) on August 26, 2025.  *Id.*

### III.    <u>PROCEDURAL HISTORY / TEXT ORDER VIOLATION</u>

On September 9, 2025, the Court appointed Lead Plaintiffs.  ECF 22.

Defendants filed their three-page letter outlining Rule 12(b)(6) arguments on December 9, 2025 (ECF 35) ("MTD Letter"), and Lead Plaintiffs responded on December 16, 2025 (ECF 36).  The Court's ensuing Text Order (ECF 37) stated:

> TEXT ORDER that the Court has reviewed the parties' pre-motion letters (ECFs 35, 36) and hereby WAIVES the pre-motion conference. Defendants shall file their Motion, ***limited to the arguments set forth in their pre-motion letter***….

---

[6]    Defendants' Memo at 3 n.1 cites the Memorial Day weekend to justify waiting to disclose these facts, but the market closure did not necessitate that wait and it does not excuse their long-concealing the Phase 2 Trial's SAE history.  Their Memo at 7 notes the May 27, 2025 statements "disclosed the SAE experienced by two patients in the Phase 2 study" – but that was also the first, belated disclosure of all four SAEs.

Defendants moved on January 30, 2026 (ECF 40).

Defendants' Motion and Memo clearly *violated* the Text Order by including extensive argument not appearing in their MTD Letter, specifically: (1) their new arguments challenging the CAC's confidential witness (CW) allegations (*see* Memo at 11 n.4); (2) their extensive new arguments – spanning 30% of their brief – referencing purported risk warnings (*see* Memo at 16, 18-19, 23-32); and (3) their loss causation arguments targeting the alleged corrective disclosures / stock drops following key resignations on August 8 and 26, 2025 (*see* Memo at 37 n.5).

All these arguments exceed the MTD Letter's scope and should be stricken. The letter does not mention "confidential witness," "CW," or "warning." It included only one reference to "cautionary language" in one sentence (ECF 35 at 2), but as Lead Plaintiffs noted, did "not identify any purported warnings…." ECF 36 at 2. The MTD Letter's loss causation argument was expressly limited to the May 2025 corrective disclosure / stock drop. ECF 35 at 3. Lead Plaintiffs noted the omission: "Defendants ignore the other two alleged corrective stock drops …." ECF 36 at 3.

## IV.    ARGUMENT

### A.    APPLICABLE PLEADING STANDARDS

To state a claim under Exchange Act §10(b) and Rule 10b-5, a plaintiff must "allege defendants made a misstatement or an omission of material fact with scienter in connection with the purchase or the sale of a security upon which plaintiffs

13

reasonably relied and plaintiffs' reliance was the proximate cause of their injury." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 251 (3d Cir. 2009) (quoting *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007)).  On a Rule 12(b)(6) motion, a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 242 (3d Cir. 2015).  The issue is not whether a plaintiff will ultimately prevail but whether he is entitled to offer evidence to support the claims.  *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 540 (D.N.J. 2002) (citing, *inter alia*, *Langford v. Atlantic City*, 235 F.3d 845, 847 (3d Cir. 2000)).  Even under the PSLRA, a Rule 12(b)(6) motion is not the stage "to resolve disputed facts or decide the merits of the case."  *Opengate Cap. Grp. LLC v. Thermo Fisher Sci. Inc.*, 2014 WL 3367675, at *5 (D. Del. July 8, 2014) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-557 (2007)).

In articulating pleadings standards, Defendants raise two meritless arguments.  First, Defendants belatedly challenge the CAC's CW allegations, for failure to plead their titles.  Memo at 11 n.4.  If considered (*see* §III, *supra*), the argument fails.  CAC ¶27 pleads the CWs' retaliation concerns if their titles were publicly docketed and offered such information for *in camera* review.  That approach suffices.[7]  Second,

---

[7]    *See, e.g.*, *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,

they argue, without citation, "liability cannot be imposed in this case for the additional reason that the claims asserted arose from an unexpected event that the Defendants had sought *to avoid*."  Memo at 11-12.  This is not a breach of fiduciary duty or negligence case.  Liability arises from alleged *misstatements* and *omissions* to investors.  There were at least **four** "events" (the SAEs), if not more (dosing halts, root cause analyses, etc.).  Whether Defendants tried to "avoid" them is irrelevant; what matters is their allegedly fraudulent statements misrepresenting or omitting those events.  *See, e.g., In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 598 (D.N.J. 2001) ("Even if Defendants did not think that their improper behavior would 'catch up with them,' that does not somehow make their failure to disclose material information acceptable or negate their knowledge of the omission.").

## B.    THE CAC ADEQUATELY PLEADS FALSITY

Neither the PSLRA nor Rule 9(b) create an insurmountable pleading hurdle. *See Barbee v. Amira Nature Foods, Ltd.*, 2025 WL 2505605, at *3-4 (D.N.J. Sep. 2, 2025) ("Irrefutable evidence of a statement's falsity need not be pleaded pursuant to Rule 9(b) or the PSLRA, but rather the 'complaint must contain particularized

---

477 F. Supp. 3d 123, 132 & n.1 (S.D.N.Y. 2020) (Rakoff, J.) (where retaliation threat alleged, CW was described such that it was "probable that CW-1 would have had access to information" stated, and court considered it even without *in camera* review of CW title that plaintiff offered); *Cohen v. Kitov Pharms. Holdings, Ltd.*, 2018 WL 1406619, at *9 (S.D.N.Y. Mar. 20, 2018) (CWs described as "former consultants of Kitov with knowledge of the clinical trial results," sufficed because "any more detailed description…likely would reveal the identity of the source").

factual allegations that plausibly allege that a statement was misleading.'" (quoting *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 681 (3d Cir. 2023))). The PSLRA and Rule 9(b) simply "require[] plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." *Avaya*, 564 F.3d at 253; *see also Prudential*, 70 F.4th at 680 (PSLRA and Rule 9(b) require complaint state each misstatement's or omission's time, place, contents, speaker identity, and reasons why false or misleading). The CAC complies, setting forth every alleged misstatement's date, speaker(s), and format (*e.g.*, 10-K) (¶¶62-80), before detailing why each was materially false or misleading (¶81(a)-(f)).[8]

Contrary to the Memo at 12, the threshold for §10(b) actionability is not a "statement that was false when made." Instead: "The first step for a Rule 10b-5 plaintiff is to establish that defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997). Defendants also miscast the CAC's case theory, which is not a standalone duty to "disclose every detail" of the Phase 2 Trial protocol, interim clinical details, anticipated FDA feedback, or "every risk inherent in drug development." Instead, in lockstep with black-letter law, the CAC pleads a duty to

---

[8]    Defendants describe the CAC as a "confusing jumble" that "obfuscate[es] the facts." Memo at 7. Yet, Defendants had no trouble parsing and arguing that various statements or categories of statements were not adequately alleged as false.

16

disclose omitted facts when disclosure was necessary to make Defendants' statements, in the light of the circumstances under which they were made, not misleading. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38, 48 (2011).[9]

Here, Defendants **chose to speak** (*see* §II, *supra*), and the omitted facts were material and rendered their statements misleading under the circumstances, *e.g.*: (i) the first Phase 2 Trial patient's TMA-related SAE; (ii) the ensuing dosing halt and root cause analysis; (iii) Rocket's effort to convince FDA a genetic predisposition was at fault and to alter the trial protocol to exclude other predisposed patients; (iv) the fourth Phase 2 Trial patient's TMA-related SAE; (v) the second ensuing dosing halt; (vi) the need to redesign the Phase 2 Trial protocol's complement suppression regimen with FDA approval; (vii) Rocket's decision to use the novel C3 inhibitor; (viii) the fifth and sixth Phase 2 Trial patients' CLS-related SAEs; and (ix) the inability to restart dosing while safely and effectively managing SAE risks.

For example, Defendants actively discussed the first trial patient, saying, *e.g.*, he was "treated earlier, followed for a certain time, discussed with FDA and IDMC, and then we started the broader trial," without disclosing that he was "followed" to

---

[9]    *See also Cont'l Gen. Ins. Co. v. Olafsson*, 2024 WL 4263211, at *7 (D.N.J. Sep. 23, 2024) (same) (Quraishi, J.) (citing *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 174 (3d Cir. 2014)); *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) ("Once a company has chosen to speak on an issue—even an issue it has no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading.").

17

monitor his acute kidney injury and extended hospitalization and "discussed with FDA" to determine the causes of his TMA-related SAE and its impacts on the Phase 2 Trial while dosing was halted and a root cause analysis was done.  ¶¶9, 11, 68(b). These omissions made Defendants' statements materially misleading, when made, particularly given investor scrutiny on the Phase 2 Trial.

Defendants' string-cited cases (Memo at 12-13) are either in harmony or are factually distinguishable.  For instance, their case, *Gregory v. ProNAi Therapeutics, Inc.*, agrees that "the failure to disclose protocol amendments can make affirmative statements about the success of a drug materially misleading," rejecting the claims only because, unlike Defendants here, "ProNAi made such disclosures" insofar as "the vast majority of the protocol amendments at issue were promptly disclosed on the Clinical Trials website."  297 F. Supp. 3d 372, 410 (S.D.N.Y. 2018).[10]

Defendants' lead case (Memo at 13-15, 27), *City of Edinburgh*, 754 F.3d at 159, does not counsel otherwise.  After a company official said in 2006 that Phase 3 testing would not proceed unless Phase 2 results were "spectacular" (which the court

---

[10]    Similarly, unlike here, "much of the information conveyed to Sanofi by the FDA was publicly available" in *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 539 (S.D.N.Y. 2015), and defendants "promptly disclosed" FDA's concerns and need for more studies in *Johnson v. Pozen, Inc.*, 2009 U.S. Dist. LEXIS 12765 (M.D.N.C. Feb. 19, 2009).  Defendants' other cases are distinguishable and involved failure to disclose some aspect of trial testing methodology, *e.g.*, misleading assumptions in calculating a secondary endpoint (*Hoey*), unsound statistical analysis and deviations from protocol methods (*MELA*), or use of a multiple-dose study (*Fort Worth*).

18

said was puffery), a May 2007 press release disclosed the decision to "initiate" a Phase 3 program, and said, "No conclusion about the Phase 2 study can be drawn until the study is completed and the final data are analyzed and released in 2008." *Id.* at 164, 171.  The company otherwise ***chose not to speak*** about Phase 2 results. *Id.* at 169.  The May 2007 press release "made no statement about the strength of interim results" or the drug's "efficacy or safety," and later statements were "vague," "non-specific," or consistent with the May 2007 press release.  *Id.* at 168, 170, 172-173.  Having "made no affirmative statement about the strength of the Phase 2 interim results nor characterized those results in any manner," the results were not "in play" and "no duty to provide additional details about those results" arose.  *Id.* at 174.  Thus, the claims were dismissed, despite a later revelation that Phase 2 "failed to meet its objectives" and had "serious safety concerns."  *Id.* at 165, 169.

By contrast, here, Defendants ***chose to speak***, at length and repeatedly, regarding the Phase 2 Trial. *See* §II, *supra*.  They discussed the first patient's dosing, post-dosing monitoring, and related discussions with FDA, while concealing his TMA-related SAE and the trial impacts therefrom.  Throughout the Class Period, Defendants also regularly touted the Phase 2 Trial's "low dose" and "additional safety measures," including the "refined immunomodulatory regimen," that were all implemented "to mitigate the complement-mediated safety concerns identified in the high dose [Phase 1] cohort (thrombotic microangiopathy ('TMA'))."  ¶¶62(a)-(b).

19

They continued doing so even *after* multiple TMA-related SAEs, prompting dosing halts, a root cause analysis, trial redesigns, a decision to employ a novel C3 inhibitor, and the need to lobby FDA for approvals to proceed. Their statements brought the Phase 2 Trial dosing efforts, safety measures, and complement activation suppression regimen "in play" in the way *City of Edinburgh* noted could happen when companies choose to speak. *See, e.g.*, *Levon v. CorMedix Inc.*, 797 F. Supp. 3d 381, 407 (D.N.J. 2025) (discussion of FDA approval timeline "created a parallel duty to disclose the issues at ROVI's facility impeding the proscribed timeline").[11]

Defendants' other arguments fail. First, misstatements can be actionable without being a "blanket statement" about "safety," "certainty of outcome," or "certainty of timeline" (Memo at 16, 21).[12] *See, e.g.*, *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 348-349 (E.D. Pa. 2014) (rejecting argument that statements are inactionable because they "never made guarantees or assurances"

---

[11]    *See also In re Celgene Corp. Sec. Litig.*, 2019 WL 6909463, at *18 (D.N.J. Dec. 19, 2019) (telling investors "positive clinical study results" without disclosing discovery of a metabolite that altered safety and efficacy profile and required more testing was misleading); *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 186 (D.N.J. 2022) (saying company "in discussions with the FDA" about software upgrades actionable for omitting that FDA found company had failed to fix software problems and demanded a product ship hold; "defendants may not describe 'a favorable picture' of material issue 'without including the details that would have presented a complete and less favorable one'").

[12]    Defendants claim Rocket never "made any representation or guarantee of final success in the clinical trials." Memo at 22. The CAC's claims, however, do not concern final FDA approval of A501, which it never discusses. The fraud concerns the Phase 2 Trial itself and meets the pleading standard for securities fraud.

20

about an NDA's success as "irrelevant to whether Hemispherx systemically misled investors about the key components of the [] NDA").

Second, as noted in §II, *supra*, the NEJM article (not properly before the Court) does not undermine falsity (Memo at 16, 22), both because it concerned Phase 1 TMA issues that the Phase 2 Trial had purportedly been designed to address, and because it was published nine months into the Class Period – after many misstatements and both TMA-related SAEs in Phase 2 had occurred.

Third, Defendants made statements of *fact* (Memo at 17) – *i.e.*, describing the Phase 2 Trial's dosage, complement activation suppression regimen, and safety features; describing the dosing, monitoring, and FDA communications about the two safety run-in patients; updating on patient enrollment, dosing, and follow-up; and attributing trial delays to benign reasons and not SAEs / related setbacks. Declaring those statements immaterial fails, especially viewed in the context of Phase 1 issues. *See, e.g.*, *Whiteley v. Zynerba Pharms., Inc.*, 2020 WL 13879653, at *1 n.1 (E.D. Pa. Nov. 25, 2020) (statements describing phase 2 trial, including that patients "are being dosed," actionable where "Defendants knew but failed to disclose that almost all patients enrolled in the [] trial suffered treatment emergent adverse events").[13]

---

[13]    *See also City of Livonia Emps.' Ret. Sys. v. Wyeth*, 2010 WL 3910265, at *5-7 (S.D.N.Y. 2010) (complaint sufficiently pled duty to disclose SAEs in study after defendants made safety-related statements excluding SAEs); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 903-904 (E.D. Pa. 2018) (significant stock drop after revelation of facts about drug's lack of safety and abuse-deterrent

21

SEC filings (Memo at 17-19).[14] Arguing Rocket's 10-K and 10-Q statements during the Class Period were not false or misleading, Defendants excerpt parts that repeatedly: (a) tout measures adopted in the Phase 2 Trial to "mitigate complement-mediated safety concerns observed in the high dose cohort" of Phase 1, and (b) say Phase 2 Trial patient "dosing and follow-up is ongoing." These statements omitted material facts necessary to make them, under the circumstances, not misleading, *e.g.*, the two TMA-related SAEs, initial dosing halt, root cause analysis, and trial redesign to add the novel C3 inhibitor which further delayed the trial.[15] *See, e.g.*, *Whiteley*, 2020 WL 13879653, at *1 n.1 (statements that patients "are being dosed" actionable where defendants knew almost all patients suffered treatment emergent adverse events); *Levon*, 797 F. Supp. 3d at 406-09 ("statements regarding the timeline for FDA approval" – *e.g.,* NDA was "on track," approval was "on schedule" – "created a parallel duty to disclose [issues] impeding the proscribed timeline"). Defendants' August 7, 2025 statements discussed prior SAEs and efforts at "regulatory alignment" while concealing that Rocket lacked any viable approach to safely dose

---

properties demonstrate materiality); *Levon*, 797 F. Supp. 3d at 407 (materiality evidenced by allegations of subsequent disclosure and significant impact on market).

[14] The Memo ignores certain types of filings (Forms 8-K, Annual Reports, etc.).

[15] As noted in §I, *supra*, Defendants wrongly blur Rocket's past tense statements that "additional safety measures have been implemented" in the Phase 2 Trial protocol into future-looking rewrites that it was "implementing" or "incorporating" safety measures (*e.g.*, Memo at 18-19) in some open-ended way that would render a trial redesign to add the novel C3 inhibitor insignificant and expected. Not so.

22

patients while effectively managing SAE risks.  *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 193 (3d Cir. 2001) ("Statements which are technically true may be so incomplete as to be misleading (*e.g.*, half-truths or distortions).").

Press Releases (Memo at 20-22).[16]  Defendants' claim of "generalized, vacant allegations" is false.  The CAC has ***six pages*** of detailed allegations (*see* ¶81(a)-(f)) explaining why ***every*** misstatement was materially false or misleading when made. Those allegations and the detail with which each alleged misstatement is pled satisfy the applicable pleading standards.  *Avaya*, 564 F.3d at 253.  Defendants otherwise summarize snippets of larger statements as mere "periodic updates," *e.g.*, "Dosing in the Phase 2 pivotal study is ongoing" (¶67) or "The pediatric run-in enrolled two patients in a sequential manner with a minimum three-month follow-up prior to subsequent enrollment" (¶66).  Here, too, having chosen to speak, Defendants had a duty to disclose information – the TMA-related SAEs and their impacts – needed to make the statements made, under the circumstances, not misleading.  *Matrixx*, 563 U.S. at 37-38, 48; *Olafsson*, 2024 WL 4263211, at \*7; *Whiteley*, 2020 WL 13879653, at \*1 n.1; *Wyeth*, 2010 WL 3910265, at \*5-7; *Levon*, 797 F. Supp. 3d at

---

[16]    Defendants miscast several pre-Class Period press releases from 2019-2023, pled in CAC §V.A. ("Rocket's Business & Operations") ¶¶36, 40, 42, as misstatements (Memo at 20) and miscast the 5/27/2025 Press Release (discussed in ¶53) as a misstatement.  To the contrary, all misstatements are alleged in CAC §V.C. (¶¶61-81).  Without explanation, Defendants also quote "pipeline" and "strong progress" language from the 2/27/2025 Earnings Release (Memo at 21-22, 27) that is not part of the misstatement as pled in the CAC.  ¶73(a).

23

406-09; *Celgene*, 2019 WL 6909463, at *18; *Becton*, 620 F. Supp. 3d at 186.  Again, "blanket statements" are not needed actionability.  *Frater*, 996 F. Supp. 2d at 348-349.  The 8/7/2025 Earnings Release and 8/20/2025 Press Release, issued after the CLS-related SAEs and patient death, were materially misleading for omitting the material fact that Rocket lacked a viable approach that could address the SAE issues from the Phase 1 trial, dose A501 at levels sufficient to conduct adequate Phase 2 clinical testing, and ensure Phase 2 Trial patient safety.  ¶81(f).  Indeed, despite FDA's clinical hold lifting in August 2025, no more patients have been dosed. ¶103.

Webinars & Conferences (Memo at 22-23).  Contrary to Defendants' out-of-context snippets, the alleged webinar and conference misstatements are robust.  For instance, "And then we had a two-patient run-in, right, and the patients had to be staggered too. And then after the second patient, there's another follow-up period. And then you talk to the FDA again."  ¶65.  In September 2024, after *both* TMA-related SAEs, that statement discussed dosing, follow-up monitoring, and FDA discussions for the two-patient safety run-in, which included the first trial patient, who suffered an undisclosed TMA-related SAE, prompting a dosing halt, root cause analysis, FDA discussions, and trial modification.  Still later, Defendants said "we're in the process of dosing, and we are dosing patients" at a November 12, 2024 conference (¶68(a)), "We're continuing to dose patients" at a December 3, 2024 conference (¶70(a)), and "We're finishing dosing as fast as possible" on January 13,

24

2025 (¶72) – when all dosing was *halted*, following the second TMA-related SAE earlier in 2024 and pending the later C3 inhibitor addition.  Multiple times (*e.g.*, December 3, 2024 (¶70(b) and April 8, 2025 (¶74)) Defendants attributed trial delays to benign reasons, like the "heavy protocol," necessary patient "staggering," or the holidays, when the reality was that dosing was *halted*.  Each time, the omitted facts rendered the statement materially misleading.  *Matrixx*, 563 U.S. at 37-38, 48; *Olafsson*, 2024 WL 4263211, at \*7; *Whiteley*, 2020 WL 13879653, at \*1 n.1; *Wyeth*, 2010 WL 3910265, at \*5-7; *Levon*, 797 F. Supp. 3d at 406-09; *Celgene*, 2019 WL 6909463, at \*18; *Becton*, 620 F. Supp. 3d at 186.

### C.    THE MISSTATEMENTS AND OMISSIONS ARE NOT PROTECTED FROM LIABILITY

Also unavailing are Defendants' "protected forward-looking statements" arguments relying on: (i) purported "cautionary language" and the PSLRA safe harbor, (ii) the bespeaks caution doctrine, and/or (iii) statements being "opinions." *See* Memo at 23-32.  The CAC plainly pleads why neither the PSLRA safe harbor nor the bespeaks caution doctrine apply to any alleged misstatement.  ¶¶119-122.

First, as Defendants concede (Memo at 24), the PSLRA safe harbor only applies to *forward-looking* statements.  15 U.S.C. 78u-5(c).  Defendants fatally fail to identify *which* if any misstatements, or portions thereof, are purportedly "forward-looking," declaring instead, without citation, that entire categories of statements – *e.g.*, "dosing progress" or "regulatory interactions" – qualify.  Memo at

25

23.  The CAC misstatements (*see* §II, *supra*) say otherwise.  Those describing the Phase 2 Trial protocol,[17] discussing the first two dosed patients,[18] touting progress in dosing trial patients,[19] attributing trial delays to benign reasons,[20] and, after a patient died, downplaying the TMA-related SAEs[21] and expressing confidence and commitment to restarting the trial[22] were all past- and/or present-tense statements

---

[17]    *E.g.*, "we have moved forward with the low dose" and "additional safety measures have been implemented and are reflected in the updated trial protocol." ¶¶8, 62(a)-(b).

[18]    *E.g.*, "The pediatric run-in enrolled two patients in a sequential manner with a minimum three-month follow-up prior to subsequent enrollment," "two patients were treated earlier, followed for a certain time, discussed with FDA and IDMC, and then we started the broader trial," and "we had a two-patient run-in, right, and the patients had to be staggered too.  And then you talk to the FDA again." ¶¶9, 11, 65, 66, 68(b), 79(b).

[19]    *E.g.*, "we're finishing dosing as fast as possible," "dosing and follow-up are ongoing," and "the trial and follow-up are ongoing." ¶¶10, 72, 73(b), 77.

[20]    *E.g.*, "Number one, these patients require immunomodulation.  So, that takes time to set up and source appropriately.  Number two, there's some vaccines involved in immunomodulation, which also takes time.  There's a troponin run-in, number three, of three months that the FDA mandates.…  [I]nstead of putting everyone at one site, we try to stagger them.  So, that takes a little bit of time.…  So, all this, along with the holidays, has added the time up, which I understand is not ideal, but it is getting done." ¶¶11, 65, 68(b), 70(b), 74.

[21]    *E.g.*, the complement activation and TMA "was part of routine explained side effects of gene therapy" with "no clinical hold." ¶¶78(b), 79(b).

[22]    *E.g.*, "we remain committed to advancing RP-A501 with the highest standards of safety, science, and care," "we're confident that there is a path forward with the simplified regimen here," "Rocket is actively working with FDA, independent safety monitors, and clinical experts to ensure patient safety and resume the trial," "We're already in deep dialogue with FDA back and forth…discussing with them a potential revising immunomodulatory regimen and potentially other changes" and "The hold was lifted in under three months, underscoring…Rocket's commitment to expeditiously optimize safety and resume the trial." ¶¶78(a), 78(c)-(e), 79(a), 80.

discussing then-existing facts.  Defendants point to **no misstatements** that fall within the PSLRA safe harbor examples they cite – "future economic performance," "future operations," or "plans or objectives."  Memo at 24 (citing 15 U.S.C. 78u-5(i)(1)).

The PSLRA safe harbor does not protect statements about present facts, even if part of mixed present / future statements.  *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at *11 (D.N.J. July 31, 2019) (safe harbor does not apply where plaintiffs sufficiently allege defendants omitted present facts from challenged statements); *Olafsson*, 2024 WL 4263211, at *11 ("A mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." (quoting *Avaya*, 564 F.3d at 255)).[23]  Defendants' authority concurs. *See Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010) (bespeaks caution doctrine not applicable to present or historical fact).[24]

Second, as the CAC pled, many misstatements were not identified as forward-looking and accompanied by **any** risk warnings.[25]  Those misstatements are

---

[23]    *See also In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*, 2019 WL 1299673, at *18 (D.N.J. Mar. 20, 2019) (merely containing "some reference to a projection of future events" does not bring statement within PSLRA safe harbor "if the allegation of falsehood relates to non-forward-looking aspects of the statement").

[24]    Their other cases (Memo at 23-25) involved forward-looking statements, *e.g.*, when a company expected to file a future NDA and when it could expect FDA approval (*Gillis*), prospects of future FDA approval (*Lewakowski*), expected future investment losses (*Slayton*), and future ability to repay bonds  (*Donald J. Trump*).

[25]    *See* ¶64 (5/16/2024 BoA Conference); ¶65 (9/5/2024 MS Conference); ¶68 (11/12/2024  UBS  Conference);  ¶70  (12/3/2024  Evercore  Conference);  ¶74 (4/8/2025 Needham Conference).

ineligible for safe harbor protection.  15 U.S.C. 78u-5(c)(1)(A)(i).

Third, forward-looking statements must be accompanied by "***meaningful*** cautionary statements identifying important factors that could cause results to differ materially from those in the forward-looking statement," and "[c]autionary language must be extensive and specific."  *Avaya*, 564 F.3d at 256 (quoting, *inter alia*, 15 U.S.C. §78u-5(c)(1)(A)(i)).  The purported "cautionary language" Defendants quote (Memo at 16, 18-19, 25-32) is legally deficient, for any or all of four reasons:

(i)     Certain purported warnings were generic and boilerplate.[26]  "A vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation."  *Avaya*, 564 F.3d at 256; *see also Shulman v. Weston*, 2025 WL 3754159, at *8 (D.N.J. Dec. 29, 2025) (generic language regarding risk of relying on forward-looking statements is boilerplate warning insufficient to correct a reasonable investor's risk calculations).

(ii)    Certain purported warnings were not tailored to the alleged

---

[26]     *E.g.*, Warnings like "investing in our securities involves a high degree of risk," "our business is subject to numerous risks and uncertainties," "This press release contains forward-looking statements concerning Rocket's future expectations, plans and prospects that involve risks and uncertainties, as well as assumptions that, if they do not materialize or prove incorrect, could cause our results to differ materially from those expressed or implied," "Statements made during today's webinar and our responses during the Q&A may include forward-looking statements…subject to known and unknown risks and uncertainties that may cause actual results to differ materially from the statements made," "Actual results may differ materially from those indicated by these forward-looking statements as a result of various important factors…."  Memo at 18-19, 28-29, 30-32.

misstatements and omissions, concerning the Phase 2 Trial, its SAEs, and related trial impacts, as versus any "expectations."[27]  "To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge."  *Avaya*, 564 F.3d at 256; *Levon*, 797 F. Supp. 3d at 411 (same for PSLRA and bespeaks caution doctrine).

(iii)    As Defendants concede, certain purported warnings did not adjust over time, being repeated in substantially similar fashion throughout the Class Period despite evolving circumstances rendering them outdated.  *See* Memo at 16, 26 (discussing Forms 10-K and ARS).  *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *15 (D.N.J. Apr. 27, 2017) ("[T]he fact that the vague cautionary language never changed strongly suggests that it was not tailored to the specific future projection."), *aff'd*, 905 F.3d 106 (3d Cir. 2018).[28]

(iv)    Certain purported warnings concerned already-occurred events.[29]

---

[27]    *E.g.*, Rocket "may fail to demonstrate safety and efficacy… which could prevent us from commercializing our current and future product candidates," "our product candidates may cause undesirable and unforeseen side effects…which could…limit the commercial potential," and "forward-looking statements include…expectations regarding the safety and effectiveness of product candidates that Rocket is developing to treat…Danon Disease…, the expected timing…of Rocket's ongoing and planned clinical trials,…the safety, effectiveness, and timing of…clinical trials."  Memo at 18, 25, 29, 31.

[28]    *See also In re Innocoll Holdings Pub. Ltd. Sec. Litig.*, 2020 WL 1479128, at *17-18 (E.D. Pa. March 25, 2020) ("[T]he cautionary language…did not change from 2014 to 2016.  Therefore, the Court finds that the PSLRA's 'Safe Harbor' provision does not apply to any of Defendants' statements.").

[29]    *E.g.*, "our business is subject to numerous risks and uncertainties" including

*Levon*, 797 F. Supp. 3d at 411 ("Cautionary statements are not truly cautionary when the defendant knows that an identified risk has or will occur."); *Becton*, 620 F. Supp. 3d at 189, 191 (rejecting the purported cautionary language as not meaningful and stating, "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired").

Defendants' untethered "opinions" argument (Memo at 27-28, 30, 35) fails. First, they fail to identify **which** misstatements they consider opinions, and their only example (a statement about the Phase 1 trial's "strong progress") is not pled as a misstatement.[30]   To the contrary, the CAC challenges statements of **facts**, not opinions, *e.g.*, "dosing and follow-up are ongoing" or "two patients were treated earlier, followed for a certain time, discussed with FDA and IDMC, and then we started the broader trial."  *Prudential*, 70 F.4th at 684 ("[A]n opinion is a belief, a

---

"substantial delays  in…completion of our clinical trials," "[g]ene therapy is still a relatively new approach to disease treatment and adverse side effects could develop with our product candidates," "[i]f certain side effects are observed in testing of our potential product candidates, we may decide or be required to halt or delay further clinical development," "[o]ur product candidates may cause undesirable and unforeseen side effects…which could delay or prevent their advancement into clinical trials," and "the administration process or related procedures associated with a given product candidate also can cause adverse side effects.  If any such adverse events occur, our clinical trials could be suspended."  Memo at 18, 25-26.

[30]     Even their case law examples (Memo at 27-28, 35) are facially inapposite, as the CAC does not plead any misstatements claiming anything was "encouraging" (*Kleinman* and *Sanofi*), regarding anticipated commercialization dates (*Ocugen* and *Aratana*), or involving interpretation of clinical trial data (*Sanofi*, *City of Edinburgh*, *Gillis*) or the strength of patents being litigated (*Dang*).

view, or a sentiment which the mind forms of persons or things, whereas a fact is a thing done or existing or an actual happening." (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015))).

Even assuming, *arguendo*, some misstatements were opinions, they are actionable if "(1) the speaker did not actually hold the stated belief at the time made; (2) the opinion contains 'embedded statements of fact' that were untrue; or (3) the speaker omitted known material facts that 'conflict with what a reasonable investor would take from the statement itself.'" *In re Advance Auto Parts, Inc. Sec. Litig.*, 2020 WL 599543, at *4 (D. Del. Feb. 7, 2020) (quoting *Omnicare*, 575 U.S. at 184); *Levon*, 797 F. Supp. 3d at 414. All three tests are met here. Defendants knowingly omitted material facts, *e.g.*, about the TMA-related SAEs and resulting trial impacts. Thus, even if statements are opinions, they are actionable.

Also meritless is Defendants' argument calling the alleged misstatements "fraud by hindsight." Memo at 4, 29. All alleged misstatements are pled in detail as materially false or misleading when made ¶¶81(a)-(f), which Defendants ignore.[31]

### D.  THE CAC ADEQUATELY PLEADS SCIENTER

Scienter allegations must be read "holistically." *Tellabs, Inc. v. Makor Issues*

---

[31]  Defendants do not identify a specific "fraud by hindsight" misstatement, and neither of their cases, *Cozzarelli* and *NAHC*, use that term. Defendants merely quote dicta regarding analysis of motive scienter pleading (*Cozzarelli*) or nondisclosure of a loss that had not yet occurred (*NAHC*).

31

& *Rts., Ltd.*, 551 U.S. 308, 310, 326 (2007). "The inquiry…is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. *Id.* at 322-323 (emphasis original). The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. Rather, after weighing the "inferences urged by the plaintiff" with "competing inferences ***rationally*** drawn ***from the facts alleged***," *id.* at 314, "the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326; *see also Matrixx*, 563 U.S. at 38, 48 (scienter adequately pled if "a reasonable person would deem the inference…cogent and at least ***as compelling*** as any opposing inference"). Where, as here, motive and opportunity is alleged, the scienter pleading burden is more easily met. *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013) ("Though it is not necessary to plead motive to establish that a defendant acted with scienter, its presence can be persuasive when conducting a holistic review of the evidence.").

Accordingly, unless Defendants proffer a ***more compelling*** inference, rationally drawn from the CAC's allegations, their Motion must be rejected – as they concede (Memo at 12, 33). If the parties' competing inferences are in equipoise, the CAC must be upheld. *See, e.g.*, *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed*

32

*Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("At the motion to dismiss stage a tie on scienter goes to the plaintiff." (citing *Tellabs*, 551 U.S. at 314)).

The CAC pleads a strong inference of scienter, supported by extensive factual allegations. *See* CAC §V.E.1.-7. (¶¶94-118); §II, *supra*. Defendants, knowingly or with deliberate recklessness, misrepresented and omitted material adverse facts causing their public statements during the Class Period about the Phase 2 Trial and its true risk profile to be materially false or misleading.[32]  The CAC pleads Defendants' knowledge or reckless disregard of such facts making their statements false or misleading **when made**. ¶¶98-103. It pleads their motive and opportunity, based on Rocket's $182.5 million corporate offering and stock sales by Defendants Shah and Ondrey, all at fraud-inflated prices, suspicious in timing and amount. ¶¶95-97; *see also* Appendix A submitted herewith. It adds allegations that support the scienter inference, including implication of the core operations doctrine (¶¶104-106); Shah's and Ondrey's signing, being quoted in, and SOX-certifying Rocket's

---

[32]    Specifically: (i) the Phase 2 Trial was beset by a TMA-related SAE due to A501 (Patient #1), an ensuing dosing halt and root cause analysis, work to persuade FDA to permit resumption after excluding patients with a genetic predisposition, another TMA-related SAE due to the complement suppression regimen (Patient #4), an ensuing dosing halt and decision to switch to the C3 inhibitor, work to persuade FDA to permit a trial redesign, then two CLS-related SAEs (Patients #5 and #6) due to the C3 inhibitor, causing one patient death, a trial hold, and a cessation of dosing; and (ii) throughout the Class Period, Rocket had no viable approach or trial design that could safely and effectively dose patients with A501 while managing the trial's SAE risks. ¶¶6-7, 47, 81(a)-(f), 98-103.

allegedly fraudulent SEC filings (¶¶107-108); suspicious resignations of key Rocket officers and directors, including Defendant Ondrey (¶¶109-114); and violations of Rocket's Corporate Code of Conduct and Insider Trading Policy (¶¶115-118).

As Lead Plaintiffs' MTD Letter response noted (ECF 36 at 3), Defendants offer *no* competing inference rationally drawn from the CAC's allegations, a deficiency that requires denial of their Motion since dismissal is possible only if Defendants' inference is *more* compelling than the one pled in the CAC. *Tellabs*, 551 U.S. at 322-324; *Matrixx*, 563 U.S. at 48. Instead, they *rewrite* the CAC's theory and argue against their strawman, critiquing the CAC for, *e.g.*, (i) not pleading they had actual knowledge the C3 inhibitor would harm patients (ii) pleading "no facts suggesting Rocket believed this addition would harm patients," and (iii) inferring Rocket would "knowingly introduce a component it anticipated would jeopardize patient safety and undermine the very trial upon which the future of its experimental treatment depended." Memo at 33-34. Those "doomed to failure" arguments might apply to a breach of duty case, not the securities fraud claims as pled in the CAC.[33]

Defendants otherwise challenge aspects of the CAC's scienter pleading, in isolation, counter to the required *Tellabs* holistic analysis. Their arguments fail.

---

[33] In Defendants' cases (Memo at 33-35), no suspicious stock sales prompted the court to credit competing inferences that defendants fully disclosed disappointing phase 2 trial results and their phase 3 redesign to use a different comparator drug based on a public study the court found they "reasonably relied" on (*Kelley*) or that they believed trial results supported FDA approval (*Lewakowski* and *Cozzarelli*).

34

<u>Knowledge / Recklessness</u> (Memo at 34-35, 37-38).  The CAC pleads, *inter alia*: (i) pursuant to 21 C.F.R. §312.64, all SAEs were required to be, and were, immediately reported to Defendants (¶¶98-99); (ii) CWs and Rocket's later admissions demonstrate Defendants' knew about SAE #1 in early 2024 and SAE #2 in August 2024, decided to add the C3 inhibitor in January 2025, and knew of SAEs #3 and 4 once dosing resumed in May 2025 (¶¶100-101); (iii) Rocket's C-suite, including Defendants Shah and Ondrey, were heavily involved in the A501 program, including dosing halts, root cause analyses, and FDA discussions and non-resumption of the Phase 2 Trial (¶¶102-103).[34]   These are factual allegations, not legal conclusions, rendering Defendants' cases (*GSC* and *Ashcroft*) inapposite.  The same facts adequately plead Defendants' deliberate recklessness, in harmony with Defendants' citations.  *See, e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 308, 311 (2d Cir. 2000) (recklessness sufficient where complaint pled defendants "knew facts or had access to information suggesting that their public statements were not accurate").[35] That FDA approved the C3 inhibitor (Memo at 38) is a non-sequitur.  The fraud, concerning the C3 inhibitor, arises not just from its addition, but also from

---

[34]   Defendant mischaracterize CAC ¶143, whose next sentence (which they omit) states, "Defendants' first-hand knowledge is alleged herein."

[35]   Defendants' other cases do not counsel dismissal, as they involved defendants that engaged in mismanagement (*Digit. Island*), failed to investigate but lacked knowledge of negative facts (*S. Cherry*), or acted only negligently, lacking motive and opportunity, and offered more compelling nonculpable inferences (*Radian*).

concealing the preceding SAEs, dosing halts, FDA negotiations, and trial redesign.

Motive – Stock Sales (Memo at 35-36).  The CAC pleads that Defendants' Class Period sales of stock at fraud-inflated prices were suspicious in both amount (compared to their salaries) and timing.  ¶95(a)-(b); *see* Appendix A (aligning sales with misstatements, corrective disclosures, and key events).  Sidestepping these allegations,[36] Defendants: (i) cite Form 4 and 144 filings outside the pleadings, (ii) ask the Court to accept the truth of assertions therein that sale proceeds were used to pay taxes, (iii) argue that such use does not support scienter, and (iv) cite a case (*Audible*) that does not address "tax" sales but rather sales within a Rule 10b5-1 plan.[37]  The CAC pleads that Defendants' stock sales were ***not*** within a Rule 10b5-1 plan (¶¶95(a)-(b)), and Defendants make no contrary proffer.  Also, the purported reasons for Defendants' sales is a disputed fact unfit for Rule 12(b)(6) resolution.[38]

---

[36]     Defendants have waived all arguments not presented in their opening brief and cannot first make them on reply.  *In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II)*, 751 F.3d 150, 157 (3d Cir. 2014) (arguments raised for the first time in a reply brief are waived).

[37]     Rule 10b5-1 plans are used by corporate executives to pre-set the conditions and terms of future stock sales.  When not created (or adjusted) during a class period, such plans may insulate against liability if the stock sales at issue occurred therein.

[38]     *See, e.g.*, *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *16 (S.D.N.Y. Mar. 25, 2013) (defendants election to sell stock to satisfy tax liability gave "personal motive to keep the stock price inflated" that supported motive scienter); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 555 (S.D.N.Y. 2017) (rejecting argument that "in-kind" stock sales, *e.g.* "sales to cover tax liabilities," should be discounted in scienter analysis because "money is fungible"); *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *17 (D.N.J. July 27, 2018) (refusing to resolve dispute about reason for defendants' sales on motion

Motive – Offerings (Memo at 36-37).  Rocket's corporate offerings were suspiciously timed, during an extended, undisclosed dosing halt and just before the nonpublic decision to add the C3 inhibitor, to maximize fraud-inflated proceeds. ¶¶96-97; *see also* Appendix A.  These allegations support scienter.  *See, e.g.*, *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *19 (D.N.J. Dec. 6, 2018) (corporate note offerings during fraud support motive scienter); *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 411-412 (D.N.J. 2004) (motive scienter based on need to elevate stock price for public offering and to use stock as currency in a merger).[39] [40]

Resignations (Memo at 37-38).  The CAC pleads suspiciously-timed, high-level resignations of Rocket Directors, its CMO, President / COO, and Defendant Ondrey – two also pled as corrective disclosures that dropped Rocket's stock price

---

to dismiss); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 n.6 (S.D.N.Y. 2010) (justifications for stock sales, "to pay the exercise price of expiring options and associated taxes" are not suitable for motion to dismiss).  Moreover, even if Defendants had not sold any stock, it would not be definitive.  *Levon*, 797 F. Supp. 3d at 427 (lack of class period stock sales "neither bolsters nor defeats scienter").

[39]    *See also In re Res. Am. Sec. Litig.*, 2000 WL 1053861, *5-6 (E.D. Pa. July 26, 2000) (desire to raise capital via secondary offering supported scienter); *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 275-277 (S.D.N.Y. 2014) ($117 million offering evidenced corporate scienter even where all individual defendants dismissed); *Kendall v. Odonate Therapeutics, Inc.*, 2021 WL 3406271, at *8 (S.D. Cal. Aug. 4, 2021) (corporate offerings netting $222.5 million supported scienter even where individual defendants only bought stock); *Van Dongen v. CNinsure, Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) ($109.6 million secondary offering can provide motive for fraud).

[40]    Defendants' cases rejecting motive pleadings involved attempts to increase performance-based executive compensation (*Wilson*), earned fees (*S. Cherry*), or an offering not pled as suspiciously-timed with no individual stock sales (*MELA*).

– support scienter.  ¶¶109-114; *see also* Appendix A.  *In re Hertz Glob. Holdings, Inc.*, 905 F.3d 106, 118 (3d Cir. 2018) (executive resignations can support scienter when combined with allegations of knowing or reckless involvement in fraud).[41]

Defendants ignore allegations that the CAC's scienter inference is supported by the core operations doctrine (¶¶104-106); Shah's and Ondrey's signing, being quoted in, and SOX-certifying Rocket's allegedly fraudulent SEC filings (¶¶107-108); and violations of Rocket's Corporate Code of Conduct and Insider Trading Policy (¶¶115-118).  They waive challenges at this stage.  *See* n.36, *supra*.

E.    **THE CAC ADEQUATELY PLEADS LOSS CAUSATION**

"Allegations of loss causation are not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA: all that is required is that plaintiff provide 'some indication of the loss and the causal connection that the plaintiff has in mind,' consistent with Rule 8(a)."  *Dudley v. Haub*, 2013 WL 1845519, at *18 (D.N.J. Apr. 30, 2013) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 348 (2005)).  "A plaintiff must show that 'the revelation of the alleged misrepresentation or omission was a *substantial factor* in causing a decline in the security's price, thus creating an

---

[41]    *See also In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *22 (D.N.J. June 5, 2020) (same); *Roofer's*, 2018 WL 3601229 at *20 (probative value in resignation); *In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *10 (D.N.J. Sep. 30, 2009) (defendant's resignation, with other allegations, reinforces scienter); *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at *10 (D.N.J. Apr. 28, 2017) (executive and director departures supported scienter).

actual economic loss for the plaintiff.'"  *Levon*, 797 F. Supp. 3d at 429 (quoting

*McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425-26 (3d Cir. 2007) (emphasis

added)).  "Courts in this district have held loss causation is adequately pled when a

company's stock price declines after media reports and disclosures presented new

information about the alleged fraud to the public."  *Id.* at 430 (collecting cases).  The

pleading burden is not heavy, and "[i]mportantly, 'the issue of loss causation is

usually not resolved on a motion to dismiss.'"  *Id.* (collecting cases).  "Although a

corrective disclosure must be related to the same subject as the misrepresentation,

and not some other adverse facts about the company, there is no requirement that the

disclosure mirror the earlier misrepresentation."  *In re Urban Outfitters, Inc. Sec.

Litig.*, 103 F. Supp. 3d 635, 655 (E.D. Pa. 2015).  And, "the truth can be revealed

through a series of partial corrective disclosures."  *Id.* (citing *In re Merck & Co., Inc.

Sec., Derivative, & ERISA Litig.*, 2011 WL 3444199, at *31 (D.N.J. Aug. 8, 2011)).

The CAC sufficiently pleads loss causation based on partial corrective

disclosures and correlating stock drops on May 27, August 8, and August 26, 2025.

*See* §II, *supra*; ¶¶12-13, 82-93.  Defendants (Memo at 38-39) misstate the standard

as "learning the falsity of prior material misstatements," facially counter to their

cited authority (*McCabe*), and reduce the May 27, 2025 corrective disclosure to only

the patient death revelation.  The full corrective disclosure includes a Rocket press

release, 8-K, and webinar and four pre-market-close analyst reports, collectively

causing a -62.84% stop drop (¶¶12, 83-86), as even more analyst reports later explained (¶¶87(a)-(c)). Together, they revealed, *inter alia*, **prior-concealed** TMA-related SAEs, FDA negotiations, resulting trial redesign, the C3 inhibitor introduction, CLS-related SAEs, a patient death, an ongoing root cause analysis, and an FDA-imposed clinical hold – prompting Shah to admit Rocket was "going back to the drawing board."[42] Defendants omitted from their MTD Letter argument as to the August 8 and 26, 2025 disclosures, thus waiving it. *See* §III, *supra*. If considered, their claimed need for mirror-image misstatements (Memo at 37 n.5) fails. *Urban Outfitters*, 103 F. Supp. 3d at 655-656 (market may learn truth about misrepresentation from, *e.g.*, analysts, CFO resignation, company announcements).

### F.    THE CAC'S §20(A) CLAIM SHOULD BE SUSTAINED

Failing to challenge, and thus conceding, Shah and Ondrey controlled Rocket, Defendants' only §20(a) claim challenge (Memo at 39-40) is failure to plead a §10(b) violation. If the §10(b) claim survives, even partly, the §20(a) claim must survive.

### V.    CONCLUSION

Defendants' arguments lack merit, and their Motion should be denied in full.

---

[42]    The CAC's alleged analyst reports linking the revelations to a higher-than-previously-understood A501 risk profile, as part of the corrective disclosure, readily distinguishes Defendants' other cases, where plaintiffs did not clearly explain how the corrective disclosure "alerted the market" to the stock's overpricing due to the fraud (*Intelligroup*) or tried to use negative financial results as a proxy for disclosure of underlying problems the results did not mention (*Nat'l Junior Baseball*).

Dated:   April 1, 2026

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Brian Calandra*
Brian Calandra
Matthew L. Tuccillo
Zachary Denver
600 Third Avenue, 20th Floor
New York, New York   10016
Phone:        212-661-1100
Facsimile:   917-463-1044
bcalandra@pomlaw.com
mltuccillo@pomlaw.com
zdenver@pomlaw.com

**THE ROSEN LAW FIRM, P.A.**

Gonen Haklay
101 Greenwood Ave., Ste. 520
Jenkintown, Pennsylvania   19046
Phone:        215-600-2817
Facsimile:   212-202-3827
ghaklay@rosenlegal.com

Laurence A. Rosen
One Gateway Center, Suite 2600
Newark, NJ 07102
Phone:        (973) 313-1887
Facsimile:   (973) 833-0399
lrosen@rosenlegal.com

*Co-Lead Counsel for Co-Lead Plaintiff
Dimitar Yankov, and the Proposed Class*

41

## CERTIFICATE OF SERVICE

I, Brian Calandra, hereby certify that I have caused a copy of this Opposition to Defendants Motion to Dismiss the Consolidated Amended Class Action Complaint to be served on all counsel by the Court's CM/ECF System. Notice of this filing will be sent by e-mail to all parties by operation of the Court' s electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Brian Calandra*
Brian Calandra