**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **IN RE ROCKET PHARMACEUTICALS, INC. SECURITIES LITIGATION** | Civil Action No. 25-10049 (ZNQ) (TJB) |
| **THIS DOCUMENT RELATES TO:**<br>**ALL ACTIONS** | **OPINION** |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon a Motion to Dismiss the Consolidated Amended Class Action Complaint ("CAC," ECF No. 34) filed by Rocket Pharmaceuticals, Inc. ("Rocket,") Dr. Gaurav Shah ("Shah"), and Aaron Ondrey ("Ondrey") (collectively, "Defendants"). ("Motion," ECF No. 40.) Defendants submitted a brief in support of their Motion. ("Moving Br.," ECF No. 40-1.) Plaintiffs, individually and behalf of a proposed class, filed an opposition brief, ("Opp'n Br.," ECF No. 43) to which Defendants submitted a reply brief. ("Reply Br.," ECF No. 46).

The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will **GRANT** the Motion.

## I. BACKGROUND AND PROCEDURAL HISTORY

The information below is taken from the Consolidated Amended Complaint ("CAC") and the documents upon which Plaintiffs rely in the CAC.[1]

[1] For the purposes of this motion, the Court assumes as true the facts alleged in the Complaint. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). The Court is permitted to consider "document[s] integral to or explicitly

Rocket is a "pre-revenue, clinical stage company [that] develop[s] gene therapies for rare diseases . . . ." (CAC ¶ 31.) Relevant to this case, Rocket is developing "RP-A501" ("A501") to treat Danon Disease, an "almost universally fatal" inherited disorder where a genetic mutation results in an enlarged heart. (*Id.* ¶¶ 3, 33.) In June 2019, Rocket "conducted a seven-patient Phase 1 trial of A501" in pursuit of approval from the Food and Drug Administration ("FDA"). (*Id.* ¶¶ 4, 35.) Unfortunately, one of the Phase 1 patients developed thrombotic microangiopathy ("TMA"), a disorder "where blood clots form in small blood vessels, blocking blood flow and potentially damaging organs . . . ." (*Id.* ¶ 40.) Rocket publicly described the TMA as a serious adverse event ("SAE") and the FDA paused the Phase 1 trial for four months. (*Id.* ¶¶ 40, 41.) Once granted permission to resume the Phase 1 trial, Rocket publicly reported that the TMA occurred "due to immune-mediated complement activation." (*Id.* ¶ 41.) "Complement activation is a chain reaction of proteins that triggers an immune response to eliminate pathogens" and is "a known risk to the efficacy of the A501 gene therapy." (*Id.* ¶¶ 42–46.)

In 2023, Rocket began the A501 Phase 2 Trial after "implement[ing] additional safety measures . . . not included in the [Phase 1 Trial,] primarily to prevent complement activation." (*Id.* ¶ 46.) According to a confidential witness, in either late 2023 or early 2024, a Phase 2 Trial patient "experienced a serious SAE, which was identified as a TMA by his medical doctors." (*Id.* ¶ 58.) According to the confidential witness, Rocket investigated the root cause of the patient's SAE and determined "that the boy had a genetic mutation that predisposed him to a strong immune response." (*Id.*) Rocket continued dosing patients until August 2024 when the fourth patient dosed suffered from a TMA-related SAE. (*Id.*) After the second TMA in the Phase 2 Trial,

relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). Plaintiffs reference several of Defendants' public securities filings, press releases, and presentations.

Rocket introduced a "novel" C3 complement inhibitor ("C3 inhibitor") to the pretreatment regimen. (*Id.*) A C3 inhibitor is a "drug that blocks the activity of the complement system, hoping to prevent excessive immune responses, inflammation, and cell damage." (*Id.* ¶ 52.) Dosing was paused while Rocket sought permission from the FDA to add the C3 inhibitor to the pretreatment regimen. (*Id.* ¶ 59.) After reaching an agreement with the FDA, Rocket resumed dosing patients in early 2025. (*Id.* ¶ 59.) On May 27, 2025, Rocket held a webinar and disclosed to investors that two recently dosed patients suffered from capillary leak syndrome, "a rare, life-threatening condition" that "can lead to shock and multiple organ failure if not promptly treated." (*Id.* ¶ 53.) According to the webinar, the patient was dosed in early May 2025 and died over the May 24–26, 2025 weekend. (*Id.* ¶ 54.)

## II. SUBJECT MATTER JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act, U.S.C. § 78aa.

## III. LEGAL STANDARD

### A. RULE 12(b)(6)

A district court may grant a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. When considering a motion under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (citation modified). Thus, to survive a motion to dismiss, the complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Bell*

*Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009)). The court may, however, ignore legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed me. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

**B. RULE 9(b)**

Fraud-based claims brought under the Securities Exchange Act ("Exchange Act") are subject to the heightened pleading requirement of both Rule 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u, et seq., ("PSLRA"). *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276–77 (3d Cir. 2006).

Under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see Frederico v. Home Depot*, 507 F.3d 188, 200–02 (3d Cir. 2007) (noting that a court may grant a motion to dismiss a fraud-based claim if the plaintiff fails to plead with the required particularity). Particularity requires sufficient details to put the defendant "on notice of the precise misconduct with which [it is] charged." *Id.* at 201 (alteration in original) (quoting *Lum v. Bank of Am.*, 261 F.3d 217, 223–24 (3d Cir. 2004) (abrogated on other grounds)) (internal quotation marks omitted). At a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual background that would accompany the first paragraph of any newspaper story—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties*, 438 F.3d at 276–77.

The PSLRA, which has an even higher pleading standard than Rule 9(b), is targeted at preventing abusive securities litigation. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("Private securities fraud actions ... if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law."). The PSLRA provides two distinct pleading requirements, both of which must be met for a securities complaint to survive a motion to dismiss. *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). *First*, under 15 U.S.C. § 78u–4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Id.* (quoting *Winer Family Tr.*, 503 F.3d at 326) (internal quotation marks omitted). *Second*, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (quoting 15 U.S.C. § 78u–4(b)(2)) (internal quotation marks omitted).

Both provisions of the PSLRA require facts to be pled with "particularity." *Id.* at 253. This particularity language echoes the requirements of Rule 9(b). *Id.* Indeed, although the PSLRA replaces Rule 9(b) as the pleading standard governing private securities class actions, Rule 9(b)'s particularity requirement "is comparable to and effectively subsumed by" PSLRA § 78u–4(b)(1). *Id.* (discussing the PSLRA's requirement that a plaintiff plead the "who, what, when, where and how: the first paragraph of any newspaper story") (internal quotation marks omitted).

## IV. DISCUSSION

Defendants argue in their Motion that the CAC should be dismissed because: (1) Plaintiffs fail to allege actionable misstatements or omissions of material fact; (2) the challenged statements are forward-looking statements and fall under the "safe harbor" of the PSLRA; (3) there are no

allegations that raise a strong inference of scienter; (4) Plaintiffs fail to adequately lead loss causation; and (5) Plaintiffs' claims under Section 20(a) fails because there is no primary violation under Section 10(b).

**A. VIOLATIONS OF SECTION 10(b) AND RULE 10b-5 (COUNT I)**

Section 10(b) of the Act prohibits the "use or employ[ment], in connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014) (quoting 15 U.S.C. § 78j(b)). SEC Rule 10b-5 "broadly prohibits deception, misrepresentation, and fraud 'in connection with the purchase or sale of any security.'" *Merril Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 78 (2006). Specifically, the Rule prohibits three categories of conduct in the purchase or sale of securities:

> (a) [employing] any device, scheme, or artifice to defraud,
>
> (b) [making] any untrue statement of a material fact or [omitting] a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) [engaging] in any act, practice, or course of business which operations or would operate as a fraud or deceit upon any person . . . .

17 C.F.R. § 240.10b-5(a)–(c).

In a private damages action under Section 10(b) and Rule 10(b)-5, a plaintiff must allege "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh*, 754 F.3d at 168.

Here, Plaintiffs allege that Defendants made false statements or omissions of material fact on six topics: (1) the severe TMA and multi-month hospitalization suffered by the first patient in the Phase 2 Trial; (2) the severe TMA suffered by the fourth patient dosed in the Phase 2 Trial; (3) the decision "to alter the Phase 2 Trial pretreatment regimen and add the C3 inhibitor;" (4) the SAEs suffered by the fifth and sixth Phase 2 Trial patients; (5) "true reasons for the Phase 2 Trial's extended timeline and progress pacing;" and (6) the viability of the Phase 2 Trial's design (CAC ¶ 81.)[2] The first, second, and fourth topics can be discussed together as "misrepresentations or omissions relating to the Phase 2 Trial's SAEs." The third and sixth topics can be discussed together as "misrepresentations or omissions relating to the Phase 2 trial's planning and design." The fifth topic will be discussed on its own.

1. <u>Phase 2 Trial's Severe Adverse Events</u>

*First*, Defendants argue that Plaintiffs have not adequately alleged that the challenged statements are false. A plaintiff need not plead "irrefutable evidence of a statement's falsity at the pleading state; rather, a complaint must contain particularized factual allegations that plausibly allege that a statement was misleading." *City of Warren,* 70 F.4th at 681. Allegations of falsity "must demonstrate that discovery would be reasonably likely to reveal evidence of the falsity of the [alleged] statements." *Id.* at 682. "An opinion statement is misleading if it: (1) was not sincerely believed when made; (2) contains an expressly embedded, untrue factual assertion; or (3) reasonably implies untrue facts and omits appropriate qualifying language." *Id.* at 686. "Interpretations of clinical trial data are considered opinions." *City of Edinburgh*, 754 F.3d at 170.

[2] Plaintiffs intermix regulatory language that invokes Rule 10b-5(a) and (c) which involve conduct. *See* CAC ¶ 140 (alleging that Defendants engaged in an "unlawful scheme, plan and course of conduct" that "operated as a fraud and deceit upon Lead Plaintiffs and the other Class members.") The substantive allegations of the CAC concern statements made by the Defendants. To the extent that Plaintiffs wish to assert these claims, they must seek leave to amend to allege specific conduct of Defendants that violate Rule 10b-5(a) or (c).

*Second*, Defendants argue that Plaintiffs have not adequately alleged that the challenged statements are material. "Material information is information that would be important to a reasonable investor in making his or her investment decision." *Roofer's Pension Fund v. Papa*, 687 F.Supp.3d 604, 617 (D.N.J. 2023) (quoting *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000)) (internal quotations omitted); *see Basic Inc. v. Levinson*, 485 U.S. 224, 231-232 (1998) ("There must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.") (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "Section 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information." *City of Edinburgh*, 754 F.3d at 174 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44–45 (2011)). "[W]hen considering whether an alleged misstatement is material, [courts] pay particular attention to whether or not [d]efendants sufficiently disclosed facts and information that would render the alleged misrepresentations not misleading." *Fan v. StoneMor Partners LP*, 927 F.3d 710, 715 (3d Cir. 2019). In the context of pharmaceuticals, "[a]pplication of *Basic*'s 'total mix' standard does not mean that pharmaceutical manufacturers must disclose all reports of adverse events." *Matrixx*, 563 U.S. at 43. "A company's failure to accurately disclose clinical trial data may be actionable under the securities laws" when there are "plausible allegations of affirmative false statements about a drug's efficacy and safety. *See City of Edinburgh*, 754 F.3d at 170.

Plaintiffs have not pled actionable misstatements or omissions regarding the SAEs suffered by patients during the Phase 2 trial. Plaintiffs contend that certain statements by Defendants are false or misleading because "they expressly referenced the first two patients, their 'run-in' pretreatment, and their 'follow-up period . . .'" and concealed that SAEs "had been plaguing the

Phase 2 Trial." (CAC ¶ 81.) For example, Plaintiffs claim that Defendant Shah made an actionable omission when, speaking at a conference in September 2024, he disclosed that the Phase 2 trial had "a two-patient run-in . . . and the patients had to be staggered too. And then after the second patient, there's another follow-up period. And then you talk to the FDA again." (*Id.* ¶ 65.) Similar alleged omissions include a press release published by Defendant Rocket on September 17, 2024 that read, "[t]he pediatric run-in enrolled two patients in a sequential manner with a minimum three-month follow-up prior to subsequent enrollment," *Id.* ¶ 66, and Defendant Shah's appearance at UBS Global Healthcare Conference when he stated that the Trial's first "two patients were treated earlier, followed for a certain time, discussed with FDA and IDMC, and then we started the broader trial really from July to September." (*Id.* ¶ 68.)

To be clear, Plaintiffs allege no misrepresentations. They do not allege that Defendants asserted that no patients experienced setbacks during the Phase 2 Trial. The risk of SAEs occurring during the Phase 2 Trial would have been apparent to any investor prior to the class period because Rocket disclosed the risk through its public securities filings. For example, Rocket's February 27, 2024 Form 10-K, which immediately precedes the proposed class period, stated that the Phase 2 Trial was designed "to mitigate complement-mediated safety concerns observed in" patients from the Phase 1 Trail. (*See id.* ¶ 62.) Defendants' securities filings disclosed the risks of clinical trials including that "[a] clinical trial may be delayed or halted at any stage of testing for . . . patients experiencing unexpected side effects or other safety concerns being raised." (*See* Motioning Br. Ex. B at 38.) Additionally, Rocket explained that it would not provide the same level of interim updates as it did in the Phase 1 trial in May 2024. (CAC ¶ 64.) According to the allegations in the CAC, Rocket (through its Chief Medical and Gene Therapy Officer) told investors at the Bank of America Health Care Conference 2024 that "[w]e have avoided precise guidance as we're really

more focused on enrollment, treatment and execution with the goal of also preserving data integrity, not providing a whole bunch of interim looks at efficacy as we did in Phase 1." (*Id.*) Rocket added that investors could "anticipate some updates regarding the study status [in 2024] and [Rocket will] provide more granularity on that later in the year." (*Id.*) In November 2024, at the UBS Global Healthcare Conference, Defendant Shah shared that the Phase 2 trial was "fully enrolled, we're in the process of dosing . . . . We haven't given exact guidance on when the readout is. But we'll start seeing some incremental data internally, certainly in 2025." (*Id.* ¶ 68.)

Plaintiffs argue that "having chosen to speak, Defendants had a duty to disclose information — the TMA-related SAEs and their impacts — needed to make the statements made, under the circumstances, not misleading." (Opp'n Br. at 23.) The Court disagrees. When the alleged omissions are viewed within the context that they were made, they are neither false nor misleading. For example, Defendant Shah's comments at the Morgan Stanley Global Healthcare Conference, alleged by Plaintiffs to be "particularly false or misleading" were made in response to the question "[R]emind us when you started enrolling patients. And then the pivotal study and just maybe how that's been going?" (CAC ¶¶ 65, 81(a).) Defendant Shah's response explained the timeline of enrolling patients in the study, including the two-patient run-in and discussions with the FDA. (*Id.*) The only portion of the study that Defendant Shah praised was the enrollment. (*Id.* ¶ 65 ("But the enrollment is going on pretty well at this point.")) Additionally, omitting that the run-in patients had suffered SAEs did not render these statements misleading because prior filings by Defendants already disclosed that Rocket had "complement-mediated safety concerns." (*See id.* ¶ 62.) Defendants had no further duty to disclose that the run-in patients suffered from TMAs or any other SAE as these statements do not imply that the Phase 2 Trial had not experienced any difficulties.

The other statements that Plaintiffs allege are "particularly false or misleading" without the disclosure of the SAEs that affected several of the first patients dosed in the Phase 2 Trial are the 9/17/2024 Press Release and the 11/12/2024 UBS Conference Shah Comments. These statements did not require additional disclosures by Defendants either. The 9/17/2024 Press Release merely explained the structure of the Phase 2 Trial and did not endeavor to announce A501's efficacy or safety. (*Id.* ¶ 66 ("On September 17, 2024, Rocket published the 9/17/2024 Press Release on its corporate website announcing completion of enrollment for the Phase 2 Trial.")) Nothing about the completion of patient enrollment is made misleading by nondisclosure of run-in patients suffering SAEs. Insofar as Defendant Shah's comments at the 11/12/2024 UBS Conference relate to the run-in patients, they are not misleading for similar reasons. (*Id.* ¶ 68.) At the same conference, Defendant Shah explained that Rocket would "wait for the final disclosure until the whole data set is done because it is a pivotal trial design, and just to respect the confidentiality of the FDA dialogues there." (*Id.*) Once again, Defendant Shah's mention of the run-in patients was in response to a question regarding Rocket's enrollment timeline and whether patients had been dosed. Specifically, Defendant Shah was asked "when do you dose the first patient? Have you talked about that?" (*Id.* ¶ 68.) In this context, Defendant's statement was truthful and no additional disclosure was needed to clarify its meaning. Since Defendants had no duty to disclose the SAEs suffered by the first two patients dosed and none of the statements alleged by Plaintiffs are misleading without that disclosure, the Court finds that Plaintiffs have not sufficiently pled that a securities fraud cause of action with respect to this category of alleged misstatement. These claims must therefore be **DISMISSED WITH PREJUDICE**.

2. <u>Phase 2 Trial's Planning and Design</u>

Plaintiffs allege that Defendants concealed (1) their decision "to alter the Phase 2 Trial pretreatment regimen and add the C3 inhibitor," and (2) that they "lacked a viable approach that could simultaneously address the SAE issues that arose during the Phase 1 Trial, dose A501 at levels sufficient to conduct adequate Phase 2 clinical testing, and ensure the safety of Phase 2 Trial participants." (*Id.* ¶ 81.)

According to Plaintiffs, the decision to implement the C3 inhibitor in the pretreatment regimen "demonstrated that the TMA issues that had arisen during the Phase 1 trial and that had . . . worsened in the Phase 2 Trial were not addressable by the original Phase 2 Trial structure . . . ." (*Id.*) Plaintiffs allege that Defendant Shah's statements at the January 13, 2025 J.P. Morgan Healthcare Conference ("JP Morgan Conference") and April 8, 2025 Needham Conference ("Needham Conference") were materially false or misleading because Defendants did not disclose that they were adding the C3 inhibitor into the pretreatment regimen. (*Id.*) Additionally, Plaintiffs allege that several securities filings between February and April 2025 were materially false or misleading for the same reasons. (*Id.*)

At the JP Morgan Conference, Defendant Shah reiterated that "[l]ow dose is the one that we are moving forward into the Phase 2 pivotal study . . . . [Y]ou can see, again, a profound decrease over time versus what would happen untreated and even versus other agents that are out there on the market." (*Id.* ¶ 72.) He added that Rocket was "[a]gain, drawing from Phase 1, if we see even a partial response of Phase 1, this could be a positive trial." (*Id.*) Plaintiffs do not specifically allege *why* Defendant Shah's remarks at the JP Morgan Conference are misleading without the disclosure of the Phase 2 Trial alterations. Insofar as these statements relate to the design and planning of the Phase 2 Trial, they are not misleading with additional disclosures.

Plaintiffs concede that Defendants were consistently reiterating that dosing could only occur after certain prerequisites were fulfilled. (*See id.* ¶¶ 65, 66, 68–70.) According to Plaintiffs, in December 2024, Defendant Shah explained that "[a]fter enrollment, patients still have to undergo screening of other labs like troponin mandated by the FDA because it is a key secondary endpoint. And also, this is . . . in some ways, a heavy protocol. We're looking at a lot of different measures." (*Id.* ¶ 70.) Given the complexity of Phase II Trial's pretreatment regimen and the disclosures by Defendants regarding the "heavy protocol," failure to disclose its amendment through the addition of a C3 inhibitor did not render any of the alleged misstatements misleading.

Similarly, Defendant Shah's remarks at the Needham Conference did not require the disclosure of the C3 inhibitor addition to the Phase 2 Trial. At the Needham Conference, Defendant Shah answered a question about the "live time between enrollment and dosing" and was asked to provide updates on the Phase 2 Trial. (*Id.* ¶ 74.) Defendant Shah stated that "the enrollment to treatment time is, unfortunately, a little bit cumbersome. And it's very specific to the trial." (*Id.*) He explained "there's several reasons . . . Number one, these patients require immunomodulation. So, that takes time to set up and source appropriately." (*Id.*) Defendant Shah's answer explains that the "set up and sourc[ing]" of "immunomodulation" is a cause of the delay in the Phase 2 Trial. (*Id.*) Nor did Defendants have a "duty to disclose interim, non-final discussions with the FDA." *Paxton v. Provention Bio, Inc.*, Civ. No. 21-11613, at *13 (D.N.J. Aug. 4, 2022). Insofar as Defendants were forthcoming with investors about the multiple components of the pretreatment regimen, they were under no duty to inform investors about their specific choices or amendments to the protocol. (*See* Motioning Br. Ex. B at 40 ("In addition to side effects caused by the product candidate, the administration process or related procedures

associated with a given product candidate also can cause adverse side effects. If any such adverse events occur, our clinical trials could be suspended or terminated.”))

Plaintiffs’ claim that they were misled by Defendants’ failure to disclose that they “lacked a viable approach” for the design of the Phase 2 Trial generally does not far any better. (*See* CAC ¶ 81.) Since before the proposed class period, Defendants disclosed that “success in early clinical studies may not be indicative of results obtained in later studies.” (*See* Motioning Br. Ex. B at 39.) As recognized by Plaintiffs, “Rocket is a pre-revenue, clinical-stage, multi-platform biotechnology company.” (CAC ¶ 31.) Rocket disclosed that its “experience with clinical trials [is] limited” and that they “may fail to demonstrate safety and efficacy to the satisfaction of applicable regulatory authorities.” (*See* Motioning Br. Ex. B at 38.) A reasonable investor in companies specializing in “new approach[es]” for treating “rare . . . diseases” understands that there is an inherent risk in the investment that further testing of the novel treatment might destroy its commercial viability. *See In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 570 (E.D. Pa. 2009) (noting risk associated with investing in a start-up pharmaceutical company); *see also Cozzarelli v. Inspire Pharma. Inc.*, 549 F.3d 618 (4th Cir. 2008) (“All investments carry risk, particularly in a field like biopharmaceuticals.”) While Plaintiffs allege that Defendants “touted aspects of the Phase 2 Trial’s design,” (CAC ¶ 81,) the referenced statements are only commenting generally on the stages of the Phase 2 Trial. Insofar as there are any normative statements made about the Trial’s design, “such references are too vague to ascertain anything on which a reasonable investor might rely.” *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 284 (3d Cir. 2010).

For these reasons, these claims will be **DISMISSED WITH PREJUDICE**.

3. Phase 2 Trial's Delays and Dosing

While Plaintiffs allege material misstatements regarding the Phase 2 Trial's delays and dosing with sufficient specificity, for the reasons set forth below the Court finds that CAC's allegations do not support the requisite strong inference of scienter.

a) Material Misstatements

Plaintiffs allege that Defendants affirmatively misrepresented Phase 2 Trial's progress and the reasons for delays. (CAC ¶ 81.) Among other statements, Plaintiffs specifically point to an exchange between a securities analyst and Rocket's Chief Medical & Gene Therapy Officer Jonathan Schwartz regarding interim data from the trial in May 2024. (*Id.* ¶ 64.) When asked about the timing for interim results, Schwartz's answer included that "the study is active and enrolling as anticipated, very much on track." (*Id.*) In several subsequent public filings, Rocket announced that "dosing in the Phase 2 pivotal study is going." (*Id.* ¶ 67.) In November 2024, Defendant Shah spoke at several conferences and claimed that Rocket was "in the process of dosing, and we are dosing patients" and that Rocket was "dosing patients as rapidly as possible." (*Id.* ¶¶ 68–70.) In early 2025, Defendants continued to tell the public that "[w]e're finishing dosing as fast as possible," and that "[d]osing in the Phase 2 pivotal study . . . is ongoing." (*Id.* ¶¶ 72–77.) Plaintiffs allege that these statements are misleading because "the Phase 2 Trial had experienced significant delays, dosing halts, and timeline extensions." (*Id.* ¶ 81.)

The Court finds that Plaintiffs have sufficiently pled falsity with respect to the statements by Defendants, "which said that the trial was 'on track' with dosing 'ongoing' and similar language." These statements are not merely opinions or interpretations of clinical trial data but are verifiable assertions of then-present facts. The plain meaning of Defendants' statements regarding the Phase 2 Trial's progress is contradicted by Plaintiffs' allegations that Defendants

"had stopped dosing [and] delay[ed] the trial for months." (*Id.* ¶¶ 52, 58.) Defendant Shah later admitted that "we would have treated all the patients who were lined up for infusion . . . over the course of 2 or 3 months. The only issue is that because of this TMA risk, we had to pause the trial . . . [and it] took another 6 months to get the trial started." (*Id.* ¶ 55.)

Further, Plaintiffs allege that Rocket had paused dosing to obtain approval for adding the C3 inhibitor from the FDA. (*See id.* ¶¶ 55, 59.) According to the CAC Defendants' timeline for disclosing results from the trial evolved through the proposed class period. (*Compare id.* ¶ 64 ("I think you can anticipate some updates regarding the study status this year [2024], and we'll provide more granularity on that later in the year.") *with id.* ¶ 68 ("[W]e'll start seeing some incremental data internally, certainly in 2025.") *and id.* ¶ 74 ("And we continue to anticipate an efficacy readout in the first half of 2026. I just want to make sure we're in 2025 now. So, 2026 is next year, correct.")). According to the CAC, Rocket did not dose any Phase 2 Trial patients from August 2024 to May 2025. (*Id.* ¶ 101.) Taken together, the shifting timeline for results, the alleged TMAs suffered by patients, and Defendants' later admissions are sufficient to allege that Defendants' statements regarding the timing of dosing in the A501 Phase 2 Trial were false.

b) <u>Scienter</u>

To successfully plead a securities fraud claim, plaintiffs must "allege facts giving rise to a strong inference of either reckless or conscious behavior," or scienter. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534–35 (3d Cir. 1999) (quoting *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 318 n.8 (3d Cir. 1997)). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Matrixx*, 563 U.S. at 48 (quoting *Tellabs*, 551 U.S. at 319). "[I]t is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false." *GSC Partners CDO Fund v.*

*Washington*, 368 F.3d 228, 239 (3d Cir. 2004). "[I]n conducting the scienter analysis, courts must analyze the complaint holistically to determine whether its allegations, taken collectively, give rise to a strong inference of scienter . . . ." *In re Hertz Glob. Holdings, Inc.*, 905 F.3d 106, 114 (3d Cir. 2018) (quoting *Tellabs*, 551 U.S. at 323).

Confidential witnesses ("CWs") must be "described sufficiently to support the probability that the source possesses the information alleged." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004). When assessing allegations from confidential witnesses, courts evaluate the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Avaya*, 564 F.3d at 263 (quoting *Chubb*, 394 F.3d at 147). "If anonymous source allegations are found wanting with respect to these criteria, then we must discount them steeply." *Id.* "Generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of [the PSLRA.]" *Chubb*, 394 F.3d at 155.

Plaintiffs allege that a strong inference of scienter is supported by (1) the Defendants' financial motivations, (2) mandatory SAE reporting pursuant to federal regulations, (3) the "core aspect of the Danon Disease program to Rocket's survival," (4) Defendants' certification of the alleged misstatements, (5) alleged violations of Rocket's "Code of Business Conduct and Ethics," and (6) "suspicious employment status changes." (*Id.* ¶¶ 95–118.) For the following reasons, the Court finds that Plaintiffs fail to plausibly plead that Defendants' knowingly or recklessly made the misstatements with an intent to deceive.

Plaintiffs' attempts to plead scienter through documentary proof are insufficient. "Motive must be supported by facts stated with particularity . . . ." *GSC Partners*, 368 F.3d at 237 (internal

quotations omitted). Plaintiffs argue that stock sales by Defendants Shah and Ondrey evidence their financial motivation to commit fraud. (CAC ¶ 95.) Similarly, Plaintiffs allege that Rocket was "highly motivated" to complete a public offering and private placement to raise funds. (*Id.* ¶ 96.) However, without additional factual allegations, the assertion of financial motivations alone fail to establish a strong inference of scienter because "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud." *GSC Partners*, 368 F.3d at 237 (alterations in original) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)).

Plaintiffs allege that Defendants knew or should have known of the "total cessation of dosing in the Phase 2 Trial from August 2024 to May 2025." (CAC ¶ 101.) According to Plaintiffs, an "FDA-required investigator was obligated to immediately report to Rocket . . . any serious adverse event" that occurred during the Phase 2 Trial. (*Id.* ¶ 98.) Plaintiffs do not allege that the investigator would have reported the SAE directly to Defendants Shah and Ondrey. Instead, Plaintiffs argue that Defendants Shah and Ondrey, "by virtue of their positions . . . were likely to be in receipt of information reflect[ing] the true facts regarding Rocket." (*Id.* ¶ 105.) According to Plaintiffs, "it is inconceivable that [Defendants Shah and Ondrey] did not know the facts and circumstances" of the delays in dosing. (*Id.* ¶ 106.) However, "[m]ere allegations of [defendants'] knowledge of the business and without more, is insufficient to infer scienter." *Turnofsky v. electroCore, Inc.*, Civ. No. 19-18400, 2023 WL 4527553 at *14 (D.N.J. July 13, 2023). In support of these arguments, Plaintiffs rely on claims made by confidential witnesses.

According to Plaintiffs' confidential witnesses: (1) Defendants allegedly consulted with the FDA for approval to change the pretreatment regimen during the Trial, (2) Rocket's executive leadership was "heavily involved" in conversations with the FDA regarding regulatory approvals,

and (3) Rocket employees at headquarters routinely shared information regarding the company's activities. (*Id.* ¶¶ 52, 59, 60.) However, the details and sources of the confidential witnesses' knowledge are vaguely pled. For example, "CW1 was told by co-workers with direct knowledge" that a patient suffered a TMA "in late 2023 or more likely early 2024." (*Id.* ¶ 58.) The CAC alleges that CW1 "vaguely recalled" and "thinks" that another patient "experienced an overdose of a preconditioning drug," which resulted in acute kidney damage. (*Id.*) CW2 and CW3 face similar obstacles. According to the CAC, CW2's knowledge comes from "informal conversations with co-workers . . . ." (*Id.* ¶ 59.) Likewise, CW3's knowledge is from unspecified coworkers and lunch conversations. (*Id.* ¶ 60.) None of the confidential witnesses' titles are alleged. The lack of specificity is "significant because we are left to speculate whether the anonymous sources obtained the information they purport to possess by firsthand knowledge or rumor." *Chubb*, 394 F.3d at 148. With such specificity missing, the Court must discount these allegations as support for the inference of scienter, and as a result, Plaintiffs fail to sufficiently plead this element.

The remaining evidence Plaintiffs use for establishing a strong inference of scienter is minimally persuasive without additional facts supporting the conclusions Plaintiffs attach to them. Generally, "a plaintiff's allegations based on defendants' erroneous SOX certification cannot establish the requisite strong inference of scienter unless the complaint asserts facts indicating that, at the time of the certification, defendants knew . . . the information that was rendering their SOX certification erroneous." *In re Intelligroup Sec. Litig.*, 527 F.Supp.2d 262, 355 (D.N.J. 2007). The list of resignations that are asserted as "suspicious" with no explanation of why or how are "bare allegations [that] cannot operate even as a meaningful piece of additional evidence . . . for the purposes of this Court's overall assessment of scienter-related evidence." (*See id.* at 347–48; *see also* CAC ¶¶ 109–114.) Finally, the alleged violations of Rocket's "Code of Business Conduct

and Ethics" do not meaningfully support a strong inference of scienter. (*Id.* ¶¶ 115–18.) If violations of a code of conduct could serve as evidence of scienter, the scienter requirement would disappear because "corporations are effectively required to adopt a code of conduct under SEC regulations and NASDAQ rules." *In re Cognizant Tech. Solutions Corp. Sec. Litig.*, Civ. No. 16-6509, 2018 WL 3772675 at *18 ("Given the near-universal adoption of codes of conduct, and the breadth [of] their proscriptions, allowing securities plaintiffs a cause of action every time a code of conduct is violated would 'turn all corporate wrongdoing into securities fraud.'") (quoting *Retail Wholesale & Dept. Store Union v. Hewlett-Packard Co.*, 845 F.3d 1268 (9th Cir. 2017)). For these reasons, the Court finds that, when the CAC is viewed holistically, Plaintiffs have not alleged facts sufficient for raising a strong inference of scienter.

c) Reliance

Plaintiffs have sufficiently pled reliance. According to Plaintiffs, "the market for Rocket shares was an efficient market" with liquidity and the ability to reflect the publicly disseminated information about Rocket into the price of its securities. (*Id.* ¶ 128.) "An investor who buys or sells stock at the price set by the market does so in reliance of the integrity of that price." *Basic*, 485 U.S. at 247. While *Basic*'s presumption of reliance can be rebutted, Defendants do not challenge its application in this case.

d) Causation

Plaintiffs have also sufficiently pled loss causation. In a § 10b securities fraud claim, "investors must plead that the very misrepresentation at issue proximately caused them an economic loss." *In re Intelligroup Sec. Litig.*, 527 F.Supp.2d at 295 . "[A] securities plaintiff need not plead facts indicating that disclosure of the alleged fraud was the sole reason for the investment's decline in value." *Id.* (quoting *In re Dauo Sys. Inc.*, 411 F.3d 1006, 1025 (9th Cir.

2005) (internal citations and quotations omitted). "[T]he complaint must contain facts sufficient to indicate that disclosure of the alleged fraud . . . at the very least, substantially contributed to the damages sustained by the plaintiff." *Id.* (alterations omitted). Defendants argue that "[t]he alleged price decline on May 27, 2025 followed Rocket's immediate disclosure of the death of a patient . . . ." (Moving Br. at 39.) The analyst reports referenced in the CAC make clear that the development timeline of A501 was important. (CAC ¶ 85, 87) ("The report also said 'we think the ongoing clinical hold and patient death will likely call into question the therapy's risk-benefit profile among investors.'") ("It also said, "How long will it take to address these concerns? Another important unknown — perhaps the most significant at this point.") It is possible that the May 27, 2025 price drop was driven, at least in part, by the news of a patient's death. But Plaintiffs have alleged facts that plausibly allege investors also had other considerations in mind, including the timing of A501's development. For this reason, Plaintiffs have sufficiently pled that Defendants' misstatements regarding the progress of dosing in the Phase 2 Trial caused their injury.

For the foregoing reasons, the Court will **DISMISS WITHOUT PREJUDICE** Plaintiffs' claims based on Phase 2 Trial delays and dosing.

**B. VIOLATIONS OF § 20(a) OF THE EXCHANGE ACT (COUNT II)**

Plaintiffs also allege violations of Section 20(a) of the Securities Exchange Act against Defendants Shah and Ondrey. (CAC ¶¶ 148–153.) Section 20(a) makes "controlling persons" liable for violations of the Exchange Act committed by people and entities under their control. *See* 15 U.S.C. § 78t(a). "[C]laims under Section 20(a) are derivative, requiring proof of a separate underlying violation of the Exchange Act." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 541 (3d Cir. 1999). "[I]n order for secondary liability to attach under § 20(a), the defendant must have been

a culpable participant in the acts or acts constituting the violation or cause of action." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484–85 (3d Cir. 2013) (quoting *SEC v. J.W. Barclay & Co.*, 442 F.3d 834, 841 n. 8 (3d Cir. 2006)) (internal quotations omitted). Plaintiffs have not yet plausibly alleged a violation of Section 10(b) of the Exchange Act and Rule 10b-5 by Defendants. As a result, Plaintiffs' Section 20(a) claim will also be **DISMISSED.**

## V. <u>CONCLUSION</u>

For the reasons stated above, the Court will **GRANT** Defendants' Motion to Dismiss.

The Court will **DISMISS WITH PREJUDICE** the following portions of Plaintiffs' Count I: 1) Plaintiffs' claims based on alleged misstatements regarding the SAEs suffered by patients in the Phase 2 Trial; and 2) Plaintiffs' claims based on the planning and design of the Phase 2 Trial. (*See* CAC ¶ 81(a)–(d), (f).)

The Court will **DISMISS WITHOUT PREJUDICE** the remaining portion of Plaintiffs' Count I: claims based on alleged misstatements on "the halts, disruptions, and delays in dosing patients." (*See* CAC ¶ 81(e).)

The Court will also **DISMISS WITHOUT PREJUDICE** Count II.

The Court will **GRANT** Plaintiffs leave to file a Second Amended Consolidated Complaint, limited to remedying the defects identified herein, within 30 days. Failure to remedy the defects by that date may result in this matter being dismissed with prejudice. An appropriate Order will follow.

Date: October 28, 2026

s/ Zahid N. Quraishi

**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**